## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

UNITED STATES OF AMERICA, EX REL.
MARK J. O'CONNOR and SARA F.
LEIBMAN,

                  Plaintiffs,

      v.

UNITED STATES CELLULAR
CORPORATION, USCC WIRELESS
INVESTMENT, INC., TELEPHONE AND
DATA SYSTEMS, INC., KING STREET
WIRELESS, L.P., KING STREET
WIRELESS, INC., and ALLISON CRYOR
DINARDO,

                  Defendants.

Case No. 20-CV-2071-TSC

**ORAL ARGUMENT REQUESTED**

## MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF MOTION TO DISMISS OF DEFENDANTS KING STREET WIRELESS, L.P., KING STREET WIRELESS, INC., AND ALLISON CRYOR DINARDO

# TABLE OF CONTENTS

Page

I.   INTRODUCTION ................................................................................................ 1

II.  BACKGROUND AND SUMMARY OF ALLEGATIONS .................................... 3

    A.   FCC Spectrum Auctions and the Designated Entity Program ...................... 3

    B.   The King Street Defendants ........................................................................ 6

    C.   Relators' Allegations .................................................................................. 7

III. ARGUMENT ...................................................................................................... 8

    A.   Relators' Claims Are Precluded by the FCA's Public Disclosure Bar ........... 8

         1.   Legal Standards .................................................................................. 8

         2.   The Prior *Qui Tam* Lawsuit Publicly Disclosed the Basis for Relators'
             Claims .............................................................................................. 10

         3.   Public FCC Filings Included All the Key Documents and Material
             Information on Which Relators Base Their Claims .............................. 13

         4.   SEC Filings Independently Disclosed the Basis for Relators' Claims ................ 21

         5.   News Media Reports on the Relationship Between King Street and U.S.
             Cellular Preclude Relators' Claims ..................................................... 23

         6.   Relators Are Not "Original Sources" of Publicly Disclosed Information ........... 25

    B.   Relators Do Not Plead the Elements of the FCA ........................................ 29

         1.   Relators' Allegations Fail the FCA's Rigorous Materiality Standard ................. 29

         2.   Relators' Allegations Make Clear that Defendants Cannot Have Acted
             with FCA Scienter ............................................................................. 34

         3.   Relators Cannot Satisfy the FCA's Falsity Standard ............................ 37

    C.   Relators' Conspiracy and Reverse False Claims Counts Fail Because There Is
        No Underlying FCA Violation .................................................................. 39

    D.   The SAC Should Be Dismissed with Prejudice .......................................... 40

IV. CONCLUSION ................................................................................................. 41

# TABLE OF AUTHORITIES

Page(s)

## Cases

*Adarand Constructors, Inc. v. Pena*,
515 U.S. 200 (1995)..................................................................................................4

*Ashcroft v. Iqbal*,
556 U.S. 662 (2009)................................................................................................26

*Cimino v. Int'l Bus. Machs. Corp.*,
2019 WL 4750259 (D.D.C. Sept. 30, 2019) ....................................................31, 32

*Connecticut v. United States Dep't of the Interior*,
344 F. Supp. 3d 279 (D.D.C. 2018) ........................................................................14

*Corp. Sys. Res. v. Wash. Metro. Area Transit Auth.*,
31 F. Supp. 3d 124 (D.D.C. 2014) ..........................................................................40

*Does I through III v. Dist. of Columbia*,
238 F. Supp. 2d 212 (D.D.C. 2002) ....................................................................6, 11

*Gonzalez v. Planned Parenthood of L.A.*,
759 F.3d 1112 (9th Cir. 2014) ................................................................................37

*Hagood v. Sonoma Cty. Water Agency*,
81 F.3d 1465 (9th Cir. 1996) ............................................................................14, 37

*In re Interbank Funding Corp. Sec. Litig.*,
629 F.3d 213 (D.C. Cir. 2010) ................................................................................40

*Kowal v. MCI Commc'ns Corp.*,
16 F.3d 1271 (D.C. Cir. 1994) ................................................................................40

*Omnipoint Corp. v. FCC*,
78 F.3d 620 (D.C. Cir. 1996) ....................................................................................4

*Safeco Ins. Co. of Am. v. Burr*,
551 U.S. 47 (2007)..................................................................................................34

*Satellite Broad. Co. v. FCC*,
824 F.2d 1 (D.C. Cir. 1987)....................................................................................35

*\*Schindler Elevator Corp. v. United States ex rel. Kirk*,
563 U.S. 401 (2011)................................................................................................15

**TABLE OF AUTHORITIES** *(continued)*

Page(s)

*Slovinec v. Georgetown Univ.,*
    268 F. Supp. 3d 55 (D.D.C. 2017), *aff'd,*
    No. 17-7122, 2018 WL 1052650 (D.C. Cir. Jan. 26, 2018) ....................................................14

*Tel. & Data Sys., Inc. v. Fed. Commc'ns Comm'n,*
    19 F.3d 42 (D.C. Cir. 1994)........................................................................................36, 39

*Trinity Broad. of Fla., Inc. v. FCC,*
    211 F.3d 618 (D.C. Cir. 2000)..........................................................................................38

*United States ex rel. Bettis v. Odebrecht Contractors of Cal.,*
    297 F. Supp. 2d 272 (D.D.C. 2004) ................................................................................38, 39

*United States ex rel. Burke v. Record Press, Inc.,*
    816 F.3d 878 (D.C. Cir. 2016)..........................................................................................36

*United States ex rel. Conteh v. IKON Office Sols., Inc.,*
    103 F. Supp. 3d 59 (D.D.C. 2015) .....................................................................................39

*\*United States ex rel. Doe v. Staples, Inc.,*
    773 F.3d 83 (D.C. Cir. 2014)..........................................................................9, 22, 27, 28, 29

*United States ex rel. Findley v. FPC-Boron Emps.' Club,*
    105 F.3d 675 (D.C. Cir. 1997),
    *abrogated in part on other grounds by*
    *Rockwell Int'l Corp. v. United States*, 549 U.S. 457 (2007).......................................................13

*United States ex rel. Gardner v. Vanda Pharm., Inc.,*
    No. 17-cv-464, 2020 WL 2542121 (D.D.C. May 19, 2020).......................................................29

*United States ex rel. Godfrey v. KBR, Inc.,*
    360 F. App'x 407 (4th Cir. 2010) ......................................................................................39

*United States ex rel. Green v. Serv. Contract Educ. & Training Tr. Fund,*
    843 F. Supp. 2d 20 (D.D.C. 2012).................................................................................24, 28

*United States ex rel. Harper v. Muskingum Watershed Conserv. Dist.,*
    842 F.3d 430 (6th Cir. 2016) ...........................................................................................37

*United States ex rel. Hawkins v. ManTech Int'l Corp.,*
    No. CV 15-2105, 2020 WL 435490 (D.D.C. Jan. 28, 2020) .....................................................10

*United States ex rel. Hockett v. Columbia/HCA Healthcare Corp.,*
    498 F. Supp. 2d 25 (D.D.C. 2007) ...............................................................................8, 9, 26

**TABLE OF AUTHORITIES** *(continued)*

Page(s)

*United States ex rel. Holloway v. Heartland Hospice, Inc.*,
  960 F.3d 836 (6th Cir. 2020) ....................................................... 11

*United States ex rel. Hutchins v. DynCorp Int'l, Inc.*,
  342 F. Supp. 3d 32 (D.D.C. 2018) .............................................. 32

*United States ex rel. J. Cooper & Assocs., Inc. v. Bernard Hodes Grp., Inc.*,
  422 F. Supp. 2d 225 (D.D.C. 2006) .............................................. 8

*United States ex rel. Janssen v. Lawrence Mem'l Hosp.*,
  949 F.3d 533 (10th Cir. 2020) ............................................. 31, 40

*United States ex rel. Jones v. Collegiate Funding Servs.*,
  469 F. App'x 244 (4th Cir. 2012) ........................................ 15, 22

*United States ex rel. K & R Ltd. P'ship v. Mass. Housing Fin. Agency*,
  530 F.3d 980 (D.C. Cir. 2008) ..................................................... 35

*United States ex rel. Kasowitz Benson Torres LLP v. BASF Corp.*,
  285 F. Supp. 3d 44 (D.D.C. 2017) .............................................. 37

*United States ex rel. Kasowitz Benson Torres LLP v. BASF Corp.*,
  929 F.3d 721 (D.C. Cir. 2019) ............................................. 39, 40

*United States ex rel. Lamers v. City of Green Bay*,
  168 F.3d 1013 (7th Cir. 1999) ..................................................... 37

*United States ex rel. McBride v. Halliburton Co.*,
  No. 1:05-cv-828, 2014 WL 12691854 (D.D.C. Dec. 10, 2014) ............ 37

*\*United States ex rel. McBride v. Halliburton Co.*,
  848 F.3d 1027 (D.C. Cir. 2017) ................................................... 31

*United States ex rel. Morton v. A Plus Benefits, Inc.*,
  139 F. App'x 980 (10th Cir. 2005) .............................................. 37

*United States ex rel. Oliver v. Philip Morris USA Inc. ("Oliver I")*,
  763 F.3d 36 (D.C. Cir. 2014) ....................................................... 10

*\*United States ex rel. Oliver v. Philip Morris USA Inc. ("Oliver II")*,
  826 F.3d 466 (D.C. Cir. 2016) .......................... 9, 13, 14, 15, 21, 27, 28

*United States ex rel. PCA Integrity Assocs., LLP v. NCO Fin. Sys., Inc.*,
  CV No. 15-750, 2020 WL 686009 (D.D.C. Feb. 11, 2020) ................. 39

**TABLE OF AUTHORITIES** *(continued)*

Page(s)

*United States ex rel. Porter v. Magnolia Health Plan, Inc.*,
  810 F. App'x 237 (5th Cir. 2020) ............................................41

*\*United States ex rel. Purcell v. MWI Corp.*,
  807 F.3d 281 (D.C. Cir. 2015) ...................................2, 34, 35

*United States ex rel. Ryan v. Endo Pharm., Inc.*,
  27 F. Supp. 3d 615 (E.D. Pa. 2014), *aff'd sub nom.*
  *United States ex rel. Dhillon v. Endo Pharm.*,
  617 F. App'x. 208 (3d Cir. 2015) ....................................15, 22

*United States ex rel. Settlemire v. Dist. of Columbia*,
  198 F.3d 913 (D.C. Cir. 1999) ....................................8, 13, 21

*United States ex rel. Shea v. Cellco P'ship*,
  863 F.3d 923 (D.C. Cir. 2017) ............................................24

*United States ex rel. Shea v. Verizon Commc'ns, Inc.*,
  160 F. Supp. 3d 16 (D.D.C. 2015), *aff'd sub nom.*
  *United States ex rel. Shea v. Cellco P'ship*,
  863 F.3d 923 (D.C. Cir. 2017) ............................................10

*\*United States ex rel. Siewick v. Jamieson Sci. & Eng'g, Inc.*,
  214 F.3d 1372 (D.C. Cir. 2000) ............................................38

*United States ex rel. Spay v. CVS Caremark Corp.*,
  875 F.3d 746 (3d Cir. 2017) ............................................37

*\*United States ex rel. Springfield Terminal Ry. Co. v. Quinn*,
  14 F.3d 645 (D.C. Cir. 1994) ........................9, 11, 14, 28, 29

*United States ex rel. Williams v. Martin Baker Aircraft Co.*,
  389 F.3d 1251 (D.C. Cir. 2004) ............................................29

*United States ex rel. Wilson v. Kellogg Brown & Root, Inc.*,
  525 F.3d 370 (4th Cir. 2008) ............................................37

*United States ex rel. Yannacopoulos v. Gen. Dynamics*,
  652 F.3d 818 (7th Cir. 2011) ............................................37

*United States v. AseraCare, Inc.*,
  938 F.3d 1278 (11th Cir. 2019) ............................................37

**TABLE OF AUTHORITIES** *(continued)*

Page(s)

*United States v. Comstor Corp.*,
   308 F. Supp. 3d 56 (D.D.C. 2018), *reconsideration denied sub nom.*
   *United States ex rel. Folliard v. Comstor Corp.*,
   No. CV 11-731, 2018 WL 5777085 (D.D.C. Nov. 2, 2018)............................................10, 32

*United States v. Sci. Applics. Int'l Corp.* ("*SAIC*"),
   626 F.3d 1257 (D.C. Cir. 2010)...........................................................................2, 34

*Universal Health Servs., Inc. v. United States ex rel. Escobar*,
   136 S. Ct. 1989 (2016)...........................................................2, 29, 30, 32, 33, 34, 38

**Statutes**

31 U.S.C. § 3729(a)(1)(G)..................................................................................40

31 U.S.C. § 3729(b)(1)......................................................................................34

31 U.S.C. § 3730(e)(4).......................................................................................8

31 U.S.C. § 3730(e)(4)(A)..............................................................................11, 25

31 U.S.C. § 3730(e)(4)(a)(i)............................................................................11, 14

31 U.S.C. § 3730(e)(4)(A)(i)-(iii)..........................................................................10

31 U.S.C. § 3730(e)(4)(A)(iii)...............................................................................24

31 U.S.C. § 3730(e)(4)(B)..............................................................................25, 26

47 U.S.C. § 309(j)(3)(B).......................................................................................3

47 U.S.C. § 309(j)(4)(C)(ii)....................................................................................3

**Regulations**

47 C.F.R. § 1.2110(b)(1)(i) (2006)...........................................................................5

47 C.F.R. § 1.2110(b)-(c) (2006).............................................................................4

47 C.F.R. § 1.2110(f) (2006)..................................................................................4

47 C.F.R. § 1.2110(f)(1) (2006)..............................................................................4

47 C.F.R. § 1.2110(f)(2)(i)-(iii) (2006)......................................................................5

47 C.F.R. § 1.2110(j) (2006)..................................................................................5

**TABLE OF AUTHORITIES** *(continued)*

<u>Page(s)</u>

47 C.F.R. § 1.2111(d)(1) (2006) ...............................................................................4, 38

47 C.F.R. § 1.2111(d)(1)-(2) (2012) ...............................................................................5

47 C.F.R. § 1.2111(d)(2)(i)(E) (2012) ....................................................................27, 28

**Other Authorities**

FCC Public Notice, DA-09-2643 (Dec. 30, 2009)................................................12, 30

*Implementation of Sec. 309(j) of the Commc'ns Act – Competitive Bidding,* Fifth
    Report & Order, 9 FCC Rcd. 5532 (July 15, 1994).....................................................3

*Promoting Interoperability in the 700 MHz Com. Spectrum*, 27 FCC Rcd. 3521
    (Mar. 21, 2012) ..........................................................................................18, 20, 27

*Updating Part 1 of Competitive Bidding Rules*, 30 FCC Rcd. 7493 (July 21, 2015) .....................4

# I.      INTRODUCTION

This case is a classic example of litigation Congress has prohibited.  Relators are Washington, D.C. lawyers who have foraged through old public documents to cobble together a baseless False Claims Act ("FCA") case that attacks the integrity of an individual (sued gratuitously in her individual capacity) and her small business.  The Federal Communications Commission ("FCC")—the expert agency responsible for enforcing the regulations at issue here— was fully aware of every arrangement and business practice attacked in the Second Amended Complaint ("SAC").  After a lengthy investigation, the Department of Justice ("DOJ") declined to intervene in this case, as it did in a related case (No. 20-CV-2070) pending before this Court, *and* as it did in a nearly identical case filed by Relator O'Connor's law firm *back in 2008*.  Relators' stale effort to invoke the *qui tam* mechanism fails as a matter of law.

Congress in the FCA authorized private parties to sue in the name of the United States, but only in limited circumstances.  Congress expressly prohibited suits based on information already in the public domain.  Congress intended the FCA's private enforcement provisions to bring to light cases the government otherwise would not know about, but Congress banned—through a "public disclosure bar"—*qui tam* cases that recycle and repackage public information.  Relators here are not insiders and have never had unique access or information.  Instead, they selectively quote public information to second-guess the FCC's decision to award spectrum licenses and bidding credits to King Street Wireless, L.P. ("King Street").  The public disclosure bar was tailor-made to protect defendants from cases, like this one, based entirely on public sources.

Relators' case also suffers from three additional and incurably fatal legal defects, each of which independently compels dismissal.  *First*, the FCC and the Department of Justice thoroughly investigated the 2008 *qui tam* suit—which raised the *same* material allegations and False Claims

Act theory against the King Street Defendants (i.e., King Street, King Street Wireless, Inc., and Ms. DiNardo) that Relators allege here.  After that investigation, the FCC awarded licenses and bidding credits to King Street with complete knowledge of the core allegations Relators make about King Street's ownership structure, business relationships with U.S. Cellular, and operations—what Relators in this case again claim is a "fraud"—and over many years has never reversed those decisions.  The Supreme Court has held that the government's knowledge and approval of a claim, while aware of the facts constituting the supposed "fraud," negates the materiality element of an FCA action at the pleading stage.  *See Universal Health Servs., Inc. v. United States ex rel. Escobar*, 136 S. Ct. 1989, 2003-04 & n.6 (2016).  The FCC's investigation, review, and decision to award spectrum and bidding credits to King Street while fully aware of the 2008 FCA suit means that Relators cannot establish materiality as a matter of law.

*Second*, the D.C. Circuit has held that the scienter element of FCA claims must be "strict[ly] enforce[d]."  *United States v. Sci. Applics. Int'l Corp.*, 626 F.3d 1257, 1270 (D.C. Cir. 2010) ("*SAIC*").  Specifically, FCA liability cannot be imposed where an individual follows a reasonable interpretation of complex regulations, and the government knows about and does not express any concerns about the approach.  *See United States ex rel. Purcell v. MWI Corp.*, 807 F.3d 281, 287-89 (D.C. Cir. 2015).  Relators accordingly cannot establish the *scienter* element, because the FCC knew about King Street's position on and understanding of FCC regulations and not only did not "warn[] away" King Street, *see id.*, but actually *approved* its license applications.

*Third,* Relators also fail to satisfy the FCA's *falsity* element, because their allegations that the King Street Defendants made false statements turn on disagreements about reasonable ways to comply with the FCC's complex regulations regarding small business participation in spectrum auctions.  Multiple courts have held that a relator's divergent legal judgment cannot give rise to

liability under the FCA where what is disputed is *not* a statement of fact that can be proven objectively true or false but instead a legal judgment about compliance with legal regulations.

This case has been pending for more than five years, hanging over the head of an individual entrepreneur and her business. Many of the allegations go back to or even pre-date the 2008 *qui tam*. DOJ and the FCC both investigated the 2008 matter and this case. DOJ has declined to intervene, and the FCC has never sought—over the course of many years—return of the licenses or the bidding credits it awarded to King Street. Relators are on their third attempt at a legally sufficient complaint. The SAC should be dismissed with prejudice.

## II.     BACKGROUND AND SUMMARY OF ALLEGATIONS

### A.     FCC Spectrum Auctions and the Designated Entity Program

Since the 1990s, the FCC has licensed electromagnetic spectrum to the public by auction. SAC ¶ 43. To avoid concentration of spectrum in a small number of large telecommunications companies, and to afford small businesses, minorities, and women greater opportunities to become FCC licensees, Congress directed the FCC to "disseminat[e] licenses among a wide variety of applicants, including small businesses, rural telephone companies, and businesses owned by members of minority groups and women." 47 U.S.C. §§ 309(j)(3)(B), 309(j)(4)(C)(ii). In response, the FCC implemented the Designated Entity ("DE") Program, in which qualified entities would receive "bidding credits" to apply toward their bids for spectrum licenses. In addition to making bidding credits available to help DEs compete financially for spectrum, the FCC also actively "encourage[d] large companies to invest in designated entities" so that the DEs stood better chances of success in an industry where the "primary impediment to participation" was "lack of access to capital," given that spectrum licenses sometimes required tens of millions of dollars (or more). *Implementation of Sec. 309(j) of the Commc'ns Act – Competitive Bidding, Fifth Report*

& *Order*, 9 FCC Rcd. 5532, 5539, 5608 (July 15, 1994) (hereinafter "*Fifth Report & Order*");
SAC ¶¶ 6, 15, 174.[1]

Bidding credits were originally available to small businesses as well as to businesses owned
by women and members of minority groups. *See* SAC ¶ 43. The FCC eliminated bidding credits
based on the race or gender of an entity's owners after the Supreme Court ruled in *Adarand
Constructors, Inc. v. Pena*, 515 U.S. 200 (1995), that race-conscious affirmative action programs
are subject to strict scrutiny. *See Omnipoint Corp. v. FCC*, 78 F.3d 620, 627 (D.C. Cir. 1996).
However, "the congressional directive" to the FCC "to create opportunities . . . for women- and
minority-owned businesses to participate in the PCS market," *id.* at 633, still stands. The FCC
properly recognized that many women- and minority-owned businesses were small or very small
businesses. Indeed, as recently as 2015, in the course of amending the competitive bidding rules,
the FCC explained that: "Through these changes [to the rules], and in furtherance of our statutory
obligations, we recommit and refocus our efforts to provide meaningful opportunities to *bona fide*
small businesses and rural service providers, including businesses owned by members of minority
groups and women (collectively 'designated entities,' or 'DEs') to participate in auctions and in
the provision of spectrum-based services." *Updating Part 1 of Competitive Bidding Rules*, 30 FCC
Rcd. 7493, 7494 (July 21, 2015).

At all relevant times, a DE's eligibility to obtain and retain DE bidding credits turned on
the entity's size. SAC ¶ 54; *see also* 47 C.F.R. §§ 1.2110(b)-(c), (f) (2006), 1.2111(d)(1) (2006).

---

[1]  At the relevant time, an entity that qualified for "very small business" DE status could receive
bidding credits of up to 25% of the amounts of its winning bids. *See* SAC ¶ 55. The credits
were applied such that, for each license the entity won at auction, the entity paid only 75% of
its winning bid on that particular license. *See id. See also* 47 C.F.R. § 1.2110(f)(1) (2006)
("The Commission may award bidding credits (i.e., payment discounts) to eligible designated
entities."). So, for example, if a "very small business" DE made a winning bid of $10,000,000
on a particular license, the DE would pay $7,500,000 for the license.

The FCC determined a DE's size by aggregating its gross revenues with those of its "affiliates, its controlling interests, the affiliates of its controlling interests, and the entities with which it ha[d] an attributable material relationship."  47 C.F.R. § 1.2110(b)(1)(i) (2006); *see also* SAC ¶ 57.  If the aggregated revenues exceeded $40 million, the entity was not eligible for any sort of DE status.  *See* 47 C.F.R. § 1.2110(f)(2)(i)-(iii) (2006); *see also* SAC ¶ 55.  In addition, if a DE took certain actions in the five-year period after the license award—such as a change in ownership resulting in a loss of DE status, or a transfer of control of a license to a large telecommunications company ineligible for bidding credits—the DE would need to pay an "unjust enrichment payment" in the amount of the bidding credits to the FCC.  *See* SAC ¶ 64; 47 C.F.R. § 1.2111(d)(1)-(2) (2012).

The FCC conducted an extremely thorough process to vet DE applications.  The agency required bidders to submit Short-Form (pre-auction Form 175) and Long-Form (post-auction Form 601) applications containing specific and voluminous information concerning their DE eligibility.  *See* 47 C.F.R. § 1.2110(j) (2006); *see also* SAC ¶¶ 46-52.  The FCC subjected every DE applicant who claimed eligibility for a DE bidding credit to a rigorous review in which the agency closely examined the precise issues of control, attributable revenues, and material relationships raised by Relators in the SAC.  SAC ¶¶ 49-52.  The FCC also required DEs to file Annual Reports summarizing, among other things, agreements related to their continued eligibility for DE benefits, SAC ¶ 64, and to report to the FCC, "during the five-year unjust enrichment period," any event "that would affect [the DEs'] eligibility to retain their DE bid credits for the remainder of the period," SAC ¶ 65.  These pre- and post-license processes *were all public*, as were all the DE submissions to the FCC.  *See generally* FCC, Universal Licensing System, https://wireless2.fcc.gov/UlsApp/ApplicationSearch/searchAppl.jsp.

5

B.      **The King Street Defendants**

Defendant Allison Cryor DiNardo is a small business entrepreneur.  Ms. DiNardo graduated with an MBA from the University of Virginia's Darden School of Business in 1988. Following graduation, she served as Deputy Associate Director for Presidential Personnel in the White House.  *See* Resp. to Bureau Inquiry (Redacted), FCC ULS File No. 0003379814 (May 8, 2009), at 6-9 (incorporated in SAC ¶ 88) (the "May 8, 2009 Submission").[2]  Since 2000, Ms. DiNardo has devoted her career to the wireless industry.  As President and Chief Operating Officer of Kington Management Corporation, she managed the operations for the general partner in each of several DEs from 2000 to 2005.  That experience provided Ms. DiNardo with in-depth industry knowledge and skills, and she went on to be the qualified very small business control person in a series of successful wireless ventures.  *Id.* at 6-9.  Ms. DiNardo also has a strong record of civic engagement.  Among other roles, she served on the University of Virginia's Board of Visitors from 2011 to 2015.[3]  She also has served as Chair of the Board of Directors of the Alexandria Economic Development Partnership,[4] and she currently serves on the Board of Directors of CTIA, a wireless industry trade association.

---

[2]  Filings posted on the FCC Universal Licensing System ("ULS") docket are available at https://wireless2.fcc.gov/UlsApp/ApplicationSearch/searchAppl.jsp and are cited here by title and FCC File Number.  Certain other filings by FCC auction participants are available at https://auctionfiling.fcc.gov/form175/search175/index.htm and are cited here by "FCC Applic. File No." to distinguish them from ULS filings.

[3]  *See* Va. Gen. Assembly, S. Joint Res. No. 99 (Jan. 13, 2012) (confirming appointment made by Governor Robert F. McDonnell on June 15, 2011).

[4]  *See* City Council Work Session, The Alexandria Economic Development Partnership (Apr. 14, 2009), https://dockets.alexandriava.gov/FY09/041409RM/diws.pdf.  This Court may take judicial notice of this source and the other sources cited in this paragraph without converting this Motion to one for summary judgment.  *See, e.g.*, *Does I through III v. Dist. of Columbia*, 238 F. Supp. 2d 212, 216 (D.D.C. 2002) ("[I]t is well established that courts are allowed to take judicial notice of matters in the general public record . . . without triggering the conversion requirement.").

King Street was formed in November 2007 as a limited partnership between general partner King Street Wireless, Inc., and limited partner USCCWI, a subsidiary of U.S. Cellular. *See* SAC ¶¶ 25-26. Since King Street's founding, Ms. DiNardo has been the "sole shareholder and owner" of King Street Wireless, Inc., as well as its president. *See* SAC ¶¶ 32, 136. In FCC Auction 73 in 2008, King Street successfully bid on 152 licenses and received $102.2 million in DE bidding credits. SAC ¶ 80. Until 2012, Ms. DiNardo was also the "sole shareholder and owner of Carroll Wireless, Inc., and Barat Wireless, Inc., each of which was the general partner and 10% owner of the limited partnerships of the same name." SAC ¶ 32. In Auction 58 in 2005, Carroll Wireless, L.P. ("Carroll") successfully bid on 16 licenses and received $22.1 million in DE bidding credits, SAC ¶ 158 & n.13; in Auction 66 in 2006, Barat Wireless, L.P. ("Barat") successfully bid on 17 licenses and received $42.4 million in DE bidding credits, SAC ¶ 185.

## C.     Relators' Allegations

Relators' central claim is that King Street (and non-defendant DEs Carroll and Barat) obtained and retained DE bidding credits for which they were not eligible through alleged misrepresentations to the government on three subjects. *See id.* ¶¶ 1, 4, 12, 17. *First*, Relators contend that King Street's foundational agreements with U.S. Cellular—all of which were submitted to and thoroughly reviewed by the FCC prior to any license grants—gave U.S. Cellular a "controlling interest" in King Street, such that U.S. Cellular revenues were "attribut[able] to" King Street rendering King Street too large to be a DE. *See id.* ¶¶ 14, 78-79, 84-88, 115. *Second*, Relators contend that certain agreements between King Street and U.S. Cellular entered into *after* the awarding of King Street's licenses placed the two entities in an "Attributable Material Relationship" ("AMR"), which Relators claim caused King Street to become too large and to lose its DE status. *See* SAC ¶¶ 92-97. *Third*, Relators claim that, via these agreements and the provision of wireless services to U.S. Cellular customers using U.S. Cellular's equipment and King

Street's licenses, King Street ceded "control" of its licenses to U.S. Cellular, thus rendering King Street ineligible for DE status.  *See id.* ¶¶ 14, 107, 117, 135, 212(i).

## III.   ARGUMENT

The SAC—and the documents it incorporates and attaches—confirm that the FCC was fully aware of the business relationships between and among King Street, Ms. DiNardo, and U.S. Cellular—as well as the division of responsibilities between them—long before this lawsuit commenced.  The SAC merely seeks to repackage (and monetize) public information while second-guessing the determinations of the FCC.

### A.   Relators' Claims Are Precluded by the FCA's Public Disclosure Bar

#### 1.   Legal Standards

Congress prohibits a relator from bringing an FCA case if "*substantially the same allegations or transactions*" have been "publicly disclosed" through certain channels, unless the relator meets the narrow statutory definition of an "original source."  *See* 31 U.S.C. § 3730(e)(4) (emphasis added).  A public disclosure prohibits a later FCA suit whenever the "publicly disclosed information could have formed the basis for a governmental decision on prosecution, or could at least have alerted law-enforcement authorities to the likelihood of wrongdoing."  *United States ex rel. Settlemire v. Dist. of Columbia*, 198 F.3d 913, 918 (D.C. Cir. 1999) (internal quotation marks omitted).  This standard does not require complete "identity of facts" between the disclosed facts and the *qui tam* allegations, *United States ex rel. Hockett v. Columbia/HCA Healthcare Corp.*, 498 F. Supp. 2d 25, 49 (D.D.C. 2007), and the bar can be triggered even when "a *qui tam* suit [is] 'even partly based upon publicly disclosed allegations or transactions,'" *United States ex rel. J. Cooper & Assocs., Inc. v. Bernard Hodes Grp., Inc.*, 422 F. Supp. 2d 225, 235 n.10 (D.D.C. 2006).  Moreover, "[i]t is not necessary that a public disclosure contain every detail of the alleged fraud"— including the "who, when, and where" of the supposed scheme—"so long as it contains the *basic*

*allegation* of fraud." *Hockett*, 498 F. Supp. 2d at 49 (citation omitted) (emphasis added). The statute reflects the "twin goals of rejecting suits which the government is capable of pursuing itself, while promoting those which the government is not equipped to bring on its own." *United States ex rel. Springfield Terminal Ry. Co. v. Quinn*, 14 F.3d 645, 651 (D.C. Cir. 1994).

The D.C. Circuit has explained that the public disclosure bar is triggered where either "the allegation of fraud itself" or "the transactions that give rise to an inference of fraud" are already in the public domain. *United States ex rel. Oliver v. Philip Morris USA Inc.* ("*Oliver II*"), 826 F.3d 466, 471 (D.C. Cir. 2016). The D.C. Circuit has set out a formula to assess whether a "transaction" has been publicly disclosed:

> [I]f X + Y = Z, Z represents the allegation of fraud and X and Y represent its essential elements. In order to disclose the fraudulent transaction publicly, the combination of X and Y must be revealed, from which readers or listeners may infer Z, *i.e.*, the conclusion that fraud has been committed.

*Springfield Terminal*, 14 F.3d at 654. In this formula, "X" and "Y" represent "two elements: a misrepresented state of facts and a true state of facts." *Id*. at 655 (emphasis omitted). Thus, "the government has 'enough information to investigate the case' either when the allegation of fraud itself"—the "Z"—"has been publicly disclosed, or when both of its underlying factual elements— the misrepresentation and the truth of the matter," the "X" and "Y"—"are already in the public domain." *United States ex rel. Doe v. Staples, Inc.*, 773 F.3d 83, 86 (D.C. Cir. 2014) (citation omitted).

A public disclosure also must occur in a channel identified in the statute, including (1) a federal "criminal, civil, or administrative hearing"; (2) "a congressional, Government Accountability Office, or other Federal report, hearing, audit, or investigation"; or (3) "the news media." 31 U.S.C. § 3730(e)(4)(A)(i)-(iii); *see also United States ex rel. Oliver v. Philip Morris USA Inc.* ("*Oliver I*"), 763 F.3d 36, 42 (D.C. Cir. 2014).

This case presents the extraordinary situation in which the X, the Y, and the Z were *all* matters of public record.  Unquestionably, both "the allegation of fraud itself" and the "critical elements of the transaction themselves" on which Relators base their SAC were disclosed publicly through statutory channels *well before* Relators ever put pen to paper.  The entire formula of X + Y = Z was disclosed in: (1) a prior *qui tam* lawsuit; (2) multiple public filings with the FCC; (3) multiple public filings with the SEC; and (4) the news media.[5]

### 2.    The Prior *Qui Tam* Lawsuit Publicly Disclosed the Basis for Relators' Claims

First, the law firm of which Relator O'Connor was then a name partner filed a *qui tam* action in 2007 (and amended it in 2008) in *this District* relating to DE bidding credits obtained by King Street, Barat, and Carroll in Auctions 73, 66, and 58, respectively—the *same* entities and the *same* auctions at issue here.  *See* Am. Compl., No. 1:07-cv-00800-JDB (D.D.C. Apr. 24, 2008), ECF No. 11 ("2008 Complaint") (attached hereto as Exhibit A).  The 2008 Complaint is indisputably a public disclosure under the FCA made "in a [] civil . . . hearing."[6]  31 U.S.C. §

---

[5] Congress amended the public disclosure bar in 2010.  This District has held that "the pre-amendment version of § 3730(e)(4)'s public disclosure bar applies to claims arising from Defendants' conduct before March 23, 2010, and the amended version of the public disclosure bar applies to conduct based on post-March 23, 2010 conduct."  *United States ex rel. Shea v. Verizon Commc'ns, Inc.*, 160 F. Supp. 3d 16, 24 (D.D.C. 2015), *aff'd sub nom. United States ex rel. Shea v. Cellco P'ship*, 863 F.3d 923 (D.C. Cir. 2017).  "The pre-2010 version was expressly jurisdictional, while the provision today states only that a court must dismiss a case falling under the public disclosure bar."  *United States ex rel. Hawkins v. ManTech Int'l Corp.*, No. CV 15-2105, 2020 WL 435490, at *13 n.9 (D.D.C. Jan. 28, 2020).  Accordingly, "when the amended version of § 3730(e)(4)(A) applies, public disclosure does not deprive the Court of subject matter jurisdiction, but merely deprives the plaintiff of his claim."  *Shea*, 160 F. Supp. 3d at 24.  The relevant substantive public disclosure bar analysis is the same under both versions.  *See, e.g.*, *United States v. Comstor Corp.*, 308 F. Supp. 3d 56, 71-72 (D.D.C. 2018), *reconsideration denied sub nom. United States ex rel. Folliard v. Comstor Corp.*, No. CV 11-731, 2018 WL 5777085 (D.D.C. Nov. 2, 2018).

[6] Because the 2008 Complaint preceded the 2010 amendments to the public disclosure bar, this Court need not decide whether the prior *qui tam* suit qualifies as a proceeding "in which the Government or its agent is a party."  31 U.S.C. § 3730(e)(4)(a)(i).  That requirement was only

3730(e)(4)(A); *see also Springfield Terminal*, 14 F.3d at 652 (holding that filings in civil litigation constitute public disclosures under the FCA). The 2008 Complaint was unsealed (except as to the identity of the relator) in January 2009. Prior to acting favorably on the King Street Auction 73 application, the FCC published a notice of the 2008 Complaint in the Daily Digest on the agency's official website as well as on Westlaw. FCC Letter to Mr. Thomas Gutierrez Re: Auction 73 Application of King Street Wireless, L.P., 24 FCC Rcd. 4527, 2009 WL 1012832 (April 14, 2009); *Daily Digest* Vol. 28 No. 73 (Apr. 15, 2009), https://www.fcc.gov/edocs/daily-digest/2009/04/15. The 2008 Complaint was unsealed in its entirety in October 2009. *See* Minute Order, No. 1:07-cv-00800-JDB (D.D.C. Oct. 22, 2009). Shortly after the Justice Department declined to intervene, the 2008 case was voluntarily dismissed. *See* Order, No. 1:07-cv-00800-JDB (D.D.C. Jan. 13, 2010), ECF No. 29.

The 2008 Complaint included not only the central elements of Relators' case here—the "X" and the "Y" in the D.C. Circuit's formula—but also the explicit "allegation of fraud *itself*"— the "Z." The theory of the 2008 Complaint was that U.S. Cellular and DEs formed by Ms. DiNardo were in effect "sham" entities that U.S. Cellular "control[led]." *See, e.g.*, 2008 Complaint ¶¶ 6, 49. In particular, the 2008 Complaint alleged that "US Cellular and USCCWI and their controlling parent, TDS . . . formed sham 'very small business' bidding entities"—naming Carroll, Barat, and King Street—"for purposes of obtaining 25 percent credits against their gross winning bids in three FCC auctions," Auctions 73, 66, and 58; that the DEs "did not seek to acquire licenses for the

---

added in 2010, and even so, a *qui tam* relator is the government's "agent" for purposes of application of the public disclosure bar in cases in which the government has declined to intervene. *See United States ex rel. Holloway v. Heartland Hospice, Inc.*, 960 F.3d 836, 845 (6th Cir. 2020). This Court also can take judicial notice of the 2008 Complaint without converting this Motion to a motion for summary judgment. *See, e.g.*, *Does I through III*, 238 F. Supp. 2d at 216 ("[I]t is well established that courts are allowed to take judicial notice of . . . records of prior litigation without triggering the conversion requirement.").

purpose of developing or providing telecommunications services for end-users" but instead "to complement US Cellular's existing markets, and be available for use by US Cellular within its own discretion"; and that "[i]n furtherance of their fraudulent scheme . . . [Defendants] made material misstatements and omissions in their submissions to the FCC." *Id.* ¶¶ 3-4, 8, 54; 63-68; 81-85.  The SAC also tracks the earlier allegations almost verbatim.  *See, e.g.*, SAC ¶¶ 1, 3-4, 12, 17-19, 25, 28, 32, 55, 78-79, 84-86, 151, 161, 184-87.  Notably, this prior complaint suffered from the same defect as the SAC does here, in that it was based entirely on public documents.  Relators simply have repackaged and repurposed the material allegations from the 2008 Complaint.

Critically, the 2008 Complaint not only "*alerted*" the government to the alleged fraud—it prompted a thorough FCC investigation, followed by a Department of Justice declination and the granting of licenses to King Street.  Shortly after the 2008 Complaint was filed, and before King Street was awarded the licenses in Auction 73, the Department of Justice and the FCC investigated the 2008 Complaint, including via a public request by the FCC that King Street provide its position on the allegations.  *See* Letter from R. Noel to T. Gutierrez Re: Auction 73 Application of King Street Wireless, L.P., 24 FCC Rcd. 4527.  King Street responded to the allegations at length in a document made public on the FCC docket.  *See* Resp. to Bureau Inquiry (Redacted), FCC ULS File No. 0003379814 (May 8, 2009).  The Department of Justice subsequently declined to intervene in the *qui tam* case, and the FCC granted licenses and bidding credits to King Street.  *See* Gov't's Notice of Election to Decline Intervention, No. 1:07-cv-00800-JDB (D.D.C. Oct. 9, 2009), ECF No. 25; FCC Public Notice, DA-09-2643 (Dec. 30, 2009).

Relators do include some new allegations post-dating the 2008 Complaint, but these add-ons do not save the SAC from dismissal under the public disclosure bar.  The law is clear that "[m]erely providing more specific details about what happened does not negate substantial

similarity," *Oliver II*, 826 F.3d at 472, and "a relator's ability to reveal specific instances of fraud where the general practice has already been publicly disclosed is insufficient" to prevent dismissal under the bar. *Settlemire*, 198 F.3d at 919 (citing *United States ex rel. Findley v. FPC-Boron Emps.' Club*, 105 F.3d 675, 687-88 (D.C. Cir. 1997), *abrogated in part on other grounds by Rockwell Int'l Corp. v. United States*, 549 U.S. 457 (2007)). Similarly, in *Oliver II* the D.C. Circuit rejected a relator's argument that the bar did not apply where the public disclosure of the relevant practices predated the alleged fraud. The court explained that "the time difference does not undermine the disclosure of [the] general practice" and that "we have found 'disclosures going back as far as forty years prior to the relator's lawsuit . . . sufficient to disclose the practices which formed the basis of the relator's suit.'" 826 F.3d at 473 (quoting *Settlemire*, 198 F.3d at 919). Relators have no way around these bedrock rules. The 2008 Complaint forecloses all of Relators' claims.[7]

### 3. Public FCC Filings Included All the Key Documents and Material Information on Which Relators Base Their Claims

Second, and independently, *all* of Relators' material claims in the SAC also are based on information in public FCC filings that the SAC itself either incorporates or attaches. These filings demonstrate that the information concerning King Street's organization, financing, conduct of

---

[7] Relators initially filed the current action in the Western District of Oklahoma, which has no apparent connection to any events in this case, but which does have the virtue of being halfway across the country from the venue where the 2008 Complaint was filed and dismissed, and where and all the relevant FCC filings were made. The District Court for the Western District of Oklahoma transferred this case to this District over Relators' objections, holding that "Relators fail to articulate a 'material relation' between their allegations and this forum." Order Granting Transfer, No. 5:15-cv-00370-G (W.D. Okla. July 29, 2020), ECF No. 126, at 4.

Auction 73, and relationship to U.S. Cellular was all sitting there on the public FCC docket for the world to see.[8]

FCC filings are public disclosures under two provisions of the FCA.  First, FCC auction filings are made "in a[n] . . . administrative hearing."  31 U.S.C. § 3730(e)(4)(A)(i).  The D.C. Circuit has explained that "[i]t is clear from statutory context that the term 'hearing' was intended to apply in a broad context of legal proceedings under § 3730(e)(4)(A)."  *Springfield Terminal*, 14 F.3d at 652; *see also Oliver II*, 826 F.3d at 474.  Thus, in this provision, the term "'hearing' is . . . synonymous with 'proceeding.'"  *Id*.  The D.C. Circuit has held that documents filed on a public docket, *Springfield Terminal*, 14 F.3d at 652, or included in a publicly available database established by court order, *Oliver II*, 826 F.3d at 475, trigger the public disclosure bar under this provision.  "That documents filed with an agency or court during administrative proceedings or civil litigation are considered publicly disclosed is a firmly established principle."  *Hagood v. Sonoma Cty. Water Agency*, 81 F.3d 1465, 1473 n.13 (9th Cir. 1996) (holding Federal Energy Regulatory Commission filing constituted public disclosure under the FCA).  FCC spectrum auctions were public proceedings, and the filings were made on a public docket that is still available online to anyone who wishes to view them.

In addition, FCC auction filings are "administrative . . . report[s]" (under the pre-2010 version of the bar) and "other Federal report[s]" (under the post-2010 version of the bar).  "In *Schindler Elevator Corp. v. United States ex rel. Kirk*, the Supreme Court explained that the

---

[8] Documents attached to or "referred to" in the SAC, or incorporated by reference, and "central to the [Relators'] claim[s]," are properly considered in applying the public disclosure bar.  *See Slovinec v. Georgetown Univ.*, 268 F. Supp. 3d 55, 59 (D.D.C. 2017), *aff'd*, No. 17-7122, 2018 WL 1052650 (D.C. Cir. Jan. 26, 2018) (internal citations omitted).  In addition, the Court may take judicial notice of filings on the FCC docket.  *See, e.g.*, *Connecticut v. United States Dep't of the Interior*, 344 F. Supp. 3d 279, 291 n.4 (D.D.C. 2018).

'ordinary meaning' of 'report is something that gives information or a notification, or an official or formal statement of facts or proceedings.'" *Oliver II*, 826 F.3d at 475-76 (quoting 563 U.S. 401, 408 (2011)) (holding government webpages were "administrative reports" for purposes of public disclosure bar). The Court in *Schindler Elevator* reasoned that "[t]his broad ordinary meaning of 'report' is consistent with the generally broad scope of the FCA's public disclosure bar." 563 U.S. at 407. Because the FCC filings were mandatory documents "produced at the request of and [] made public" by the FCC in the discharge of its duties as an agency, they constitute an "administrative report" within the meaning of the statute. *United States ex rel. Jones v. Collegiate Funding Servs.*, 469 F. App'x 244, 257 (4th Cir. 2012) (mandatory filings by companies with the SEC were "administrative reports" under the FCA); *see also United States ex rel. Ryan v. Endo Pharm., Inc.*, 27 F. Supp. 3d 615, 628 (E.D. Pa. 2014), *aff'd sub nom. United States ex rel. Dhillon v. Endo Pharm.*, 617 F. App'x. 208 (3d Cir. 2015) (defendant's "[SEC] filing qualifies as a public disclosure as a federal report").

Applying the D.C. Circuit's formula, King Street's FCC filings plainly included *both* the allegedly "misrepresented state of facts" as well as the "true state of facts"—the "X + Y" of Relators' allegedly fraudulent transaction, on each and every area of King Street's structure and operations that Relators now challenge. That is independently sufficient to doom Relators' SAC.

***Formation and Financing of King Street:*** Relators claim that King Street falsely certified that Ms. DiNardo had a controlling interest in King Street, when in fact U.S. Cellular did. *See* SAC ¶¶ 78-79, 84-86. But this allegation is based expressly on documents regarding King Street's formation and financing filed publicly with the FCC—the very same documents Relators attach to their Complaint. These public documents together reveal the precise nature of the ownership structure about which Relators now complain. *See, e.g.*, SAC Exs. 1-2. For example, King Street's

Short-Form Application provided all of the relevant information regarding the parties' respective roles on which Relators rely—including that Ms. DiNardo "owns 100% of King Street Wireless, Inc., which in turn, owns the sole *General Partnership Interest* and 10% of the Applicant's equity," and that U.S. Cellular "owns 100% of USCC Wireless Investment, Inc., which in turn, owns the *Limited Partnership Interest* and 90% of the Applicant's equity." SAC Ex. 1, p. 87 (emphases added). And Relators do not allege (nor could they) that the ownership structure set forth in the Short-Form Application was inaccurate. Similarly, King Street's Long-Form Application stated that "USCC . . . is a reportable member of King Street pursuant to FCC rule 1.2105(c)(6) because USCC owns an equity interest equal to or greater than 10% of King Street." SAC Ex. 2, p. 37.

Relators allege that the various financial agreements between King Street and U.S. Cellular "effectively" bar King Street from obtaining financing by making all loan payments due "immediately upon any sale of the capital stock of King Street Inc." and by giving U.S. Cellular a security interest in King Street's collateral and restricting King Street's ability to engage in third-party financial transactions. *See* SAC ¶ 102. Yet these features of the agreements were publicly disclosed in Exhibit D to King Street's Long-Form Application. *See* SAC Ex. 2, pp. 40-42 (discussing Loan Agreement, Loan and Security Agreement, and Pledge Agreements). The Complaint alleges nothing about King Street's formation, structure, and financing that has not already been disclosed publicly on the FCC docket.[9]

---

[9] Similarly, all of the documents on which Relators rely for their allegations concerning Carroll and Barat's organization, financing, conduct of Auctions 58 and 66, and connection to U.S. Cellular were filed on the FCC public docket. *See, e.g.*, SAC Ex. 9, p. 14 (disclosing that U.S. Cellular held "90% of [both Applicants'] Equity"); SAC Ex. 12, p. 7 (similar); SAC Ex. 14, p. 9 (disclosing that Barat and U.S. Cellular were parties to a Management Services Agreement that made U.S. Cellular responsible for "[d]eveloping and implementing plans for the construction of the Barat [] [s]ystems" and the "maintenance" of those systems); SAC Ex. 9, p. 53 (disclosing that "spectrum attributable to [U.S.] Cellular" has "geographic overlap with

***Management Services Agreement Between U.S. Cellular and King Street:***  Relators also allege that, while the Long-Form Application was pending, King Street and U.S. Cellular entered into a Management Services Agreement ("MSA"), which Relators say King Street deceptively failed to include in a May 8, 2009 Submission to the FCC regarding the 2008 Complaint.  SAC ¶¶ 87-88.  Relators are just wrong.  As reflected in that public submission itself, the FCC staff explicitly evaluated the organizational documents for King Street and other DEs, *including the King Street MSA that Relators allege was withheld from the FCC.  See* Resp. to Bureau Inquiry (Redacted), FCC ULS File No. 0003379814 (May 8, 2009), at n.7.  Moreover, the Complaint actually *alleges* that the MSA was described in detail in all of King Street's DE Annual Reports to the FCC between 2010 and 2013, which are available on the FCC's public docket.  *See* SAC ¶¶ 131-133, Ex. 4; King Street DE Annual Reports, FCC ULS File Nos.: 0004547584, Ex. II (Dec. 27, 2010); 0005008335, Ex. II (Dec. 29, 2011); 0005570518, Ex. II (Dec. 26, 2012); 0006070145, Ex. II (Dec. 26, 2013).  The SAC does not have basic facts about the MSA correct, and in any event the SAC is demonstrably based on public information.

***U.S. Cellular Participation in the Build-out and Use of King Street's Network:***  Relators next allege that King Street concealed U.S. Cellular's role in building out King Street's network.  SAC ¶¶ 118-130.  Not so.  U.S. Cellular's participation in King Street's spectrum build-out was clearly disclosed in multiple public filings with the FCC.  *See, e.g.*, SAC ¶¶ 100, 118-21, 124-30, 135.  For example, King Street's DE Annual Reports explained that the MSA "delegate[d] to

---

the markets in which [Carroll] is the high bidder"); SAC Ex. 9, pp. 48-52 & SAC Ex. 13, pp. 23-27 (disclosing that Carroll and Barat had entered into substantial financing, bidding, and investor protection agreements with U.S. Cellular); SAC ¶¶ 151, 177, 199 (acquisition of the Carroll and Barat spectrum by U.S. Cellular was proposed to and approved by the FCC). For this reason, Count Four of the SAC also fails.  The relevant public disclosures covered Carroll's licenses as well as its bidding credits and bar claims based on that activity.

USCC certain responsibilities as the manager of . . . systems licensed to, constructed, and operated by or on behalf of King Street [] utilizing licenses acquired in Auction No. 73." *See* SAC Ex. 4, pp. 9-10, 20-21, 31-32, 42-43; King Street DE Annual Reports, FCC ULS File Nos.: 0004547584, Ex. II (Dec. 27, 2010); 0005008335, Ex. II (Dec. 29, 2011); 0005570518, Ex. II (Dec. 26, 2012); 0006070145, Ex. II (Dec. 26, 2013). The reports stated that "USCC will provide" services to King Street that included "[d]eveloping and implementing plans" for the "construction" and "maintenance" of the systems and for monitoring the systems' performance, as well as "[o]perational, engineering, maintenance, repair and such other technical services as may be necessary to operate" the systems. *Id.*

Relators also cite certain "Construction Notices" as evidence that King Street concealed U.S. Cellular's involvement in spectrum build-out. *See, e.g.*, SAC ¶¶ 118-127. But those notices too are *available on the FCC's docket. See* SAC Ex. 5 (listing King Street's Construction Notices); SAC ¶ 118 (characterizing the construction notices listed in SAC Ex. 5 as having been "file[d] . . . throughout the license term"). And the fact that these specific documents do not mention U.S. Cellular is irrelevant because, as described above, U.S. Cellular's involvement in the build-out process was repeatedly disclosed in a cascade of public FCC filings.

As for U.S. Cellular's use of the King Street spectrum to provide wireless services to U.S. Cellular customers, the SAC's allegations are more old and public news. The *FCC itself publicly stated*, during a 2012 rulemaking proceeding concerning interoperability (the ability of wireless systems to work together), that U.S. Cellular's 4G LTE network would "use the 700 MHz licenses of its partner, King Street Wireless." *Promoting Interoperability in the 700 MHz Com. Spectrum*, 27 FCC Rcd. 3521, 3534 (Mar. 21, 2012). In addition, numerous filings on the FCC's public docket disclosed the parties' plan for shared use of spectrum—by explaining, for example: that

"King Street currently holds 700 MHz wireless spectrum in 27 states and is partnering with U.S. Cellular to deliver high speed 4G LTE service to U.S. Cellular's customers in several of the carrier's markets," U.S. Cellular *Ex Parte* Presentation, FCC WT Docket 12-268 (Dec. 3, 2012), https://ecfsapi.fcc.gov/file/7022073971.pdf; that the parties' "offering is expected to expand over time, to include additional markets in a series of build out waves," King Street Notice of *Ex Parte* Communication, FCC WT Docket 11-18, (Nov. 30, 2011), https://ecfsapi.fcc.gov/file/7021749099.pdf; and that the provision of services would be a "joint effort," *id*. And Relators' allegations regarding King Street's lack of direct "customers" (*see, e.g.*, SAC ¶¶ 101, 108, 112, 164) similarly repeat public information. King Street disclosed that it had "minimal" or no customers of its own in *all* of the DE Annual Reports attached to Relators' SAC. *See, e.g.*, SAC Ex. 4, pp. 12, 23, 34, 45 (noting that King Street's subscribers were "[c]urrently none" or "minimal"). U.S. Cellular's role in the build-out and use of King Street spectrum was widely disseminated in a veritable library of public disclosures, including public disclosures to the FCC. Relators may believe King Street should not be a DE, but that incorrect allegation is irrelevant where the "X + Y" of their FCA claims arise directly from publicly available documents.

**The Network Sharing Agreement Between U.S. Cellular and King Street:** Relators also allege that King Street fraudulently concealed a 2011 Network Sharing Agreement ("NSA") with U.S. Cellular. SAC ¶¶ 96, 145. But the FCC was aware of the precise business relationship that the 2011 NSA embodied. In numerous public filings on the FCC docket, Defendants repeatedly disclosed their plans to offer LTE services to U.S. Cellular customers using King Street's spectrum. These disclosures began mere weeks after King Street and U.S. Cellular entered into the 2011 NSA on October 25, 2011, *see* SAC ¶ 92. *See* King Street Notice of *Ex Parte* Communication, WT Docket No. 11-18 (Nov. 30, 2011),

https://ecfsapi.fcc.gov/file/7021749099.pdf (stating that "King Street, in conjunction with U.S. Cellular, plans to provide LTE services in select markets, likely commencing in the first quarter of 2012," and characterizing the provision of those services as a "joint effort"). These disclosures continued, often identifying specific portions of U.S. Cellular's customer base to whom wireless services would be offered using King Street's spectrum. *See, e.g.*, U.S. Cellular *Ex Parte* Filing, Docket No. IB 11-149 (Feb. 8, 2012), https://ecfsapi.fcc.gov/file/7021859009.pdf (referring to "the impending launch by U.S. Cellular and its partner, King Street Wireless, L.P. of 4G LTE devices to approximately 25% of U.S. Cellular's customer base"); U.S. Cellular *Ex Parte* Filing, WT Docket No. 12-69 (Jan. 24, 2013), https://ecfsapi.fcc.gov/file/7022111812.pdf (stating that "by the end of 2013, U.S. Cellular in conjunction with King Street Wireless, L.P. would have 4G LTE service deployed to 87% of its customers"). And, again, the *FCC itself* stated publicly that U.S. Cellular's provision of LTE services would use King Street's licenses. *Promoting Interoperability in the 700 MHz Com. Spectrum*, 27 FCC Rcd. 3521, 3534 (Mar. 21, 2012). Thus, the very arrangement Relators claim Defendants concealed in fact was publicly disclosed—both by the entities Relators claim concealed it, and by the agency from whom it was supposedly concealed.

Moreover, Relators *admit* that the 2011 NSA "formalized the arrangements under which U.S. Cellular financed and built the purported King Street network, incorporated the King Street network into its own 4G LTE network, and provided service to its own customers using King Street's spectrum." SAC ¶ 92. The 2011 NSA is therefore simply a specific example of how King Street and U.S. Cellular partnered to provide service using King Street's licenses. Under established D.C. Circuit precedent, "[m]erely providing more specific details about what happened does not negate substantial similarity." *Oliver II*, 826 F.3d at 472. *See also Settlemire*, 198 F.3d

at 919 (concluding that "[t]he fact that [relator] is able to provide more specific details about what happened . . . does not matter").

In any event, the SAC admits that a substantively indistinguishable 2012 NSA between King Street and U.S. Cellular was "summarized in [U.S. Cellular's] long-form application [for Auction 901] as proof that U.S. Cellular" had access to the spectrum "necessary to construct networks in the census tracts areas." SAC ¶ 142. In that proceeding, U.S. Cellular made clear that "[p]ursuant to a Network Sharing Agreement . . . King Street agreed to provide 4G services, to be managed by [U.S. Cellular] . . . via King Street's Spectrum." U.S. Cellular Auction 901 Long-Form Application., Ex. 2, FCC Applic. File No. 0005476908 (June 23, 2013). Thus, the FCC was well aware of the business relationship between King Street and U.S. Cellular arising from the network sharing arrangement, and the agency did not consider the arrangement as raising concerns regarding King Street's DE qualifications. And Relators have alleged no differences between the 2011 and the 2012 NSA beyond inconsequential differences in geographic scope and compensation terms that Relators notably do not allege were themselves material for purposes of DE eligibility. *See* SAC ¶¶ 143-145.

Relators' allegations concerning the NSAs fail under the public disclosure bar. Again, the "X + Y" was fully in the public domain, no matter how loudly Relators allege the "Z."

### 4.     SEC Filings Independently Disclosed the Basis for Relators' Claims

Third, Relators' allegations concerning U.S. Cellular's SEC filings trigger the public disclosure bar. Relators' central thesis is that King Street fraudulently concealed its relationship with U.S. Cellular. *See, e.g.*, SAC ¶ 4. But the SAC expressly alleges just the opposite—namely, that U.S. Cellular "*openly acknowledged* its *controlling interest* in King Street to the SEC and its

investors." SAC ¶ 147 (emphases added).[10]   It's odd that Relators even make this allegation, because it undermines their own allegations of fraud.  By this allegation alone, Relators make clear that dismissal is required because they unwittingly concede that, far from being hidden, their central claim was in fact disseminated widely.  "Instead of pleading facts that establish federal jurisdiction, Relator[s] ha[ve] thus pled [themselves] out of court."  *Staples, Inc.*, 773 F.3d at 88.

Filings with the SEC are public disclosures because they are "administrative" or "[other Federal] report[s]" under Section 3730(e)(4)(A)(ii).  *Jones*, 469 F. App'x at 257; *Ryan*, 27 F. Supp. 3d at 628.  Relators are correct that U.S. Cellular's public SEC filings made the relationship between U.S. Cellular and King Street abundantly clear, and the disclosures amply cover Relators' allegations in the SAC.  For example:

- "A wholly owned subsidiary of [U.S. Cellular] is a limited partner in King Street Wireless, an entity which participated in . . . FCC [] Auction 73 . . . [and] was the provisional winning bidder with respect to 152 licenses[.]"  U.S. Cellular Corp., Annual Report (Form 10-K) (Feb. 26, 2009).

- "These 152 license areas . . . are in markets which are either adjacent to or overlap current U.S. Cellular license areas."  *Id.*

- "[U.S. Cellular], indirectly through its limited partnership interest in King Street Wireless, made strategic investments" in "spectrum [which] covers areas that complement [U.S. Cellular's] strategic footprint[.]."  U.S. Cellular Corp., Proxy Statement (Sched. 14-A) (Apr. 15, 2009).

- U.S. Cellular explained that it "intends to work with [King Street] to build out and deploy 4G LTE networks," U.S. Cellular Form 10-K (Feb. 27, 2012), and that its "business development strategy" with respect to investments in various DEs, including King Street, was "to obtain interests in and access to wireless licenses in areas adjacent to or in proximity to its other wireless licenses, thereby building

---

[10]   As explained in more detail in U.S. Cellular's Motion to Dismiss, Section II(A)(2), U.S. Cellular's SEC filings used the term "controlling financial interest" for a purpose specific to SEC accounting rules, not the FCC DE regulations.  *See* SAC ¶ 148.  The very same filings made clear that "the general partner of [King Street]"—that is, King Street Wireless, Inc.— "has the exclusive right to manage, operate and control the limited partnerships and make all decisions to carry on the business of the partnerships."  *See, e.g.*, U.S. Cellular Corp., Annual Report (Form 10-K) (Feb. 28, 2014).

contiguous operating market areas," U.S. Cellular Corp., Annual Report (Form 10-K) (Feb. 25, 2011).

- In connection with its limited partnerships with King Street, Carroll, and Barat, U.S. Cellular also "announced the readiness of the initial 4G LTE network deployment to certain cities in . . . including some of [U.S. Cellular's] leading markets[.]" U.S. Cellular Form 10-K (Feb. 27, 2012).

- Subsequent SEC filings make clear that U.S. Cellular was providing 4G LTE services "in conjunction" with King Street. *See, e.g.*, U.S. Cellular Corp., Annual Report (Form 10-K) (Feb. 26, 2013).

- The U.S. Cellular capital expenditure figures Relators cite—and the language Relators use to explain the expenditures—come directly from U.S. Cellular's annual filings with the SEC. *Compare* SAC ¶ 103 *with* U.S. Cellular Corp., Annual Report (Form 10-K), at Ex. 13 p. 14 (Feb. 27, 2012); U.S. Cellular Corp., Annual Report (Form 10-K), at Ex. 13 p. 18 (Feb. 26, 2013); U.S. Cellular Corp., Annual Report (Form 10-K), at Ex. 13 p. 13 (Feb. 28, 2014).

U.S. Cellular's SEC submissions therefore detailed its relationship to King Street and the companies' plans for spectrum build-out and shared use. The public disclosures in these SEC filings preclude all of Relators' claims premised on the alleged concealment of U.S. Cellular's relationship with King Street or its role in the build-out or use of King Street's network. *See, e.g.*, SAC ¶¶ 100, 106, 110-11, 118-21, 124-30, 135, 146.

### 5.    News Media Reports on the Relationship Between King Street and U.S. Cellular Preclude Relators' Claims

Finally, if public disclosures in the first three categories above were not sufficient to trigger the public disclosure bar, and they are (either independently or standing together), public news sources also disclosed a key element of the "X + Y = Z" formula:  the "Y," or true set of facts, concerning the connection between King Street and U.S. Cellular.

Relators admit that "U.S. Cellular and King Street claim in press releases and on their respective websites that they provide wireless services in partnership, or in conjunction with one another." SAC ¶ 114.  Courts in this Circuit have construed the term "news media" under the

public disclosure bar, 31 U.S.C. § 3730(e)(4)(A)(iii), to "include readily accessible websites," even where a website does not constitute a "traditional news source." *United States ex rel. Green v. Serv. Contract Educ. & Training Tr. Fund*, 843 F. Supp. 2d 20, 32-33 (D.D.C. 2012); *see also United States ex rel. Shea v. Cellco P'ship*, 863 F.3d 923, 934 (D.C. Cir. 2017) ("Neither party disputes that publicly available websites can fall in [the] category" of "news media.").

In early 2012, U.S. Cellular issued two press releases stating that King Street and U.S. Cellular were "partnering" with each other "to deliver high speed 4G LTE service to U.S. Cellular's customers in several of the carrier's markets." *See* Press Release, U.S. Cellular Corp., U.S. Cellular Announces Launch of 4G LTE Network Next Month Along with Upcoming Devices (Feb. 1, 2012), https://investors.uscellular.com/news/news-details/2012/US-Cellular-Announces-Launch-of-4G-LTE-Network-Next-Month-Along-With-Upcoming-Devices/default.aspx; Press Release, U.S. Cellular Corp., U.S. Cellular Announces Next 4G LTE Markets and Mobile Hotspot Availability (Feb. 16, 2012), https://investors.uscellular.com/news/news-details/2012/US-Cellular-Announces-Next-4G-LTE-Markets-and-Mobile-Hotspot-Availability/default.aspx. The parties' "press releases"—and, of course, their "respective websites"—are publicly available (and readily accessible) online sources.

Moreover, multiple outlets reported that King Street and U.S. Cellular were "partnering" with each other "to deliver high speed 4G LTE service to U.S. Cellular's customers in several of the carrier's markets." *E.g.*, Darren Murph, *U.S. Cellular Launches First 4G LTE Smartphone: Samsung Galaxy S Aviator*, ENGADGET (April 5, 2012), https://www.engadget.com/2012-04-05-us-cellular-galaxy-s-aviator-lte-now-shipping-price-details.html; Colton Kaiser, *US Cellular announces new 4G LTE markets, expands existing ones*, TALKANDROID (Oct. 31, 2012); *U.S. Cellular Announces Launch of 4G LTE Network Next Month Along with Upcoming Devices*,

GLOBE NEWSWIRE (Feb. 1, 2012), https://investors.uscellular.com/news/news-details/2012/US-Cellular-Announces-Launch-of-4G-LTE-Network-Next-Month-Along-With-Upcoming-Devices/default.aspx; *U.S. Cellular Announces Next 4G LTE Markets and Mobile Hotspot Availability*, GLOBE NEWSWIRE (Feb. 16, 2012), https://investors.uscellular.com/news/news-details/2012/US-Cellular-Announces-Next-4G-LTE-Markets-and-Mobile-Hotspot-Availability/default.aspx.

This news coverage—and Relators' admission that King Street and U.S. Cellular themselves disclosed their plans to provide wireless services in partnership with each other—trigger the public disclosure bar under the "news media" prong.  Nothing about King Street's business relationship with U.S. Cellular was not in the public domain.

### 6.    Relators Are Not "Original Sources" of Publicly Disclosed Information

Few cases present such voluminous public disclosures across multiple channels.  Because all of Relators' claims are based on "substantially the same allegations or transactions" that have been publicly disclosed, Relators' only escape hatch to avoid dismissal is to demonstrate they are the "original source" of the material.  31 U.S.C. § 3730(e)(4)(A).  Before the statute was amended in 2010, the FCA defined "original source" as "an individual who has *direct and independent knowledge* of the information on which the allegations are based and has voluntarily provided the information to the Government before filing an action under this section which is based on the information."  31 U.S.C. § 3730(e)(4)(B) (2006) (emphasis added).  Under the version applicable to conduct after March 2010, Relators must show that:  "(1) prior to [the] public disclosure . . . [they] voluntarily disclosed to the Government the information on which allegations or transactions in a claim are based, or (2) [they] ha[ve] knowledge that is independent of and materially adds to the publicly disclosed allegations or transactions, and [they] [] voluntarily

provided the information to the Government before filing an action under" the FCA's *qui tam*

provision.  31 U.S.C. § 3730(e)(4)(B).  Relators cannot satisfy either standard.

The SAC does not establish that Relators have "direct and independent" knowledge or

shared the material elements of their claims with the government before the public disclosures

described above.  Instead, the SAC merely avers that "Relators are the 'original source'" because

they "have independent material knowledge of the information on which the allegations are based

and have voluntarily provided the information to the Government before filing this *qui tam* action

based on that information."  SAC ¶ 37.  Yet, Relators have pled no factual support whatsoever

suggesting, much less showing, that they actually possessed independent knowledge or that they

timely provided such information to the government.  Their conclusory allegation merely recites

the original source legal standard and is manifestly insufficient to meet their pleading burden.  *See,*

*e.g.*, *Hockett*, 498 F. Supp. 2d at 54.  As the Supreme Court has made clear, "[a] pleading that

offers labels and conclusions or a formulaic recitation of the elements of a cause of action will not

do."  *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (internal quotation marks omitted).

In any event, the SAC and its exhibits confirm that *all* of Relators' material allegations are

derived from public sources.  That makes sense because Relators are outsiders and have no access

to inside information.  The SAC merely cobbles together snippets from publicly disclosed filings

into a complaint.  That does not make Relators original sources.

Relators apparently seek to overcome this fatal defect by citing what they claim is new

information, but the effort is patently inadequate.  Relators mention "[f]ield tests" they claim to

have "commissioned" that supposedly "verified [U.S. Cellular's] undisclosed incorporation of the

King Street's licensed spectrum blocks" in certain Iowa markets.  SAC ¶¶ 98-99.  But this is

precisely the type of gimmicky tactic courts reject when relators try to identify something "new"

they added to avoid the public disclosure bar.  The "verifi[cation]" of publicly disclosed information about Defendants' spectrum-sharing arrangement does not reveal an "essential element[] of the alleged fraud," *Staples, Inc.*, 773 F.3d at 87.  Indeed, the law is clear that "[R]elators [are] not an original source [when] they at best verif[y] [] information contained in" the public record.  *Oliver II*, 826 F.3d at 479.  Defendants *had* previously disclosed to the FCC that U.S. Cellular was using King Street's spectrum, and the FCC reported that fact in a *rulemaking*.  *See Promoting Interoperability in the 700 MHz Com. Spectrum*, 27 FCC Rcd. 3521, 3534 (Mar. 21, 2012) (stating that U.S. Cellular's 4G LTE network would "use the 700 MHz licenses of its partner, King Street Wireless").  That itself is enough to prove that Relators have added nothing meaningful to the public record.

U.S. Cellular's provision of "4G LTE technology in conjunction with King Street"— *including* in "certain cities in Iowa"—*was also discussed* in numerous public filings U.S. Cellular made with the SEC.  *See, e.g.*, U.S. Cellular Corp., Annual Report (Form 10-K) (Feb. 27, 2012), at 7 (stating that "U.S. Cellular intends to work with" King Street, Carroll, and Barat, among other limited partnerships, "to build out and deploy 4G LTE networks," and that "[i]n November 2011, U.S. Cellular announced the readiness of the initial 4G LTE network deployment to certain cities in Iowa").  False Claims Act lawsuits that attack individuals and their small businesses require relators to do more than simply rehash what is set forth in public filings.

Moreover, the Relators' 2015 "drive tests" were conducted after the close of the five-year restricted DE period.  Thus, no events at that time could have affected King Street's bidding credits.  *See* 47 C.F.R. § 1.2111(d)(2)(i)(E) (2012).  Outside of the five-year period, King Street could not have owed any unjust enrichment payments to the FCC based on any alleged

"assign[ment] or transfer [of] control of [its] license[s]" to a non-DE entity. *Id.* The "field tests" add nothing substantive to Relators' recycled public information.

Relators also point to "building permits" for two sites in Linn County, Iowa, on which "King Street claimed [] it had antennas" and for which U.S. Cellular was the registered owner. SAC ¶ 111. Setting aside that county "building permits" are also public documents, and therefore public disclosures in their own right, *see, e.g.*, *Green*, 843 F. Supp. 2d at 32-33, U.S. Cellular's role in the build-out of King Street spectrum indisputably had been disclosed publicly. Notably, it is par-for-the-course (and encouraged by the FCC) for tower sites to be shared between multiple wireless carriers. *See, e.g.*, FCC Report, FCC-CIRC1812-07 at ¶ 35 ("In most cases, tower operators and property owners lease antenna, rooftop and other site space to multiple wireless service providers."). And the D.C. Circuit has made clear that the public disclosure "inquiry focuses not on the additional [allegedly] incriminating information a relator supplies, but instead on whether the 'quantum of information already in the public sphere' was sufficient to 'set government investigators on the trail of [alleged] fraud.'" *Staples, Inc.*, 773 F.3d at 87 (quoting *Springfield Terminal*, 14 F.3d at 654-55). Relators cannot qualify as an original source by pulling a few building permits or by spending a day (after the close of the restricted DE period) in Iowa using their cellphones to confirm what is already public. *See Oliver II*, 826 F.3d at 479 (declining to find that relator was an original source and warning that "[c]ourts must be mindful of suits based only on '. . . collateral research'"). Those paltry and immaterial factual add-ons do not justify letting a complaint so reliant upon public disclosures go forward.

In short, "[b]y [Relators'] own pleadings and concessions, the material elements of the fraud, X and Y"—in addition to the allegation of fraud itself, the "Z"—"were already public, so Relator's private intelligence cannot defeat the FCA's [public disclosure bar] hurdle." *Staples,*

*Inc.*, 773 F.3d at 88.  Indeed, "th[is] sort[] of lawsuit[], brought by 'opportunistic plaintiffs who have no significant information to contribute of their own,' [is] precisely the kind the public disclosure bar seeks to prevent."  *Id.* (quoting *Springfield Terminal*, 14 F.3d at 649).

**B.      Relators Do Not Plead the Elements of the FCA**

The public disclosure bar fully resolves this case and compels dismissal of the SAC, and the Court need not go further.  But the problems that beset the SAC go even deeper than repurposing old public disclosures.  "[A]n FCA claim requires the trifecta of falsity, materiality, and scienter," which must be adequately alleged in the complaint to survive a motion to dismiss. *United States ex rel. Gardner v. Vanda Pharm., Inc.*, No. 17-cv-464, 2020 WL 2542121, at *7 (D.D.C. May 19, 2020).  Relators' SAC does not win, place, or show as to any of these three elements.[11]

**1.      Relators' Allegations Fail the FCA's Rigorous Materiality Standard**

The Supreme Court has emphasized that the FCA materiality standard is "rigorous" and "demanding," and must be "strict[ly] enforce[d]."  *Escobar*, 136 S. Ct. at 1996, 2002-2003. Because "materiality 'look[s] to the effect on the likely or actual behavior of the recipient of the alleged misrepresentation,'" facts showing that the government "pa[id] a particular claim in full despite its actual knowledge that certain requirements were violated" are "very strong evidence" of immateriality.  *Id.* at 2003.  Moreover, the Court "reject[ed]" the assertion that "materiality is too fact intensive for courts to dismiss False Claims Act cases on a motion to dismiss," and

---

[11]  The SAC must comply with Rule 9(b), which applies to FCA claims.  A relator must "state the time, place and content of the false misrepresentations, the fact misrepresented . . . what was retained or given up as a consequence of the fraud," and "identify individuals allegedly involved in the fraud."  *United States ex rel. Williams v. Martin Baker Aircraft Co.*, 389 F.3d 1251, 1256 (D.C. Cir. 2004) (citations and internal quotation marks omitted).  The SAC does not meet this demanding standard.

emphasized that FCA "plaintiffs must also plead their claims with plausibility and particularity under Federal Rules of Civil Procedure 8 and 9(b) by, for instance, pleading facts to support allegations of materiality." *Id.* at 2004 n.6. The SAC fails the materiality test several times over.

> **a.** **The FCC Was Aware of and Investigated the FCA Theory at Issue in This Case Before Granting Defendants Licenses and Bidding Credits**

This Court can know that Relators' allegations are not and cannot be material to the government's decision-making for a simple and extraordinary reason: the FCC—the expert agency charged with enforcement of the DE regulations—investigated the 2008 Complaint *before* it awarded the licenses to King Street. The 2008 Complaint leveled the same core allegations against King Street and Ms. DiNardo about the same auctions as the SAC does. After the 2008 *qui tam* was filed, the FCC became aware of it, sent it to King Street, informed King Street in an accompanying letter that the agency was evaluating the 2008 Complaint "in connection with the FCC's administrative consideration of applications for licenses [by King Street] which are currently pending before the FCC," asked King Street directly to respond to the allegations, and announced the inquiry to the public by releasing the letter in its Daily Digest. *See* Letter from R. Noel to T. Gutierrez re Auction 73 Application of King Street Wireless, L.P., 24 FCC Rcd. 4527 (attached as Exhibit B). *See also* SAC ¶ 88. As noted in the SAC, King Street responded in a publicly available May 8, 2009 Submission (attached as Exhibit C). *See* SAC ¶ 88. The FCC then granted King Street's application. *See* FCC Public Notice, DA 09-2643 (Dec. 30, 2009).

This case therefore is an extraordinary example of a government agency *actually evaluating* the very same theory and central facts of the alleged fraud and concluding that the requested benefits were still warranted. Against that backdrop, Relators as a matter of law cannot plausibly establish that their allegations were "material" to the FCC for FCA purposes. Courts

have dismissed cases for inadequate materiality allegations in circumstances far less compelling than those here.

In *United States ex rel. McBride v. Halliburton Company,* 848 F.3d 1027, 1029 (D.C. Cir. 2017), for example, before the defendant was served with the *qui tam* complaint, the Defense Contract Audit Agency (DCAA) investigated the relator's claims concerning the defendant's alleged use of inflated headcount data when billing the government.  Following that investigation, "neither DCAA nor any other Government agency disallowed or challenged any of the amounts [defendant] had billed."  *Id.*  In affirming the grant of summary judgment for the defendant, the D.C. Circuit held that the relator could not meet the "demanding" materiality standard where the agency "investigated [the relator's] allegations and did not disallow any charged costs.  In fact, [the defendant] continued to receive an award fee for exceptional performance under [the relevant task order] even after the Government learned of the allegations."  *Id.*  As the D.C. Circuit observed, courts "have the benefit of hindsight and should not ignore what actually occurred" when the government learned of a claim's purported falsity.  *Id.*; *see also United States ex rel. Janssen v. Lawrence Mem'l Hosp.*, 949 F.3d 533, 542 (10th Cir. 2020) (finding immateriality where government agency commissioned investigation of the "claim against [defendant] that [was] the subject of th[e] lawsuit").

Similarly, in *Cimino v. International Business Machines Corporation*, the court granted a motion to dismiss in part because the relator had failed to plead materiality adequately under *Escobar*.  2019 WL 4750259, at *7 (D.D.C. Sept. 30, 2019).  *Cimino* involved an allegation that IBM had fabricated audit findings and presented them to the IRS in order to persuade the IRS to renew a $265 million software license.  *Id* at *1.  The court concluded that there was "strong evidence" that the IRS did not deem those audit filings material to its decision to renew IBM's

31

license agreement, particularly because the IRS paid "a substantial portion" of the new licensing agreement after the case was filed and the agency became aware of the relator's allegations.  *Id*. at *7 & n.3 (internal quotation marks removed).  The court found it "implausible that the IRS sat on its hands upon learning that IBM had tricked it into signing a contract for $265 million for software that it did not need," and "[i]n fact . . . agreed to pay even more money to IBM."  *Id*. at *7.

The bottom line is that this Court does not have to guess what the FCC would have done had it known of Relators' allegations.  The FCC had a fully formed and on-file FCA complaint that alleged the same scheme by the same parties in the same auctions as those at issue in this case.  It investigated them, and then awarded King Street the licenses and bidding credits.  Few cases involve such a demonstrable record of immateriality under *Escobar* and *McBride*.

### b.    The FCC's Knowledge of the Factual Bases for Relators' Claims Negates Materiality

Relators' own allegations also demonstrate that the FCC had full knowledge of the relationship between King Street and U.S. Cellular and of the conduct that gives rise to Relators' claims.  *See* Section II.A.3 *supra*.  That catalog of information before the FCC alone is sufficient to compel dismissal under Rule 12(b)(6) for failure to meet the materiality standard.  *Escobar*, 136 S. Ct. at 2003; *see also United States ex rel. Hutchins v. DynCorp Int'l, Inc.*, 342 F. Supp. 3d 32, 55 n.22 (D.D.C. 2018) (dismissing claim where materiality was lacking because "the Army was aware of the practice and paid [the defendant] anyway"); *United States v. Comstor Corp.*, 308 F. Supp. 3d 56, 86 (D.D.C. 2018) (dismissing for lack of materiality where "the government was fully informed for years about the relator's allegations regarding the defendants' purported role in the fraudulent scheme" and continued payment).

Moreover, "if the Government regularly pays a particular type of claim in full despite actual knowledge that certain requirements were violated, and has signaled no change in position, that is

strong evidence that the requirements are not material." *Escobar*, 136 S. Ct. at 2003-04.  The SAC alleges just such a pattern of repeated approvals, which necessarily defeats materiality.

As Relators themselves have alleged, in the time before and after Auction 73 in 2008, the FCC granted licenses to a series of DEs connected to Ms. DiNardo and U.S. Cellular and formed using the same ownership structure as King Street.  The SAC alleges that Carroll and Barat had functionally the same ownership structure and relationship to U.S. Cellular as King Street had. *See* SAC ¶¶ 17, 28-32.  The SAC also makes clear that the FCC knew the material facts underlying Relators' claims concerning Carroll and Barat, considered that information, and yet still awarded bidding credits and spectrum licenses to those entities prior to Auction 73, on January 6, 2006, and April 30, 2007, respectively.   SAC ¶¶ 161, 188.   Indeed, all of the documents showing the formation, organization, financing, and management of Carroll and Barat were submitted to the FCC and were (and remain) available on the FCC docket.  In addition, in 2008, Aquinas Wireless L.P., a DE structured with an entity owned by Ms. DiNardo as its general partner and USCCWI as its limited partner, was awarded bidding credits and spectrum licenses in connection with FCC Auction 78.  *See* SAC ¶ 32.  Relators admit that the 2012 NSA between King Street and U.S. Cellular was "summarized in [U.S. Cellular's] long-form application [for Auction 901] as proof that U.S. Cellular" had access to the spectrum "necessary to construct networks in the census tracts areas."  SAC ¶ 142.  And the FCC paid U.S. Cellular $40 million in Mobility Fund subsidies after reviewing U.S. Cellular's submissions, SAC ¶ 146, confirming that the NSA was not a regulatory problem.

The simple fact is that the FCC was aware of the arrangements to which Relators now point in alleging regulatory violations, and the FCC's decisions concerning these Defendants across a

series of auctions over a number of years confirm that the FCC took no issue with Defendants'

business arrangements.  This pattern negates materiality as a matter of law under *Escobar*.

### 2. Relators' Allegations Make Clear that Defendants Cannot Have Acted with FCA Scienter

The FCA defines "know[ledge]" of a claim's falsity as "actual knowledge," "deliberate

ignorance," or "reckless disregard."  31 U.S.C. § 3729(b)(1).  Negligence is insufficient for FCA

liability.  As the D.C. Circuit has emphasized, "Congress clearly had no intention to turn the FCA,

a law designed to punish and deter fraud, into a vehicle for . . . 'punish[ing] honest mistakes or

incorrect claims submitted through mere negligence.'"  *United States v. Sci. Applics. Int'l Corp.*,

626 F.3d 1257, 1274 (D.C. Cir. 2010) ("*SAIC*") (alteration in original) (citation omitted).  The

Supreme Court also has made clear that the FCA's scienter requirement must be "strict[ly]

enforce[d]," including at the motion-to-dismiss stage.  *See Escobar*, 136 S. Ct. at 2002 & n.6.  *See

also SAIC*, 626 F.3d at 1270.  Relators fail to meet that exacting standard.

Under established D.C. Circuit precedent, FCA scienter cannot be satisfied if the defendant

reached an objectively reasonable interpretation of an ambiguous regulation that was consistent

with how the agency applied it in practice and the defendant was not "warned away" from that

interpretation by the government.  *See United States ex rel. Purcell v. MWI Corp.*, 807 F.3d 281,

287-89 (D.C. Cir. 2015) (applying *Safeco Ins. Co. of Am. v. Burr*, 551 U.S. 47 (2007)).  In *Purcell*,

the D.C. Circuit overturned a jury verdict in favor of the government on an FCA claim because

the company's interpretation of the phrase "regular commissions" in its certifications to the U.S.

Export-Import Bank in connection with a loan was reasonable and the company had not been

"warned away" from the interpretation by the government.  *See id.* at 284, 287-291.  As the court

stated, "[c]onsistent with the need for a knowing violation, the FCA does not reach an innocent,

good-faith mistake about the meaning of an applicable rule or regulation," "[n]or does it reach

those claims made based on reasonable but erroneous interpretations of a defendant's legal obligations." *Id.* at 287-88. "Strict enforcement of the FCA's knowledge requirement helps to ensure that innocent mistakes made in the absence of binding interpretive guidance are not converted into FCA liability, thereby avoiding the potential due process problems posed by 'penalizing a private party for violating a rule without first providing adequate notice of the substance of the rule.'" *Id.* at 287 (quoting *Satellite Broad. Co. v. FCC*, 824 F.2d 1, 3 (D.C. Cir. 1987)).

Similarly, in *United States ex rel. K & R Limited Partnership v. Massachusetts Housing Finance Agency*, 530 F.3d 980, 983-84 (D.C. Cir. 2008), the D.C. Circuit affirmed summary judgment for the defendant because a reasonable interpretation of an ambiguous mortgage document cannot support FCA scienter. The relator had alleged that a mortgage lender had overbilled the Department of Housing and Urban Development ("HUD"), including by failing to pass through to HUD savings that the lender had gained by altering the interest rate given to borrowers. *Id.* at 981. The court observed that the lender used several types of notes for the loans, and "[e]ach type [of note] phrased the payment calculation differently and somewhat awkwardly." *Id.* at 982. The court concluded that the language in the notes was ambiguous, that the defendant's interpretation was reasonable, and that under the FCA scienter standard it was irrelevant "which [side] has the better reading." *Id.* at 982-83. "[The relator] never explain[ed] why [the defendant's] interpretation of the mortgage notes was unreasonable, much less why its interpretation constituted reckless disregard," and the relator "point[ed] to nothing else that might have warned [the defendant] away from the view it took." *Id.* at 984 (internal quotation marks omitted) (citing *Safeco*).

Here, the D.C. Circuit has already determined that the vast array of FCC rules governing the DE program is complex and ambiguous. *See Tel. & Data Sys., Inc. v. Fed. Commc'ns Comm'n*, 19 F.3d 42, 50 (D.C. Cir. 1994) (criticizing *de facto* control test as "a meaningless recitation" of words enabling the Commission to "find compliance or noncompliance . . . arbitrarily"). And far from warning Defendants away, the FCC granted the licenses and bidding credits to King Street— and other entities associated with U.S. Cellular, including Carroll and Barat—after receiving King Street's response to *the very same allegations Relators make here.* Relators plead no facts to suggest that the FCC has ever conveyed to any of the Defendants that the interpretation of the DE regulations reflected in the FCC's pattern of official actions was faulty. Relators may now disagree (years after the fact) with the reasonable interpretation of the DE rules by Defendants and by the FCC, but they offer no significant new information, and they cannot allege a knowing FCA violation as a matter of law given that the government's actions were consistent with Defendants' statements of compliance with the regulations.

More generally, the SAC's allegations about the course of dealing between Ms. DiNardo, U.S. Cellular, and numerous DEs over *multiple* auctions and years confirm that Defendants cannot have acted with the required scienter. The SAC expressly alleges that Auction 73 continued a "pattern and practice[]" of the FCC granting licenses to entities associated with Ms. DiNardo and U.S. Cellular, including Carroll and Barat but also including entities stretching back to the early 2000s. SAC ¶¶ 17, 32, 151. A defendant cannot have the scienter required by the FCA if it knows the government is aware of and has acquiesced in a particular practice. *See United States ex rel. Burke v. Record Press, Inc.*, 816 F.3d 878, 881 (D.C. Cir. 2016) ("'[T]he knowledge possessed by officials of the United States may be highly relevant' under the False Claims Act because it 'may show that the defendant did not submit its claim in deliberate ignorance or reckless disregard of

the truth.'" (citation omitted)); *see also United States ex rel. Spay v. CVS Caremark Corp.*, 875

F.3d 746, 756 (3d Cir. 2017) (holding government knowledge of an allegedly false claim can

negate scienter required for an FCA violation); *Gonzalez v. Planned Parenthood of L.A.*, 759 F.3d

1112, 1116 (9th Cir. 2014) (same).[12]

### 3.    Relators Cannot Satisfy the FCA's Falsity Standard

To establish the falsity element, Relators must plead and prove the concealment of an

objectively verifiable fact.  FCA liability cannot be predicated on a legal judgment, even one that

is disputed.  *United States ex rel. McBride v. Halliburton Co.*, No. 1:05-cv-828, 2014 WL

12691854, at *4 (D.D.C. Dec. 10, 2014) (for FCA liability to exist, "the statement or conduct

alleged must represent an objective falsehood" (alteration in original) (citation and internal

quotation marks omitted)).  *See also United States v. AseraCare, Inc.*, 938 F.3d 1278, 1297-1303

(11th Cir. 2019); *United States ex rel. Yannacopoulos v. Gen. Dynamics*, 652 F.3d 818, 837-38

(7th Cir. 2011); *United States ex rel. Wilson v. Kellogg Brown & Root, Inc.*, 525 F.3d 370, 377

(4th Cir. 2008); *United States ex rel. Morton v. A Plus Benefits, Inc.*, 139 F. App'x 980, 982-83

(10th Cir. 2005); *United States ex rel. Lamers v. City of Green Bay*, 168 F.3d 1013, 1018 (7th Cir.

1999); *Hagood v. Sonoma Cty. Water Agency*, 81 F.3d 1465, 1477 (9th Cir. 1996).

The reason for this rule is clear.  Imposing draconian FCA liability for a regulatory miss—

---

[12]  These conclusions apply with equal force to Carroll for purposes of Count Four of the SAC. Defendants cannot be liable for acting "knowingly" if the government took no action to reclaim licenses it knew Carroll was retaining, and if Carroll's claim to the licenses was based on a reasonable interpretation of otherwise ambiguous regulations.  *See United States ex rel. Kasowitz Benson Torres LLP v. BASF Corp.*, 285 F. Supp. 3d 44, 55 (D.D.C. 2017) ("For a defendant to 'know' that he is delivering or causing to be delivered 'less than all' of a certain property 'used, or to be used, by the Government,' he must necessarily also know that the property belongs to the government" (emphasis in original) (quoting *United States ex rel. Harper v. Muskingum Watershed Conserv. Dist.*, 842 F.3d 430, 439 (6th Cir. 2016)).

as opposed to a false statement—would convert "the practice of administrative law [into] 'Russian Roulette.'" *Trinity Broad. of Fla., Inc. v. FCC*, 211 F.3d 618, 630 (D.C. Cir. 2000). That is why the Supreme Court in *Escobar* made clear that the FCA is not "a vehicle for punishing garden-variety . . . regulatory violations." 136 S. Ct. at 2003. And it is also why courts have recognized that FCA liability cannot attach as a matter of law to reasonable interpretations of ambiguous legal requirements. For example, in *United States ex rel. Siewick v. Jamieson Sci. & Eng'g, Inc.*, 214 F.3d 1372, 1378 (D.C. Cir. 2000), the D.C. Circuit affirmed a grant of summary judgment to a defendant that had submitted claims for payment on a government contract despite violations by a corporate officer of "a criminal statute aimed at 'revolving door' abuses by former government employees." *Siewick*, 214 F.3d at 1374, 1378. The court concluded that the relator's claims amounted to nothing more than "legal argumentation and possibility" concerning the effect of the violations on the validity of the contract, and accordingly that FCA liability was improper. *See id.* at 1378. The court noted that "[d]isputes arise between the government and its contractors every day," and rejected the relator's theory because it would have meant "any contracting party that misunderstands its legal entitlements . . . would be liable under the False Claims Act." *Id.* In the D.C. Circuit, "[d]isputed legal issues do not constitute fraud." *United States ex rel. Bettis v. Odebrecht Contractors of Cal.*, 297 F. Supp. 2d 272, 291 (D.D.C. 2004).

Relators' entire theory is premised on precisely such a disputed legal judgment—namely, that King Street, Carroll, and Barat were not entitled to DE status under FCC regulations. Relators have not alleged any material information that was unavailable to the FCC when it awarded King Street's licenses in 2008, and the FCC has not taken any action to rescind those licenses or take any other enforcement action since those licenses were awarded, which it could do if it determined that King Street was no longer entitled to DE status. *See* 47 C.F.R. § 1.2111(d)(1) (2006). The

same is true for Carroll and Barat.  Relators cannot base FCA liability on a disputed interpretation

of the dizzying (some would say Byzantine) array of complex and reticulated FCC rules.  *See Tel.*

*& Data Sys., Inc.*, 19 F.3d at 50.  Relators' belated attempt to second-guess those decisions years

later (when the FCC has done no such thing) reflects precisely the type of disagreement about "a

disputed legal issue" that courts have held cannot support FCA liability.  *Bettis*, 297 F. Supp. 2d

at 291.

## C.     Relators' Conspiracy and Reverse False Claims Counts Fail Because There Is No Underlying FCA Violation

Relators cannot revive their claims or circumvent the public disclosure bar through their

conspiracy and reverse false claims allegations in Counts One and Five of the SAC.  Without

sufficient allegations regarding the key elements of FCA liability, neither claim is viable.

A conspiracy under the FCA requires an agreement to commit an FCA violation, an act

performed to accomplish the violation, and damage to the United States.  *See United States ex rel.*

*Conteh v. IKON Office Sols., Inc.*, 103 F. Supp. 3d 59, 68 (D.D.C. 2015) (pre-2009 amendments);

*see also United States ex rel. PCA Integrity Assocs., LLP v. NCO Fin. Sys., Inc.*, CV No. 15-750,

2020 WL 686009, at *14 (D.D.C. Feb. 11, 2020) (post-2009 amendments).  FCA conspiracy

liability requires a relator to "establish an underlying FCA violation."  *United States ex rel.*

*Kasowitz Benson Torres LLP v. BASF Corp.*, 929 F.3d 721, 728 (D.C. Cir. 2019) (citation and

internal quotation marks omitted); *see also United States ex rel. Godfrey v. KBR, Inc.*, 360 F.

App'x 407, 413 (4th Cir. 2010).  Because Relators do not plead the materiality, scienter, and falsity

elements of an underlying FCA claim, they cannot avoid dismissal through their conspiracy

allegations. *See BASF Corp.*, 929 F.3d at 729. The conspiracy allegations cannot add substance that is not otherwise there.[13]

Relators' fifth cause of action, under the so-called "reverse false claims" provision of the FCA, 31 U.S.C. § 3729(a)(1)(G), similarly fails. A "reverse" false claim arises when a defendant knowingly and unlawfully retains monies it received from a government agency. Like other claims under the FCA, violations of the "reverse false claims" provision require materiality, scienter, and falsity. *See Janssen*, 949 F.3d at 539. Relators' claims fail each of those elements for all of the reasons set out above.

**D.      The SAC Should Be Dismissed with Prejudice**

Dismissal of a complaint with prejudice is appropriate where the complaint fails to state a claim and amendment would be futile. *Corp. Sys. Res. v. Wash. Metro. Area Transit Auth.*, 31 F. Supp. 3d 124, 135 (D.D.C. 2014). Here, this Court has discretion to deny Relators the opportunity to amend their SAC "on grounds of futility" because an amended complaint "would not survive a motion to dismiss." *See In re Interbank Funding Corp. Sec. Litig.*, 629 F.3d 213, 215 (D.C. Cir. 2010) (citation and internal quotation marks omitted).

---

[13]   Relators contend that the "agreements" underlying the FCA conspiracy they plead in Count One included "[t]he arrangements establishing the corporate and financial relationship between and amongst the U.S. Cellular Defendants, Defendant DiNardo, Defendant King Street, as well as the arrangements establishing Carroll and Barat"; "[t]he Management Agreements"; "[t]he 2011 and 2012 NSAs"; and "[u]pon information and belief other oral or implied agreements that were necessary to carry out the conspiracy." SAC ¶ 206(a)-(d). As discussed above, the substance of all of these agreements named in the SAC was publicly disclosed. Moreover, Relators cannot evade the public disclosure bar (much less satisfy Rule 9(b)) by pleading facts "on information and belief" without any allegation "that the necessary information lies within the defendant[s'] control," and without "a statement of the facts upon which the allegations [made on information and belief] are based." *Kowal v. MCI Commc'ns Corp.*, 16 F.3d 1271, 1279 n.3 (D.C. Cir. 1994). Relators have taken neither step in support of their vague allegation in ¶ 206(d) that "other oral or implied agreements" exist sufficient to establish an FCA conspiracy.

Relators' reliance on public information for their entire case (as was also true in the 2008 Complaint) will not change if Relators are granted leave to amend the SAC, because Relators are not insiders and have no access to non-public information.  No future amendment can change the information the FCC had.   Moreover, Relators already have amended their complaint twice, including once with the benefit of DOJ's own investigation.  The fact is that the FCC knew about and investigated these allegations in 2008, and not only then but for years has approved submissions from King Street and similar entities.   No amount of re-pleading can change this fundamental truth.  *See United States ex rel. Porter v. Magnolia Health Plan, Inc.*, 810 F. App'x 237, 243 (5th Cir. 2020) (dismissing with prejudice where amendment was futile given continued payment of claims despite knowledge of alleged violations).

## IV.   CONCLUSION

This is precisely the type of False Claims Act case Congress banned.  It is a stale mash-up of information about purported highly technical regulatory violations that were publicly disclosed and were known to the FCC.   The FCC investigated the 2008 Complaint and approved King Street's bids and awarded King Street spectrum and bidding credits—and over many, many years declined to reverse those decisions.  Moreover, King Street's formation, financing, operations, and partnership with U.S. Cellular were all fully and publicly disclosed.   Relators cannot bear the mantle of *qui tam* enforcers in a case in which their efforts are so demonstrably parasitic of publicly disclosed information.  Nor can they convert their disagreement with the FCC's conclusions about King Street's regulatory compliance into a punitive FCA case.  False Claims Act litigation is not a game, particularly when individuals are named as defendants and their livelihoods are on the line.  Because nothing Relators can do will alter the mandated legal outcome, the SAC should be dismissed with prejudice.  The King Street Defendants deserve to have the overhang and stigma of FCA liability eliminated from their personal and professional lives forever.

Dated: October 26, 2020

Respectfully submitted,

/s/  *Andrew S. Tulumello*

Andrew S. Tulumello, DC Bar No. 468351
Stuart F. Delery, DC Bar No. 449890
GIBSON, DUNN & CRUTCHER LLP
1050 Connecticut Avenue, N.W.
Washington, DC  20036
Telephone:  202.955.8500
Fax:  202.530.9678
atulumello@gibsondunn.com
sdelery@gibsondunn.com

*Attorneys for Defendants King Street Wireless, L.P., King Street Wireless, Inc., and Allison Cryor DiNardo*

42