# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

UNITED STATES OF AMERICA, *ex rel.*
MARK J. O'CONNOR and SARA F.
LEIBMAN,

                   Plaintiffs,

    v.

UNITED STATES CELLULAR
CORPORATION, *et al.*,

                  Defendants.

Case No. 20-cv-2071 (TSC)

**ORAL HEARING REQUESTED**

**DEFENDANTS UNITED STATES CELLULAR CORPORATION, USCC WIRELESS INVESTMENT, INC., AND TELEPHONE AND DATA SYSTEMS, INC.'S MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF DISMISSAL**

# TABLE OF CONTENTS

**Page**

Introduction .................................................................................................................1

Background ..................................................................................................................2

    A.    Statutory and Regulatory Framework ...........................................2

    B.    Spectrum Auctions at Issue in This Case ......................................4

        1.    Auction 58—Partnership with Carroll Wireless ..............................4

        2.    Auction 66—Partnership with Barat Wireless ................................5

        3.    Auction 73—Partnership with King Street Wireless .....................6

    C.    The Prior Qui Tam Action .............................................................8

    D.    The Current Qui Tam Action .........................................................9

Standard of Review ..................................................................................................10

Argument ..................................................................................................................10

    I.    The SAC Should Be Dismissed Under The Public Disclosure Bar .......................11

    A.    Relators' Claims Are Based On Publicly Disclosed Information ..............13

        1.    Public Disclosures in the Prior Qui Tam Action ...........................13

        2.    Public Disclosures in FCC and SEC Filings .................................15

    B.    Relators Were Not An Original Source. ...................................................18

    II.    Relator Fails To Plead Essential Elements of a False Claims Act Violation ........19

    A.    Relators Have Not Plausibly Alleged That U.S. Cellular Made Any Actionable False Statements. ......................................................................20

        1.    There Was No Attributable Material Relationship Between U.S. Cellular and King Street. ......................................................21

        2.    U.S. Cellular Did Not Control the DEs ..........................................23

        3.    Relators' Alternative Theories Also Fail Adequately To Allege Falsity. ............................................................................26

B.  Relators Have Not Plausibly Alleged That U.S. Cellular Acted With Scienter. ...........................................................................................27

C.  Relators Have Not Plausibly Alleged That Any Alleged False Statement Was Material To the FCC's Approval Decision. ......................30

III.  The SAC's Claims Regarding Auctions 58 and 66 Are Time-Barred Under the False Claims Act Statute of Limitations. ..........................................................33

Conclusion .....................................................................................................................................35

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Akhmetshin v. Browder*,
    407 F. Supp. 3d 11 (D.D.C. 2019) ............................................................................22

*Ashcroft v. Iqbal*,
    556 U.S. 662 (2009) .................................................................................10, 31

*Barr v. Clinton*,
    370 F.3d 1196 (D.C. Cir. 2004) ........................................................................34

*Bell Atl. Corp. v. Twombly*,
    550 U.S. 544 (2007) ...............................................................................10

*United States ex rel. Burke v. Record Press, Inc.*,
    816 F.3d 878 (D.C. Cir. 2016) ........................................................................29

*Cimino v. Int'l Bus. Machs. Corp.*,
    2019 WL 4750259 (D.D.C. Sept. 30, 2019) ...................................................33

*Cochise Consultancy, Inc. v. United States ex rel. Hunt*,
    139 S. Ct. 1507 (2019) ..............................................................................33

*Covad Commc'ns Co. v. Bell Atl. Corp.*,
    407 F.3d 1220 (D.C. Cir. 2005) .........................................................................7

*United States ex rel. Davis v. District of Columbia*,
    679 F.3d 832 (D.C. Cir. 2012) ........................................................................11

*United States ex rel. Doe v. Staples, Inc.*,
    773 F.3d 83 (D.C. Cir. 2014) .........................................................................13

*\*United States ex rel. Doe v. Staples, Inc.*,
    932 F. Supp. 2d 34 (D.D.C. 2013), *aff'd*, 773 F.3d 83 (D.C. Cir. 2014) ...................13, 15, 19

*United States ex rel. Findley v. FPC-Boron Emps' Club*,
    105 F.3d 675 (D.C. Cir. 1997) ........................................................................11

*United States ex rel. Folliard v. Comstor Corp.*,
    308 F. Supp. 3d 56 (D.D.C. 2018), *reconsideration denied*, 2018 WL 5777085
    (D.D.C. Nov. 2, 2018).................................................................................11

*United States ex rel. Gardner v. Vanda Pharm., Inc.*,
    2020 WL 2542121 (D.D.C. May 19, 2020) ...................................................20

*United States ex rel. Green v. Serv. Contract Educ. & Training Tr. Fund*,
    843 F. Supp. 2d 20 (D.D.C. 2012) ..........................................................................17

*United States ex rel. J. Cooper & Assocs., Inc. v. Bernard Hodes Grp., Inc.*,
    422 F. Supp. 2d 225 (D.D.C. 2006) ................................................................11, 19

*United States ex rel. Janssen v. Lawrence Mem'l Hosp.*,
    949 F.3d 533 (10th Cir. 2020), *cert. denied*, 2020 WL 5883407 (Oct. 5, 2020) ....................33

*United States ex rel. K&R Ltd. P'ship v. Mass. Hous. Fin. Agency*,
    530 F.3d 980 (D.C. Cir. 2008) ..............................................................................29

*United States ex rel. Kasowitz Benson Torres LLP v. BASF Corp.*,
    929 F.3d 721 (D.C. Cir. 2019) ..............................................................................20

*United States ex rel. Lamers v. City of Green Bay*,
    168 F.3d 1013 (7th Cir. 1999) ..............................................................................27

*United States ex rel. Maxwell v. Kerr-McGee Oil & Gas Corp.*,
    540 F.3d 1180 (10th Cir. 2008) ............................................................................15

*\*United States ex rel. McBride v. Halliburton Co.*,
    848 F.3d 1027 (D.C. Cir. 2017) ............................................................................33

*United States ex rel. Oliver v. Philip Morris USA Inc.*,
    826 F.3d 466 (D.C. Cir. 2016) ........................................................................12, 15

*United States ex rel. PCA Integrity Assocs., LLP v. NCO Fin. Sys., Inc.*,
    2020 WL 686009 (D.D.C. Feb. 11, 2020) ..............................................................10

*\*United States ex rel. Purcell v. MWI Corp.*,
    807 F.3d 281 (D.C. Cir. 2015) ........................................................20, 23, 27, 28

*SEC v. RPM Int'l, Inc.*,
    282 F. Supp. 3d 1 (D.D.C. 2017) ....................................................................15, 16

*United States ex rel. Shea v. Cellco P'ship*,
    863 F.3d 923 (D.C. Cir. 2017) ..............................................................................17

*United States ex rel. Shea v. Verizon Commc'ns, Inc.*,
    160 F. Supp. 3d 16 (D.D.C. 2015), *aff'd sub nom United States ex rel. Shea v.*
    *Cellco P'ship*, 863 F.3d 923 (D.C. Cir. 2017) ......................................................11

*United States ex. rel. Sikkenga v. Regence Bluecross Blueshield of Utah*,
    472 F.3d 702 (10th Cir. 2006) ..............................................................................24

*\*United States ex rel. Springfield Terminal Ry. Co. v. Quinn*,
    14 F.3d 645 (D.C. Cir. 1994) ........................................................................12, 13, 15

*United States ex rel. Swafford v. Borgess Med. Ctr.*,
   98 F. Supp. 2d 822 (W.D. Mich. 2000), *aff'd*, 24 F. App'x 491 (6th Cir. 2001) ...................23

*United States ex rel. Totten v. Bombardier Corp.*,
   286 F.3d 542 (D.C. Cir. 2002) ........................................................................24, 30

*Winter ex rel. U.S. v. Gardens Reg'l Hosp. and Med. Ctr.*,
   953 F.3d 1108 (9th Cir. 2020) ...............................................................................20

*United States v. The Boeing Co.*,
   825 F.3d 1138 (10th Cir. 2016) ..............................................................................28

*United States v. Kellogg Brown & Root Servs., Inc.*,
   800 F. Supp. 2d 143 (D.D.C. 2011) ..................................................................20, 23

*Universal Health Servs., Inc. v. United States ex rel. Escobar*,
   136 S. Ct. 1989 (2016) ........................................................................27, 30, 31, 32

*Webster v. Spencer*,
   2020 WL 2104231 (D.D.C. May 1, 2020) ..................................................................7

*United States ex rel. Williams v. Martin-Baker Aircraft Co.*,
   389 F.3d 1251 (D.C. Cir. 2004) ..............................................................................10

*Zukerman v. U.S. Postal Service*,
   961 F.3d 431 (D.C. Cir. 2020) ...............................................................................10

**Statutes**

*31 U.S.C. § 3729 .....................................................................................19, 20, 27

*31 U.S.C. §3730 ........................................................................................... *passim*

*31 U.S.C. § 3731 ...........................................................................................33, 34

47 U.S.C. § 301 .....................................................................................................2

47 U.S.C. § 309 .....................................................................................................2

**Rules**

Fed. R. Civ. P. 8 ...............................................................................................24, 31

Fed. R. Civ. P. 9 .........................................................................................10, 24, 31

Fed. R. Civ. P. 12 .................................................................................................10

**Regulations & Rulemakings**

*47 C.F.R. § 1.2110 (2014) ...................................................................................... *passim*

47 C.F.R. § 1.2111 (2014) ....................................................................................................4

47 C.F.R. § 1.9003 (2014) ..................................................................................................22

47 C.F.R. § 24.709 (2014)......................................................................................................3

*In re Implementation of Sections 3(N) and 332 of the Communications Act Regulatory Treatment of Mobile Services*,
   9 FCC Rcd. 7123 (1994)...............................................................................................26

*In re Implementation of Section 309(j) of the Communications Act—Competitive Bidding*,
   9 FCC Rcd. 5532 (1994).................................................................................................3

*Provision of Roaming Services by Commercial Mobile Radio Service Providers*,
   61 Fed. Reg. 43977 (Aug. 27, 1996)............................................................................22

*Reexamination of Roaming Obligations of Commercial Mobile Radio Service Providers and Other Providers of Mobile Data Services*, 76 Fed. Reg. 26199
   (May 6, 2011).................................................................................................................22

*Updating Competitive Bidding Rules*, 80 Fed. Reg. 56764 (Sept. 18, 2015) .....................2, 22, 23

**Agency Adjudications**

*In re Stratos Global Corp.*,
   22 FCC Rcd. 21328 (2007)............................................................................................28

**Other Authorities**

Deloitte, *A Roadmap to Consolidation*: *Identifying a Controlling Financial Interest* (2019), *available at* https://www2.deloitte.com/content/dam/Deloitte/us/Documents/audit/ASC/Roadmaps/us-aers-a-roadmap-to-consolidation-identifying-a-controlling-financial-interest.pdf ......................................................25

Press Release, U.S. Cellular Corp., U.S. Cellular Announces Launch of 4G LTE Network Next Month Along with Upcoming Devices (Feb. 1, 2012), https://investors.uscellular.com/news/news-details/2012/US-Cellular-Announces-Launch-of-4G-LTE-Network-Next-Month-Along-With-Upcoming-Devices/default.aspx ......................................................................17

Press Release, U.S. Cellular Corp., U.S. Cellular Announces Next 4G LTE
    Markets and Mobile Hotspot Availability (Feb. 16, 2012),
    https://investors.uscellular.com/news/news-details/2012/US-Cellular-
    Announces-Next-4G-LTE-Markets-and-Mobile-Hotspot-
    Availability/default.aspx ............................................................................................17

*Asterisks indicate those cases or authorities on which counsel chiefly relies.  Local Civ. R. 7(a).

**INTRODUCTION**

This False Claims Act ("FCA") case is not brought by whistleblowers with inside information. Rather, this case was brought by two telecom lawyers who have recycled a long-dismissed *qui tam* suit challenging the same conduct, by the same defendants, regarding the same Federal Communications Commission ("FCC") spectrum auctions, and based on the same publicly filed documents. The prior suit was a failure—voluntarily dismissed after both the FCC and the Department of Justice ("DOJ") considered its allegations fully and took no action. The FCA does not permit Relators a new bite from that rotten apple. Their Second Amended Complaint ("SAC") is parasitic of that prior case and the public record more generally, and therefore should be dismissed under the FCA's public disclosure bar. 31 U.S.C. § 3730(e)(4).

The SAC also fails because it does not adequately allege falsity, scienter, or materiality—each of which is an essential element of its FCA claims. It does not plead that Defendants made *any* false statement, let alone one that misrepresented an objective fact. Indeed, the challenged statements—certifications that certain businesses were qualified to receive small-business subsidies to participate in FCC spectrum actions—were both factually true and legally reasonable. Nor do Relators present well-pleaded allegations that those certifications were knowingly or even recklessly false. And it is clear from the FCC's own conduct that *if* any of the statements Relators challenge were false, they were not material to the Agency's decision to grant the benefits at issue. The FCC had before it all relevant facts underlying the statements and it *still* granted the challenged licenses, and indeed has granted other licenses to the Defendants under similar circumstances.

Finally, Relators' claims regarding licenses granted in 2006 and 2007 are time-barred under the FCA's statute of limitations because Relators commenced this action more than six

years after the last injury about which they complain, and more than three years after a prior *qui tam* complaint put the government on notice of each element of their claims.

Each of these defects in Relators' claims provides an independent basis for dismissal of all or part of the SAC. This case is ultimately about Relators' apparent policy disagreements with the FCC, not any fraud on the government. A policy disagreement cannot establish an FCA violation and U.S. Cellular[1] therefore moves to dismiss Relators' claims with prejudice.

## BACKGROUND

### A.    Statutory and Regulatory Framework

The Communications Act requires that cellular phone systems be licensed by the FCC, *see* 47 U.S.C. § 301, which uses competitive auctions to allocate licenses to access particular radio frequencies, known as spectrum, in certain geographic areas, *see id.* § 309(j)(1). Because demand for cellular services is high and the supply of spectrum is limited, prices for commercial licenses reach into the hundreds of millions of dollars. To encourage small businesses to participate in the wireless spectrum market, Congress and the FCC created the Designated Entity ("DE") Program, which provides subsidies to qualifying small businesses. *See id.* § 309(j)(4)(D).

As relevant here, the DE Program provides eligible businesses with two types of benefits. First, DEs may receive "bidding credits (*i.e.*, payment discounts)" against the purchase price of licenses they win at auction. 47 C.F.R. § 1.2110(f)(1) (2014).[2] Second, the FCC sets certain licenses aside to be awarded in "closed bidding," in which only qualifying DE "entrepreneurs"

---

[1] "U.S. Cellular" in this memorandum refers to defendants United States Cellular Corporation, USCC Wireless Investment, Inc., and Telephone and Data Systems, Inc. Telephone and Data Systems, Inc. owns approximately 80 percent of the equity of United States Cellular Corporation, which owns 100 percent of the equity of USCC Wireless Investment, Inc. USCC Wireless Investment, Inc. is a limited partner and 90% equity owner of King Street, Barat, and Carroll.

[2] The auctions at issue in this case are governed by the pre-2015 regulations, which were subsequently amended. *See Updating Competitive Bidding Rules*, 80 Fed. Reg. 56764 (Sept. 18, 2015).

may participate. *See id.* §§ 24.709(a)(1); 1.2110(b)(1)(ii). To be eligible for either type of DE

benefit, a business must have gross revenues below certain thresholds set by the FCC. *Id.*

§§ 1.2110(f)(2); 24.709(a)(1). To qualify for closed bidding as an entrepreneur, a business must

also have total assets below FCC limits. *Id.* § 24.709(a)(1).

  In calculating eligibility, DE applicants must aggregate their own revenues together with

other "attributable" ones. Specifically, DEs must aggregate revenues of "affiliates," "controlling

interests," the "affiliates of [their] controlling interests," and "the entities with which [they have]

an attributable material relationship." *Id.* § 1.2110(b)(1)(i)–(ii). As discussed in more detail

below, these "attributable" relationships are defined using a combination of bright-line and

balancing tests. *See generally* 47 C.F.R. § 1.2110(c)(2) (2014) (controlling interests), (c)(5)

(affiliates), (b)(iv)(A) (attributable material relationships). Ownership interests that fall outside

the definition of "attributable" are not required to be aggregated.

  Importantly, these regulations are *not* intended to prevent large wireless companies from

investing in DEs. Just the opposite—the FCC recognized that "the primary impediment to

participation by designated entities is lack of access to capital," and it explained that the purpose

of bid credits is not to bring auction pricing down to a level DEs could afford on their own, but

to "encourage large companies to invest." *In re Implementation of Section 309(j) of the*

*Communications Act—Competitive Bidding*, 9 FCC Rcd. 5532 ¶¶ 10, 15 (1994). As such, while

"[l]arge firms cannot bid on entrepreneur's licenses," they may "become partners with or make

investments in designated entities so as to gain an interest" in licenses auctioned via closed bid.

*Id.* ¶¶ 38–39.[3]

---

[3] These investments can include technical expertise as well as financing.

Using a two-step application process, the FCC scrutinizes the DE's eligibility to participate in the auction and to receive the licenses won there. The FCC has also established a number of rules with which DEs must comply after they are granted a license. Those rules disincentivize DEs from immediately transferring their subsidized licenses to businesses that would have been ineligible to obtain them in the first instance. If, within five years of initial license issuance, a DE transfers or assigns its license to, or enters into an attributable relationship with, an entity that is not eligible for DE treatment, the FCC's "unjust enrichment rule" requires the DE to pay back some of the benefits it received. 47 C.F.R. § 1.2111(b) (2014). The Rules also require the DE to submit an annual report which, *inter alia*, requires that the DE certify its continuing eligibility for the auction credits. Crucially, all the submissions required to show a DE's initial and continuing eligibility for benefits—including its Form 175 short form application (submitted pre-auction), its Form 601 long form application (submitted post-auction), and its annual reports—are *publicly filed* with the FCC. *See generally* FCC, Universal Licensing System, https://www.fcc.gov/wireless/systems-utilities/universal-licensing-system#searching (searchable public databases of licenses and license applications).

### B.     Spectrum Auctions at Issue in This Case

This case involves three auctions in which DEs successfully partnered with U.S. Cellular: Auction 58, Auction 66, and Auction 73.

### 1.     Auction 58—Partnership with Carroll Wireless

Defendant Allison Cryor DiNardo and non-party Carroll Wireless, L.P. partnered with U.S. Cellular to support Carroll's participation in FCC Auction 58, which concluded on February 15, 2005. Second Amended Compl., ECF No. 118 ("SAC") ¶ 158. Defendant USCC Wireless Investment, Inc. was the limited partner and 90 percent equity owner of Carroll, while Carroll

PCS, Inc. was the controlling general partner and owned the remaining 10 percent of Carroll's equity. SAC Ex. 8, at 6.

Carroll submitted its FCC Form 175 short-form application for Auction 58 on November 29, 2004, SAC ¶ 154 & Ex. 8, and was the high bidder on 17 licenses, of which the FCC eventually granted 16. SAC ¶ 158. Carroll won 10 licenses in closed bidding due to its "entrepreneur" status, and another six in open bidding for which Carroll received bid credits as a "very small business." *Id.*

On March 7, 2005,[4] Carroll submitted its FCC Form 601 long-form license application for the licenses it won in Auction 58. SAC ¶ 159 & Ex. 9. After review of Carroll's application and supporting documents, the FCC granted the licenses on January 6, 2006. SAC ¶ 161. As required by FCC rules, Carroll submitted DE annual reports in January of 2007, 2008, 2009, and 2010. SAC ¶ 173 & Ex. 10. On December 5, 2012 U.S. Cellular acquired Carroll and control of Carroll's spectrum licenses. SAC ¶ 178. As Relators acknowledge, the FCC approved that acquisition on the basis of a publicly-filed application. *See* SAC ¶¶ 177-78.

### 2.     Auction 66—Partnership with Barat Wireless

Defendant DiNardo and non-party Barat Wireless, L.P. partnered with U.S. Cellular to support Barat's participation in FCC Auction 66, which concluded on September 18, 2006. SAC ¶ 185. Defendant USCC Wireless Investment, Inc. was the limited partner and 90 percent equity owner of Barat, while Barat Wireless, Inc. was the controlling general partner and owned the remaining 10 percent of Barat's equity. SAC Ex. 12, at 8.

Barat submitted its FCC Form 175 short-form application for Auction 66 on May 10, 2006, SAC ¶ 184, and supplemented the Form 175 on July 12, 2006, SAC Ex. 12. Barat was the

---

[4] The SAC misstates this date as March 28, 2008.

high bidder on 17 licenses in Auction 66. SAC ¶ 185. Barat won the licenses in open bidding for

which Barat received bid credits as a "very small business." *Id.*

On October 4, 2006, Barat submitted its FCC Form 601 long-form license application for

the licenses it won in Auction 66. SAC ¶ 186 & Ex. 13. After review of Barat's application and

supporting documents, the FCC granted the licenses on April 30, 2007. SAC ¶ 188. Within a

week after the FCC granted those licenses, the law firm of Lampert & O'Connor, P.C., acting as

a *qui tam* relator under the FCA, filed a lawsuit in the U.S. District Court for the District of

Columbia (the "Prior *Qui Tam* Action"), alleging that U.S. Cellular, Carroll, and Barat, had

violated the FCA in connection with Auctions 58 and 66. *See* Complaint, *Lampert & O'Connor,*

*P.C. v. Carroll Wireless, L.P.*, Docket No. 1, No. 1:07-cv-800 (JDB) (D.D.C. May 2, 2007).

Subsequently, as required by FCC rules, Barat submitted DE annual reports in January of

2007, 2008, 2009, and 2010. SAC ¶ 196 & Ex. 16. On September 7, 2012, U.S. Cellular acquired

Barat and control of Barat's spectrum licenses. SAC ¶ 199. As Relators acknowledge, the FCC

approved that acquisition on the basis of a publicly-filed application. *See id.*

### 3.      Auction 73—Partnership with King Street Wireless

Defendants DiNardo and King Street Wireless, L.P. partnered with U.S. Cellular to

support King Street's participation in FCC Auction 73, which concluded on March 18, 2008.

SAC ¶ 80. Defendant USCC Wireless Investment, Inc. was the limited partner and 90 percent

equity owner of King Street, while King Street Wireless, Inc. was the controlling general partner

and owned the remaining 10 percent of King Street's equity. SAC Ex. 1, at 87.

King Street submitted its FCC Form 175 short-form application for Auction 73 on

November 28, 2007, SAC ¶ 77, and supplemented the application on January 4, 2008, SAC Ex.

1. King Street was the high bidder on 152 licenses in Auction 73. SAC ¶¶ 81–82. King Street

won the licenses in open bidding for which King Street received bid credits as a "very small

business." *Id.* On March 28, 2008, King Street submitted its FCC Form 601 long-form license application for the licenses it won in Auction 73, SAC ¶ 84 & Ex. 2, and supplemented the application on April 17 and April 25, 2008, SAC ¶¶ 85–86.

In 2008, while the King Street application was pending before the FCC, Lampert & O'Connor filed an amended complaint in the Prior *Qui Tam* Action. *See* Amended Complaint, *Lampert & O'Connor, P.C. v. Carroll Wireless, L.P.*, Docket No. 11, No. 1:07-cv-800 (JDB) (D.D.C. April 24, 2008) ("Prior *Qui Tam* Amended Complaint") (attached as Volpe Decl. Ex. A).[5] On top of the original accusations involving Carroll and Barat, the Prior *Qui Tam* Amended Complaint added allegations—substantially identical to those in the present case—that King Street and U.S. Cellular had violated the FCA by obtaining bid credits for Auction 73. In response to a specific request by the FCC that it address those allegations, King Street responded at length in a brief it filed with the FCC on May 8, 2009. *See* Response to Inquiry from the Wireless Telecomms. Bureau, *In re: Applications of King Street Wireless, L.P. for Licenses in the 700 MHz Lower Band*, File No. 0003379814 (May 8, 2009) (attached as Volpe Decl. Ex. B).[6]

After reviewing the Prior *Qui Tam* Amended Complaint and King Street's responses to those allegations, the FCC on December 27, 2009, granted King Street the licenses it had won in Auction 73. SAC ¶ 89. As required by FCC rules, King Street submitted DE annual reports in January of 2010, 2011, 2012, and 2013. SAC ¶ 118 & Ex. 4.

---

[5] The Court may take judicial notice of this federal court record. *Covad Commc'ns Co. v. Bell Atl. Corp.*, 407 F.3d 1220, 1222 (D.C. Cir. 2005).

[6] The Court may take judicial notice of this document, which is referenced in Relators' SAC and was publicly filed with the FCC. *Webster v. Spencer*, 2020 WL 2104231, at *5 (D.D.C. May 1, 2020). Tellingly, in their SAC Relators attempt to convey that King Street was responding to mere "inquiries from the FCC" when, in fact, it was responding to the FCC's formal request for King Street to address the allegations made in the Prior *Qui Tam* Action.

C.      **The Prior *Qui Tam* Action**

As noted above, on May 2, 2007, Lampert & O'Connor filed the Prior *Qui Tam* Action against U.S. Cellular, Barat, Carroll, and DiNardo. Lampert & O'Connor amended its original complaint to name King Street as a defendant and add the new claims regarding Auction 73 on April 24, 2008—20 months *before* the FCC granted King Street's spectrum licenses. *See* Prior *Qui Tam* Amended Complaint. Mark J. O'Connor, one of the two Relators in the present case, was an employee of Lampert & O'Connor at the time the Prior *Qui Tam* Amended Complaint was filed and he represented the firm in the prior action. However, Mark J. O'Connor was not a relator in, or otherwise a party to, that lawsuit, and neither was Sara F. Leibman, the other Relator in the present case.

The Prior *Qui Tam* Amended Complaint named the same defendants that are named here, *see* Prior *Qui Tam* Amended Complaint ¶¶ 15-28, and made allegations that Carroll, Barat, and King Street were ineligible for the bid credits and spectrum licenses they obtained in Auctions 58, 66, and 73. *See, e.g.*, *id.* ¶¶ 2-5, 10. Like the current complaint, the Prior *Qui Tam* Amended Complaint's central allegation was that the DEs had falsely claimed to be controlled only by their general partners, rather than by U.S. Cellular. *See, e.g.*, *id.* ¶¶ 3–4, 6, 49, 54, 56–57, 59, 60, 62, 64–68.

Both DOJ and the FCC OIG investigated the Prior *Qui Tam* Amended Complaint's allegations, and as discussed above, the FCC asked King Street to respond to the allegations while King Street's Auction 73 spectrum license applications were still pending.[7] The DOJ and FCC OIG closed their investigations without taking any action against U.S. Cellular or the DEs,

---

[7] King Street's public response, filed on the FCC docket, is attached as Volpe Decl. Ex. B.

and on October 13, 2009, the United States formally declined to intervene in the Prior *Qui Tam*
Action.

After the FCC granted the King Street spectrum licenses, the relator, Lampert &
O'Connor voluntarily dismissed the Prior *Qui Tam* Action in January 2010.

### D.      The Current *Qui Tam* Action

Relators Mark J. O'Connor and Sara F. Leibman are telecom lawyers. *See* SAC ¶¶ 21-22.
They have never been employees or otherwise insiders at any of the Defendants, and they played
no part in the facts underlying their SAC. They were not even parties to the Prior *Qui Tam*
Action. Rather, they are private citizens who reviewed public records relating to Auctions 58, 66,
and 73 and who, after the fact, re-raise objections to Defendants' participation in the DE program
while seeking a bounty on any recovery to the United States that their objections might net. In
this effort, they purport to disagree with the FCC Wireless Telecommunications Bureau, which
granted the bid credits and spectrum licenses; with the FCC OIG, which investigated Defendants'
conduct in Auctions 58, 66, and 73 and took no action concerning it; and with DOJ, which also
investigated Defendants' conduct in Auctions 58, 66, and 73 and has now *twice* declined to
intervene in *qui tam* lawsuits about it.

Relators filed their initial complaint here on April 8, 2015, and have amended it twice, on
February 9, 2016, and June 2, 2020. The SAC alleges that Defendants conspired to violate the
False Claims Act by abusing the DE program, SAC ¶¶ 204–211; that they made false and
fraudulent claims for auction discounts by falsely claiming that the DEs qualified for bid credits,
SAC ¶¶ 218–221; that they submitted false records and false statements in order to deceive the
FCC into granting the bid credits and spectrum licenses, SAC ¶¶ 222–225; that they unlawfully
possessed property—in the form of spectrum licenses for which they were not eligible—that
rightfully should be used by the government, SAC ¶¶ 226–228; and that they made additional

9

false statements in order to avoid having to return auction credits unlawfully obtained from the government under the DE program, SAC ¶¶ 229–231.

## STANDARD OF REVIEW

Under Federal Rule of Civil Procedure 12, a complaint must be dismissed unless it contains factual allegations sufficient "to raise a right to relief above the speculative level on the assumption that all the allegations in the complaint are true . . . ." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007); *see also, e.g.*, *Zukerman v. U.S. Postal Service*, 961 F.3d 431, 441 (D.C. Cir. 2020) ("[T]o survive . . . [a] motion to dismiss for failure to state a claim . . . , [the] complaint [must] 'contain[] sufficient factual matter, accepted as true, to "state a claim to relief that is plausible on its face."'"). Although the Court "assume[s] the truth" of the Complaint's allegations and draws all reasonable inferences in favor of the plaintiff, *Zukerman*, 961 F.3d at 441, bare legal conclusions in a complaint are not entitled to the assumption of truth; rather, "they must be supported by factual allegations" to state a claim for relief. *Ashcroft v. Iqbal*, 556 U.S. 662, 679 (2009).

For claims sounding in fraud, like those under the FCA, the Rule 9(b) particularity standard applies. *United States ex rel. Williams v. Martin-Baker Aircraft Co.,* 389 F.3d 1251, 1256 (D.C. Cir. 2004). FCA claims comply with Rule 9(b) when they plead "the who, what, when, where, and how with respect to the circumstances of the fraud." *United States ex rel. PCA Integrity Assocs., LLP v. NCO Fin. Sys., Inc.*, 2020 WL 686009, at *21 (D.D.C. Feb. 11, 2020).

## ARGUMENT

Relators' claims should be dismissed with prejudice. First, all of their claims fail under the FCA's public disclosure bar because the allegations are entirely derivative of a prior *qui tam* lawsuit and documents publicly filed with regulatory agencies, and Relators do not qualify as an original source under the FCA. Second, the SAC fails to plead with particularity or even

plausibly the key FCA elements of falsity, scienter, and materiality with respect to all of its

claims. Third, the SAC's claims regarding Auctions 58 and 66 are time-barred.

## I.    The SAC Should Be Dismissed Under The Public Disclosure Bar.[8]

Through its public disclosure bar, the FCA precludes relators from bringing "parasitic"

lawsuits based—even in part—on information or transactions already in the public domain.

*United States ex rel. J. Cooper & Assocs., Inc. v. Bernard Hodes Grp., Inc.*, 422 F. Supp. 2d 225,

235 n.10 (D.D.C. 2006) ("The FCA's [public disclosure] bar precludes suits by 'individuals who

base *any part of their allegations* on publicly disclosed information.'"). "The court shall dismiss"

*qui tam* claims "if *substantially* the same allegations or transactions as alleged in the action or

claim were publicly disclosed" unless the relator qualifies as an "original source" of the

information. 31 U.S.C. § 3730(e)(4)(A), (B) (emphasis added).[9]

"Substantially the same" does not mean "identical"—the bar is triggered where "the

relator . . . describe[s] allegations or transactions substantially similar to those in the public

domain." *United States ex rel. Findley v. FPC-Boron Emps' Club*, 105 F.3d 675, 682 (D.C. Cir.

1997). The question is whether "the government already ha[d] enough information 'to investigate

the case and to make a decision whether to prosecute' or whe[ther] the information 'could at least

have alerted law-enforcement authorities to the likelihood of wrongdoing.'" *United States ex rel.

Davis v. District of Columbia*, 679 F.3d 832, 836 (D.C. Cir. 2012). If that standard is met, the

---

[8] The public disclosure bar applies to any *qui tam* "action or claim" brought under the FCA's
enforcement provisions, and therefore to each of Relators' causes of action.  *See* 31 U.S.C.
§ 3730(e)(4)(A).

[9] The public disclosure bar was amended in 2010, and the amended version applies to claims
"based on post-March 23, 2010 conduct."  *United States ex rel. Shea v. Verizon Commc'ns, Inc.*,
160 F. Supp. 3d 16, 24 (D.D.C. 2015), *aff'd sub nom United States ex rel. Shea v. Cellco P'ship*,
863 F.3d 923 (D.C. Cir. 2017).  Where the former version of the statute imposed a jurisdictional
bar, the 2010 amendments "merely deprive[] the plaintiff of his claim."  *Id.*  The relevant
analysis is unchanged.  *See, e.g. United States ex rel. Folliard v. Comstor Corp.*, 308 F. Supp. 3d
56, 71-72 (D.D.C. 2018), *reconsideration denied,*  2018 WL 5777085 (D.D.C. Nov. 2, 2018).

public disclosure bar applies even if Relators do provide some new information. "Merely providing 'more specific details' about what happened does not negate substantial similarity." *United States ex rel. Oliver v. Philip Morris USA Inc.*, 826 F.3d 466, 472 (D.C. Cir. 2016). Nor does "a relator's ability to reveal [additional] specific instances of fraud where the general practice has already been publicly disclosed." *Id.* Finally, the public disclosures need not allege any False Claims Act violations. It is enough that they reflect "the critical elements of the fraudulent transaction[s] themselves." *United States ex rel. Springfield Terminal Ry. Co. v. Quinn*, 14 F.3d 645, 654 (D.C. Cir. 1994). The D.C. Circuit has framed the inquiry in terms of a formula: "[I]f X+Y=Z, Z represents the allegation of fraud and X and Y represent its essential elements. In order to disclose the *transaction* publicly, the combination of X and Y must be revealed, from which readers or listeners may infer Z, *i.e.* the conclusion that fraud has been committed." *Id.*

"Public disclosures" for purposes of the Act include disclosures "in a Federal criminal, civil, or administrative hearing in which the Government or its agent is a party," in a "Federal report, hearing, audit, or investigation," and "from the news media." 31 U.S.C. §3730(e)(4)(A)(i)-(iii). A previously filed *qui tam* complaint is a public disclosure "in a Federal . . . civil . . . hearing in which the Government or its agent is a party." *Id.* § 3730(e)(4)(A)(i).

To be an original source under the FCA, in relevant part, a relator must have "knowledge that is independent of and materially adds to the publicly disclosed allegations or transactions," and have "voluntarily provided the information to the Government before filing" a *qui tam* action. 31 U.S.C. § 3730(e)(4)(B)(2). In other words, "a relator is not an original source 'simply because he conducted some collateral research and had background knowledge that allowed him

to understand the significance of publicly disclosed information.'" *United States ex rel. Doe v. Staples, Inc.*, 932 F. Supp. 2d 34, 41 (D.D.C. 2013), *aff'd*, 773 F.3d 83 (D.C. Cir. 2014).[10]

A.     **Relators' Claims Are Based On Publicly Disclosed Information.**

The gravamen of Relators' SAC is that King Street, Carroll, and Barat did not qualify as DEs under FCC regulations because U.S. Cellular had control over them, but that Defendants obtained bid credits and spectrum licenses by falsely certifying that they did. This precise theory of fraud, however, was already disclosed in the Prior *Qui Tam* Action, which asserted the same claims involving the same spectrum auctions against the same parties. In addition, the elements on which Relators base their allegations of fraud were fully disclosed in publicly available documents filed with the FCC and the SEC. Put in the D.C. Circuit's terms, this is a case where both "X+Y"—the alleged fraud's "underlying factual elements"—and "Z"—"the allegation of fraud itself"—were public knowledge years before Relators sued. *See United States ex rel. Doe v. Staples, Inc.*, 773 F.3d 83, 86 (D.C. Cir. 2014).

1.     **Public Disclosures in the Prior *Qui Tam* Action**

Relators' allegations are nearly identical to the allegations made in the Prior *Qui Tam* Action. That case—which was filed by a law firm where Mark J. O'Connor (one of the relators here) worked—asserted allegations over the exact same FCC auctions (58, 66, and 73) against the exact same defendants for the same alleged fraud. The Prior *Qui Tam* Action clearly provided the "critical elements" of the allegations asserted in the present case and was sufficient to put the government "on the trail of fraud." *Springfield Terminal*, 14 F.3d at 654. Indeed, the Prior *Qui*

---

[10] The original source exception may also apply where a relator establishes that, "[p]rior to a public disclosure . . . [he or she] has voluntarily disclosed to the Government the information on which allegations or transactions in a claim are based." 31 U.S.C. § 3730(e)(4)(B)(i). Relators, however, do not allege in the SAC that they made such a disclosure. *See* SAC ¶ 37 (alleging only that they made a disclosure to the government "before filing this *qui tam* action").

*Tam* Action unequivocally *did* – per the procedural provisions of the FCA itself – cause the

government to investigate the allegations of the Prior *Qui Tam* Amended Complaint, many of

which are nearly identical to those Relators assert in the present action. For example:

| Public Disclosure (Prior *Qui Tam* Amended Complaint) | Relators' Allegation |
|---|---|
| "US Cellular . . . formed sham 'very small business' bidding entities for purposes of obtaining 25 percent credits against their gross winning bids" in Auctions 58, 66, and 73, thereby "avoid[ing] paying over $164 million to the United States Government," Prior *Qui Tam* Amended Complaint ¶ 3. | "U.S. Cellular used [King Street and other entities], all of which were formed as sham 'very small businesses' . . . , to acquire wireless communications spectrum licenses using over $150 million in Government-provided bid credits" in Auctions 56, 66, and 73. SAC ¶ 1. |
| "In Auctions 58, 66, and 73, Defendants US Cellular and TDS created and have maintained the sham entities (i.e., Defendants Carroll Wireless, Barat Wireless, and King Street Wireless) to file FCC applications to qualify as 'very small businesses' for bidding credits and to bid on licenses or to serve as 'owners' of bidders." Prior *Qui Tam* Amended Complaint ¶ 54. "The Defendants made these knowing omissions and false certifications with the intention to induce the FCC to award to the FCC Applicants 'very small business' bidding credits of 25 percent off of their high bids." *Id*. ¶ 85. | "U.S. Cellular . . . formed King Street in partnership with DiNardo to participate in Auction 73 as a DE front for U.S. Cellular, and the Defendants knew that the FCC would not have awarded DE credits to King Street on that basis." SAC ¶ 79. *See also id*. ¶ 157 (regarding Carroll and Auction 66); *id*. ¶ 194 (regarding Barat and Auction 58). |
| "The FCC Applicants' certifications to the FCC were false, because their respective Form 175 and Form 601 applications knowingly failed to attribute the revenues of Defendants US Cellular, USCCWI, and TDS—revenues that were attributable because of US Cellular's, USCCWI's, and TDS's de facto control over and affiliation with the Auction 58, Auction 66, and Auction 73 sham entities." Prior *Qui Tam* Amended Complaint ¶ 83. | "U.S. Cellular's billions of dollars in revenues should have been disclosed and attributed to King Street in its Auction 73 applications . . . ." SAC ¶ 115. *See also id*. ¶ 162 (regarding Carroll); *id*. ¶ 194 (regarding Barat). |
| "Defendants Carroll Wireless, Barat Wireless, and King Street Wireless, and their respective general partners, did not and do not operate or function as actual businesses." Prior *Qui Tam* Amended Complaint ¶ 61. "The FCC Applicants' primary function, and their most | "King Street performs only limited functions, primarily to conceal that it has ceded its spectrum to, and is controlled by, U.S. Cellular." SAC ¶ 107. "U.S. Cellular, not Carroll, made all policy and strategic decisions regarding the use and disposition of |

14

| | |
|---|---|
| significant activity to date, was to bid on licenses in Auctions 58, 66, and 73." *Id.* ¶ 69. | the Carroll licenses." *Id.* ¶ 166. "During the five-year post-licensing period, Barat's only purpose was to hold the AWS licenses for U.S. Cellular." *Id.* ¶ 190. |

At most, the SAC adds some additional flourish to the alleged scheme and enlarges the time period covered by the allegations. But the law is clear that the public disclosure bar applies when a relator merely "provid[es] more specific details" about a known scheme, *Oliver*, 826 F.3d at 472, or makes use of "background knowledge that allowed him to understand the significance of publicly disclosed information, *Doe*, 932 F. Supp. 2d at 41. And the D.C. Circuit holds specifically that "a relator's ability to reveal [additional] specific instances of fraud where the general practice has already been publicly disclosed is insufficient to prevent operation of the [public disclosure] bar." *Oliver*, 826 F.3d at 472; *see also United States ex rel. Maxwell v. Kerr-McGee Oil & Gas Corp.*, 540 F.3d 1180, 1187 (10th Cir. 2008) ("a subsequent lawsuit can be 'based upon' allegations made in a prior lawsuit even when the two suits cover different periods of time, [if] the 'essential claim[s]' [are] substantially 'similar'" (second alteration in original)).

## 2.    Public Disclosures in FCC and SEC Filings

The SAC is also barred because it is based on public disclosures in documents filed with the FCC and the SEC.[11] This is apparent from the face of the SAC, which principally relies on (and attaches as exhibits) a series of public regulatory documents Defendants submitted to the FCC. As the chart below demonstrates, each of the Relators' core allegations about the formation, capitalization, ownership, and operation of the DEs is derived almost entirely from public documents. For example:

---

[11] Regulatory filings are public disclosures under the FCA, and an FCC auction is a "Federal . . . administrative hearing in which the Government or its agent is a party" under § 3730(e)(4)(A)(i). *See Springfield Terminal,* 14 F.3d at 652 ("hearing" includes "'paper' proceedings). The records of such a proceeding are publicly-filed and subject to judicial notice. *See, e.g.*, *SEC v. RPM Int'l, Inc.*, 282 F. Supp. 3d 1, 10 n.4 (D.D.C. 2017).

| Public Disclosure (FCC Filing) | Relators' Allegation |
|---|---|
| "United States Cellular Corporation ('USCC') owns 100% of USCC Wireless Investment, Inc., which in turn, owns the Limited Partnership Interest and 90% of the Applicant [King Street Wireless L.P.]'s equity." Short Form Application (FCC Form 175) of King Street Wireless, L.P., FCC Auction No. 73 (SAC Ex. 1), at 87 (Jan. 4, 2008). | "U.S. Cellular, which held a controlling interest in King Street, had formed King Street in partnership with DiNardo to participate in Auction 73 as a DE front for U.S. Cellular, and the Defendants knew that the FCC would not have awarded DE credits to King Street on that basis." SAC ¶ 79. |
| "The documents that the Commission reviewed for each or most of the Limited Partnerships include: the Agreement Establishing the Partnership; the Loan Agreement; …; **the Management Agreement**; …." Response to Inquiry from the Wireless Telecomms. Bureau 4 n.7, *In re: Applications of King Street Wireless, L.P.*, FCC File No. 0003379814 (May 8, 2009) (emphasis added), https://bit.ly/393YI00.[12] | "On May 8, 2009, in response to specific inquiries from the FCC, King Street submitted a lengthy memorandum with exhibits, falsely denying that King Street was controlled by U.S. Cellular . . . . King Street did not include the Management Agreement with U.S. Cellular in this submission." SAC ¶ 88. |
| "Telephone and Data Systems, Inc. ('TDS') owns 86.1% of United States Cellular Corporation, which in turn, owns 90% of the Applicant." Short Form Application of Carroll Wireless, LP, FCC Auction No. 58 (SAC Ex. 8), Ex. A at 2 (Nov. 30, 2004). | "U.S. Cellular held the controlling interest in Carroll, and had formed Carroll in partnership with DiNardo, in order to expand U.S. Cellular's network and service offerings with licenses acquired with credits and benefits reserved for small businesses." SAC ¶ 157. |
| "United States Cellular Corporation ('USCC') owns 100% of USCC Wireless Investment, Inc., which in turn, owns the Limited Partnership Interest and 90% of the Applicant's equity." Short Form Application (FCC Form 175) of Barat Wireless, LP, FCC Auction No. 66 (SAC Ex. 12). | "If U.S. Cellular's ownership and control of Barat had been fully and truthfully disclosed in Barat's numerous submissions to the FCC, Barat would not have qualified for DE benefits in Auction 58 . . . ." SAC ¶ 194. |

The core of the SAC—U.S. Cellular's relationship with the DEs and how they were operated—was no secret. From the DEs' initial auction applications through the acquisition of their licenses by U.S. Cellular, it was all documented and approved in public filings with the

---

[12] Although Relators describe this document in the SAC, they did not attach it as an exhibit. It is publicly available on the FCC docket, however, and the Court may take judicial notice of it. *See, e.g.*, *RPM Int'l, Inc.*, 282 F. Supp. 3d at 10 n.4.

FCC (not to mention announced in U.S. Cellular press releases[13]). And it is no surprise that these FCC filings are precisely where Relators got the information: Relators have no other basis to know these facts since they were not insiders at all. Rather they are private telecom lawyers, SAC ¶¶ 21–22, who merely read documents that were publicly filed with the FCC and made assertions regarding the legal conclusion of "control" without any new evidence or insight.

Relators' allegations regarding the 2011 Network Sharing Agreement ("2011 NSA") are also barred because they were publicly disclosed in FCC filings.[14] As Relators acknowledge, the 2012 Network Sharing Agreement was disclosed to the FCC and summarized in U.S. Cellular's long-form application for FCC Auction 901. SAC ¶ 142. The summary explained that "[p]ursuant to a Network Sharing Agreement . . . King Street agreed to provide 4G services, to be managed by [U.S. Cellular] . . . via King Street's Spectrum." U.S. Cellular FCC Form 680 Long-Form Application for FCC Auction 901, Amended Ex. 2 - REDACTED, at 1, FCC Applic.

---

[13] *See* Press Release, U.S. Cellular Corp., U.S. Cellular Announces Launch of 4G LTE Network Next Month Along with Upcoming Devices (Feb. 1, 2012), https://investors.uscellular.com/news/news-details/2012/US-Cellular-Announces-Launch-of-4G-LTE-Network-Next-Month-Along-With-Upcoming-Devices/default.aspx; Press Release, U.S. Cellular Corp., U.S. Cellular Announces Next 4G LTE Markets and Mobile Hotspot Availability (Feb. 16, 2012), https://investors.uscellular.com/news/news-details/2012/US-Cellular-Announces-Next-4G-LTE-Markets-and-Mobile-Hotspot-Availability/default.aspx.  The public disclosure bar is triggered by disclosures in the "news media," which includes "readily accessible websites" in addition to "traditional news source[s]."  *United States ex rel. Green v. Serv. Contract Educ. & Training Tr. Fund*, 843 F. Supp. 2d 20, 32-33 (D.D.C. 2012); *see also Cellco P'ship*, 863 F.3d at 934.

[14] Tellingly, although Relators make allegations about the 2011 NSA in their SAC, they do not include the document itself as an exhibit. This is almost certainly because Relators had no independent knowledge of the document—indeed, they do not allege any such knowledge—but, rather, unequivocally obtained the document *from DOJ* during the department's investigation of Relators' *qui tam* allegations before it declined to intervene in this action. Any copy of the 2011 NSA they may have would likely reflect it came to Relators from DOJ.

File No. 0005476908 (June 23, 2013).[15] And while the 2011 and 2012 NSAs covered different geographic territories (identified by census tracts), the terms were otherwise substantively identical with regard to their bearing on King Street's status as a DE. Thus by June 23, 2013, all relevant information about *both* the 2011 and the 2012 NSAs was disclosed in public FCC filings.[16]

To the extent that Relators make any substantive allegations beyond those based on information in public *FCC* filings, those allegations are based on public *SEC* filings. Specifically, Relators allege that "[w]hile the Defendants concealed the extent of their relationship from the FCC, U.S. Cellular openly acknowledged its controlling interest in King Street to the SEC and its investors." SAC ¶ 147. Concerning Carroll, Relators similarly allege that "[a]s U.S. Cellular confirmed to the SEC and investors year after year, U.S. Cellular had *de facto* control over Carroll and its spectrum." SAC ¶ 163. This assertion conflates technical accounting requirements with FCC's rules,[17] but even if true, U.S. Cellular's disclosure statement is fatal to the Relator's claim because SEC filings are also public disclosures.[18]

**B.    Relators Were Not An Original Source.**

Because the core of Relators' SAC was publicly disclosed prior to filing, Relators must qualify as an "original source" under the FCA in order to maintain this action. 31 U.S.C.

---

[15] *Available at* https://auctionfiling.fcc.gov/form175/search175/index.htm (select "Auction 901," search in search bar for file number 0005476908, select "Winning Bids" tab, select "Show" in "Attachments" column).

[16] And, as discussed above, Relators in any event are not the source of the 2011 NSA; a copy of it clearly was provided to them *by DOJ* in the course of DOJ's investigation into their allegations here, which culminated in DOJ declining to intervene in and pursue this action.

[17] *See infra* n.22.

[18] Even a cursory review of the Prior *Qui Tam* Amended Complaint reveals that it, too, was based on public filings with the FCC and SEC. *See*, *e.g.*, Prior *Qui Tam* Amended Complaint ¶¶ 60, 62, 70, 76–77, 80–85.

§ 3730(e)(4)(B). But Relators' only allegation that they are an original source is the conclusory statement that "[t]he Relators have independent material knowledge of the information on which the allegations are based and have voluntarily provided the information to the government before filing this *qui tam* action based on that information." ¶ 37. That is nothing more than a recitation of a legal standard. Relators do not plead *any* facts showing how they are an original source, when they obtained the information, how they obtained it, or how it materially adds to the wealth of publicly-disclosed information.

This, of course, is not surprising given that Relators' entire lawsuit is grounded in information that was publicly disclosed and of which they have no independent knowledge. Their conclusory recitation of the elements of the original-source exception is insufficient to avoid dismissal. *Staples*, 932 F. Supp. 2d at 41–42 (relator "failed to 'allege specific facts—as opposed to mere conclusions—showing exactly how and when he . . . obtained direct and independent knowledge of the fraudulent acts alleged in the complaint,'" and therefore "has not satisfied the original source exception" (quoting *In re Nat. Gas Royalties*, 562 F.3d 1032, 1045 (10th Cir. 2009))); *see also J. Cooper & Assocs.*, 422 F. Supp. 2d at 237 ("The court, therefore, cannot accept the plaintiff's conclusory and unsupported statement that it is the original source of the information contained in the OIG Report.").

## II.    Relator Fails To Plead Essential Elements of a False Claims Act Violation

Four of Relators' five counts—Counts One, Two, Three, and Five[19]—share three common elements under the FCA: they require Relators to plead facts plausibly showing that Defendants (1) made an objectively false statement or claim, (2) with scienter, (3) that was

---

[19] *See* SAC Count One (conspiracy under § 3729(a)(1)(C)); *id.* Count Two (false claims for payment under § 3729(a)(1)(A)); *id.* Count Three (knowingly making false statements material to a false claim under § 3729(a)(1)(B)); *id.* Count Five (knowingly making false statements material to an obligation to pay the government under § 3729(a)(1)(G)).

material to the government's decision to pay. *See United States ex rel. Gardner v. Vanda Pharm., Inc.*, 2020 WL 2542121, at *6-7 (D.D.C. May 19, 2020) ("an FCA claim requires the trifecta of falsity, materiality, and scienter"); *see also United States ex rel. Kasowitz Benson Torres LLP v. BASF Corp.*, 929 F.3d 721, 728 (D.C. Cir. 2019) (conspiracy liability depends on "establish[ing] an underlying FCA violation"). Counts One, Two, Three, and Five of the SAC must be dismissed because Relators have failed adequately to plead falsity, scienter, or materiality.

The remaining Count Four is asserted under 31 U.S.C. § 3729(a)(1)(D), which bars knowing conversion of property "used, or to be used, by the government." Under the circumstances of this case, Relators' failure to show any violation of FCC regulations, *see infra* Part II.A, defeats a conversion claim as well, because it means they have likewise failed to show any basis on which the government would be entitled to retake possession of Carroll's licenses. Count Four also fails for lack of scienter, for the same reasons explained in Part II.B, *infra.*

### A.    Relators Have Not Plausibly Alleged That U.S. Cellular Made Any Actionable False Statements.

"[T]he FCA does not reach an innocent, good-faith mistake about the meaning of an applicable rule or regulation. Nor does it reach those claims made based on reasonable but erroneous interpretations of a defendant's legal obligations." *United States ex rel. Purcell v. MWI Corp.*, 807 F.3d 281, 287–88 (D.C. Cir. 2015); *see also United States v. Kellogg Brown & Root Servs., Inc.*, 800 F. Supp. 2d 143, 155 (D.D.C. 2011) (the FCA reaches both *factual* and *legal* falsity). Here, Relators allege that *as a legal matter* U.S. Cellular's revenues were attributable to the DEs, rendering them ineligible for credits, and that Defendants representations to the contrary were therefore *legally* false. But even claims based on so-called "legally false" certifications ultimately depend on showing that the defendant's submissions "implie[d] the existence of *facts* . . . that d[id] not exist." *See Winter ex rel. U.S. v. Gardens Reg'l Hosp. and*

*Med. Ctr.*, 953 F.3d 1108, 1119 (9th Cir. 2020) (emphasis added) (citing *United States ex rel. Polukoff v. St. Mark's Hosp.*, 895 F.3d 730, 742–43 (10th Cir. 2018); *United States v. AseraCare, Inc.*, 938 F.3d 1278, 1297 (11th Cir. 2019)). The SAC makes no such showing.

Relators offer two theories of how Defendants legal assertions were false. First, Relators assert that King Street "transferred" a large amount of spectrum to U.S. Cellular, SAC ¶ 93, and thereby created an "*attributable material relationship*," that required King Street to count U.S. Cellular's revenues as its own, *id.* ¶ 97 (citing 47 C.F.R. § 1.2110(b)(3)(iv)(A) (2014)) (emphasis added). Second, Relators allege that U.S. Cellular had such pervasive *control* over King Street, Carroll, and Barat that FCC rules required its revenues to be counted along with theirs. *See id.* ¶¶ 104, 162, 191, (relying on 47 C.F.R. 1.2110(c)(2)(i) ("[C]ontrolling interest includes . . . entities with . . . *de facto* control of the applicant"). However, neither theory adequately alleges that U.S. Cellular made an objectively false certification—and neither does Relators' grab-bag of alternative theories, which are equally insufficient.

### 1.     There Was No Attributable Material Relationship Between U.S. Cellular and King Street.

First, under the plain language of the FCC's rules, U.S. Cellular did not have an *attributable material relationship* with King Street. From 2006 (three years before King Street received its licenses) through 2015 (nearly a year after the end of the five-year "unjust enrichment" period during which the DEs were forbidden to have a material control relationship with a non-DE market participant), the FCC defined a *per se* "attributable material relationship" as arising out of a DE's "arrangements . . . for the lease or resale . . . of . . . spectrum capacity." 47 C.F.R. § 1.2110(b)(3)(iv)(A) (2014) (the "AMR Rule"). Relators' assertion that the 2011 NSA created such a relationship, *see* SAC ¶¶ 92–97, 138-46, fails based on the AMR Rule's plain language and regulatory history.

21

The AMR Rule by its terms applied only to spectrum "lease" or "resale" agreements, *see* 47 C.F.R. § 1.2110(b)(3)(iv)(A) (2014), and the 2011 NSA is neither. Rather, U.S. Cellular simply agreed on a fee-for-service basis to construct and operate, on King Street's behalf, a mobile broadband system using King Street's licenses. 2011 NSA ¶¶ 1(a), 1(c).[20] King Street, in turn, was entitled to payment according to the volume of data carried on its own spectrum. *Id.* ¶ 3. The 2011 NSA is not a "lease," and it does not purport to grant U.S. Cellular any "spectrum usage rights," *see* 47 C.F.R. § 1.9003 (2014) (defining "spectrum leasing arrangement").[21] Nor is it a resale agreement because no transfer of title or even of beneficial ownership is contemplated in the NSA. Because the plain language of the AMR Rule did not cover the 2011 NSA, King Street's certifications were not at odds with the agreement's existence, and therefore were not and could not have been objectively "false."

The regulatory history of the AMR Rule confirms this. The FCC withdrew the AMR Rule in 2015 and replaced it with current 47 C.F.R. § 1.2110(c)(2)(J). *See* 80 Fed. Reg. 56764 (Sept. 18, 2015). Where the original AMR Rule attributed to the DE the revenues of any party with which it had certain agreements to *lease* or *resell* spectrum, the new rule requires attribution

---

[20] The 2011 NSA (which the Court may consider because it is "referred to in the complaint and is central to [Relators'] claim[s], *Akhmetshin v. Browder*, 407 F. Supp. 3d 11, 16 n.4 (D.D.C. 2019)) is attached as Volpe Decl. Ex. C.

[21] Nor was the 2011 NSA a lease by virtue of any agreement that King Street would make its "compatibl[e] and interoperable[e]" system available to U.S. Cellular's roaming customers. *See* 2011 NSA at 2 (citing Management Services Agreement § 9.1(f)); *see also* Management Services Agreement § 9.2, attached as Volpe Decl. Ex. D (discussed at SAC ¶ 87). By the time of the October 2011 NSA, the FCC had obliged cellular carriers to permit roaming for more than 20 years, *see Provision of Roaming Services by Commercial Mobile Radio Service Providers*, 61 Fed. Reg. 43977 (Aug. 27, 1996), and had recently mandated that all carriers "offer [data] roaming arrangements" to their competitors, *see Reexamination of Roaming Obligations of Commercial Mobile Radio Service Providers and Other Providers of Mobile Data Services*, 76 Fed. Reg. 26199, 26220 (May 6, 2011), with no indication whatsoever that roaming agreements were a form of spectrum lease, *see, e.g.*, 61 Fed. Reg. at 43980 ("The Commission determines . . . not to promulgate any rule governing roaming agreements between carriers.").

based on arrangements beyond formal leases or resales—any use or "agreement to *use*" spectrum will suffice. 47 C.F.R. § 1.2110(c)(2)(J). That change would have been unnecessary if the AMR Rule required attribution under the circumstances in this case. The FCC's contemporaneous statements, moreover, eliminate any doubt that it in fact *did intend* to change the meaning when it changed the language. As the Agency explained, while the AMR Rule applied only "with respect to *leasing*," its replacement covered investors' use of spectrum "under *any use agreement*." 80 Fed. Reg. at 56771 (emphasis added).

Even if the 2011 NSA were somehow later found by the FCC or a competent tribunal to have created an attributable material relationship – and that has *not* occurred – King Street's certifications in light of the 2011 NSA would reflect a *legal* mistake, not a factual misrepresentation, and, as such, cannot establish falsity under the FCA. The law is very clear: "the FCA does not reach an innocent, good-faith mistake about the meaning of an applicable rule or regulation." *Purcell*, 807 F.3d at 287; *cf. Kellog Brown & Root*, 800 F. Supp. 2d at 155 (holding that "if every dispute involving contractual performance were to be transformed into an FCA suit," the statute's distinct application to fraud on the government "could evaporate"). Relators' attempt to create liability by referencing the 2011 NSA at most "devolves to a dispute over the meaning of the terms" in FCC regulations, "rather than a factual claim," and "[s]uch a legal dispute is . . . insufficient to establish falsity under the FCA." *United States ex rel. Swafford v. Borgess Med. Ctr.*, 98 F. Supp. 2d 822, 831–32 (W.D. Mich. 2000), *aff'd*, 24 F. App'x 491 (6th Cir. 2001).

### 2.    U.S. Cellular Did Not Control the DEs.

Relators' second primary theory of falsity—that U.S. Cellular's revenues were attributable to the DEs because it purportedly exercised pervasive control over King Street, Carroll, and Barat—also fails. Under FCC rules, a DE's "controlling interests" include those who

exercise "*de facto* control" over it, or who have the power to do so. 47 C.F.R. § 1.2110(c)(2)(i). But Relators' allegations fail to show—either plausibly under Rule 8(a) or with particularity under Rule 9(b)—that U.S. Cellular did so.

Relators' allegations of hidden control are largely conclusory and devoid of specifics or supporting details. *See, e.g.*, SAC ¶¶ 88 (DiNardo did not "control[] all auction activities," or "handle[] . . . partnership decisions), 101 ("U.S. Cellular, not King Street, sets the rates, terms, and condition for . . . using the King Street spectrum"), 104 ("U.S. Cellular . . . retains almost all of the revenues and profits from its use of the [King Street spectrum]."), 166 ("U.S. Cellular, not Carroll, made all policy and strategic decisions), 198 ("[T]here was no plan for Barat to construct wireless networks . . . ."). "Underlying schemes and other wrongful activities that result in . . . fraudulent claims are included in the 'circumstances . . .' that must be pled with particularity under 9(b)," *United States ex. rel. Sikkenga v. Regence Bluecross Blueshield of Utah*, 472 F.3d 702, 727 (10th Cir. 2006), and generic assertions that U.S. Cellular "handled decisions," "set terms," and formulated "policy" fall well short of "who, what, when, where, and how," *see id*. *See also United States ex rel. Totten v. Bombardier Corp.*, 286 F.3d 542, 551–52 (D.C. Cir. 2002) ("because the False Claims Act is self-evidently an anti-fraud statute, complaints brought under it must comply with Rule 9(b).").

The SAC's handful of arguably more specific allegations also fail to show objective falsity. Relators rely most heavily on a handful of SEC reporting documents that mention the DEs, but none is in any way inconsistent with the descriptions and documentation King Street provided to the FCC. For instance, the SAC references documents showing that King Street LP would be exposed to the profits and risks of its own operations, SAC ¶ 132(d), as well as documents showing that U.S. Cellular, King Street LP's limited partner and 90% owner,

anticipated ultimately benefiting from or absorbing the partnership's residual gains and losses, *id.* ¶ 147. There is no contradiction in those statements. Similarly, Relators refer to a U.S. Cellular SEC report explaining that "[t]he power to direct the activities that most significantly impact . . . King Street Wireless is shared. Specifically, the general partner . . . has the exclusive right to manage, operate and control [King Street] . . . [but] needs consent of [U.S. Cellular] to sell or lease certain licenses, to make certain large expenditures, admit other partners or liquidate the . . . partnership[]." U.S. Cellular FY2012 Annual Report, at 53 (quoted in part at SAC ¶ 148). This is entirely consistent with the description on the King Street Form 601, *see* SAC Ex. 2, Form 601 for King Street Wireless, L.P., Ex. D. at 3, and inappropriately conflates technical accounting rules used for SEC reporting with the FCC's entirely different test for control.[22]

Relators' remaining allegations fare no better. King Street's representations that it was constructing and providing service from 2011 on, SAC ¶ 118–130, were fully consistent with the fact that U.S. Cellular was doing so on King Street's behalf, as contemplated by the Management Services Agreement disclosed to the FCC in December 2010, King Street 2010 DE Report (SAC Ex. 4), Ex. II at ¶ 7 (summarizing material terms). The FCC likewise could not have been deceived as to King Street's financial relationships with U.S. Cellular, the substance of which

---

[22] Under the SEC's accounting rules, "controlling financial interest" (along with the synonymous term "primary beneficiary") is a term of art indicating only that one legal entity has consolidated another onto its balance sheet. Deloitte, *A Roadmap to Consolidation*: *Identifying a Controlling Financial Interest* 14, 19 (2019), *available at* https://www2.deloitte.com/content/dam/Deloitte/us/Documents/audit/ASC/Roadmaps/us-aers-a-roadmap-to-consolidation-identifying-a-controlling-financial-interest.pdf. Under the complex rules governing such consolidation, one entity may have a "controlling financial interest" in another for accounting purposes without possessing the actual power to control as required under the FCC rules. For example, when related parties share the power to direct an entity's activities (as U.S. Cellular and King Street's general partner did with respect to King Street), such that neither of them has actual control, one may nevertheless be deemed the entity's "controlling financial interest" if (as U.S. Cellular did here) it has the greatest exposure to the entity's gains and losses. *Id.* at 225-26, 228-29.

were disclosed to the FCC, *compare* SAC ¶ 102, *with* King Street Form 601 (SAC Ex. 2), Ex. D at 4–6, or the parties' plans to operate seamlessly interoperable systems, *compare* SAC ¶¶ 98–99, *with* King Street Form 601 (SAC Ex. 4), Ex. II at ¶ 7 (disclosing contemplation of roaming agreements).

### 3.    Relators' Alternative Theories Also Fail Adequately To Allege Falsity.

Relators mention three other legal theories that, even if Relators actually press them, fail to state a claim as well. First, U.S. Cellular lacked a *de jure* controlling interest over the DEs because it was a limited partner, not a general one. *See* SAC at ¶¶ 26, 28, 30; 47 C.F.R. § 1.2110(c)(2)(i).

Second, Relators allege no facts to suggest that U.S. Cellular and King Street were engaged in a "venture for *joint profit*." *See* SAC ¶ 106 (emphasis added); 47 C.F.R. § 1.2110(c)(5)(x). To the extent U.S. Cellular's status as a limited partner entitled it to a share of King Street's ultimate profits, FCC regulations are clear that its revenues were not attributable to the DE on that basis alone. *See id.* § 1.2110(c)(2) (providing that only "general partnership interests" give rise to *per se* attribution). And the SAC does not allege any *other* basis on which the parties were entitled to benefit jointly and in proportion to King Street's *profits* at all—only separately through management fees and expenses (for U.S. Cellular), and a flat royalty on network volume (for King Street).

Third, U.S. Cellular's Management Services Agreement with King Street did not give it a *per se* controlling interest, because the terms of that contract gave it no "authority to make decisions of otherwise engage in practices or activities that determine, or significantly influence," the "nature or type" of King Street's services, "the terms upon which such services are offered," or King Street's prices. *See* 47 C.F.R. § 1.2110(c)(2)(ii)(H); *In re Implementation of Sections 3(N) and 332 of the Communications Act Regulatory Treatment of Mobile Services*,

26

9 FCC Rcd. 7123, ¶ 25 (1994) (explaining that the relevant test is authority "under the terms of the agreement" in question); *compare with* SAC ¶ 105.

These three alternative theories, like the primary theories discussed above, fail to state a claim because they do not plausibly, much less with particularity, allege any objective falsity.

### B.      Relators Have Not Plausibly Alleged That U.S. Cellular Acted With Scienter.

But even if Defendants were legally mistaken as to whether King Street, Carroll, and Barat were valid DEs, there can be no liability because Relators have not pled the scienter the FCA requires. The FCA punishes only false statements made with knowledge, deliberate ignorance, or reckless disregard of their falsity, and "does not reach an innocent, good-faith mistake about the meaning of an applicable rule." *Purcell*, 807 F.3d at 287; *see also* 31 U.S.C. § 3729(b). "The FCA is a fraud prevention statute," not a "vehicle for policing technical compliance with administrative regulations," *United States ex rel. Lamers v. City of Green Bay*, 168 F.3d 1013, 1020 (7th Cir. 1999), and there is no liability under the statute for "claims made based on reasonable but erroneous interpretations of a defendant's legal obligations, *Purcell*, 807 F.3d at 288. The Supreme Court has reiterated the need for "strict enforcement" of the statute's scienter requirement. *Universal Health Servs., Inc. v. United States ex rel. Escobar*, 136 S. Ct. 1989, 2002 (2016), and Relators' claims in the present case fall short for three reasons:

First, the SAC essentially fails to allege scienter at all. Although it makes conclusory allegations that Defendants "knew" that they were deceiving the FCC, *see* SAC ¶ 79, and "knowingly" presented false claims, *see, e.g.*, SAC ¶ 219, it contains no well-pleaded *facts* as to what Defendants knew.

Second, Relators cannot establish scienter because they plead, at most, differences as to the technical meaning of the FCC's regulations. "[E]stablishing 'even the loosest standard of knowledge . . .' is difficult when falsity turns on a disputed interpretive question," and the SAC

alleges nothing more. *Purcell*, 807 F.3d at 288. "Under the FCA's knowledge element, then, the court's focus is on the objective reasonableness of the defendant's interpretation [of its regulatory obligations] and whether there is any evidence that the agency warned the defendant away from that interpretation." *Id.* at 290. That settled principle dismantles any inference of scienter as to either one of Relators' theories.

With respect to whether the 2011 NSA created an "attributable material relationship" between U.S. Cellular and King Street, Relators have articulated nothing other than a bare dispute over the interpretation of the term "arrangements . . . for the lease or resale" of spectrum. *See* 47 C.F.R. § 1.2110(b)(3)(iv)(A) (2014). The fact that U.S. Cellular's interpretation of that rule was at least objectively reasonable, *see supra* Part II.A.1, conclusively negates scienter.

Likewise, the SAC does not support any inference of scienter as to U.S. Cellular's alleged "control" of King Street, Carroll, or Barat. The FCC evaluates "control" according to a complex balancing test, considering the following six factors: "(1) does the licensee have unfettered use of all the facilities and equipment? (2) who controls daily operations? (3) who determines and carries out the policy decisions, including preparing and filing applications with the Commission? (4) who is in charge of employment, supervision, and dismissal of personnel (5) who is in charge of the payment of financing obligations, including expenses arising out of operations and (6) who receives monies and profits derived from the operation of the facilities?" *See, e.g.*, *In re Stratos Global Corp.*, 22 FCC Rcd. 21328, 21343 (2007). Relators have not even come close to alleging facts showing that U.S. Cellular's determination that it lacked control under that standard was so "indisputably [in]correct as to render [its] certifications '*knowingly* false as a matter of law.'" *United States v. The Boeing Co.*, 825 F.3d 1138, 1151 (10th Cir. 2016) (emphasis added); *see also Purcell*, 807 F.3d at 287–88 ("[T]he FCA does not reach an innocent,

good-faith mistake about the meaning of an applicable rule or regulation. Nor does it reach those claims made based on reasonable but erroneous interpretations of a defendant's legal obligations."); *United States ex rel. K&R Ltd. P'ship v. Mass. Hous. Fin. Agency*, 530 F.3d 980, 982-84 (D.C. Cir. 2008) (finding no inference of scienter based on defendant's reasonable interpretation of ambiguous mortgage note, even if defendant's was not ultimately "the better reading").

Relators do put forth *conclusory allegations* that each entity was controlled by, and "merely a front for," U.S. Cellular, *see, e.g.*, SAC ¶ 137; *see also supra* Part II.A.2 (discussing allegations of control that lack particularity). However, the *facts* in the SAC show only that U.S. Cellular held most of the equity in each entity, provided them financing, oversaw the process of constructing physical locations, and managed certain technical aspects of system operation. *See supra* Part II.A.2. By contrast, the SAC does not allege facts showing that U.S. Cellular restricted the DEs' access to their own facilities, determined or carried out their policy decisions, had any authority to hire, fire, or supervise their personnel, paid their financing obligations, or received any money other than its contractual fees from their operations. And on those facts, under the FCC's open-ended test, U.S. Cellular's conclusion and certification that it did not "control" the DEs is eminently reasonable. So even if that certification were somehow later determined to be mistaken, there is no basis to infer that it was *knowingly* wrong under the FCA.

The <u>third</u> reason Relators fail to show scienter is that the FCC approved DE treatment after the material facts of Defendants' relationships were fully disclosed. "'[T]he knowledge possessed by officials of the United States may be highly relevant' under the False Claims Act because it 'may show that the defendant did not submit its claim in deliberate ignorance or reckless disregard of the truth.'" *United States ex rel. Burke v. Record Press, Inc.*, 816 F.3d 878,

881 (D.C. Cir. 2016) (quoting *United States ex rel. Hagood v. Sonoma Cty. Water Agency*, 929

F.2d 1416, 1421 (9th Cir. 1991)); *see also Totten*, 380 F.3d at 496 (discussing "government

knowledge defense"). As the SAC shows, each DE disclosed to the Agency both the existence

and terms of its agreements with U.S. Cellular when it submitted its applications for licensing,

and continued to do so throughout the unjust enrichment period. *See* SAC ¶¶ 84(c), 131–32,

159(d), 187, 189. Nor are there any well-pleaded allegations that the reality of those relationships

departed from the agreements' terms. *See supra* Part II.A.2. And in *all three cases*, the FCC

approved what Relators' concede were substantively "identical" arrangements. SAC ¶ 151. So

even if Defendants' certifications of compliance were mistaken, their reliance on the FCC's

repeated, informed approval was at least reasonable, and there can be no inference that

Defendants' statements were *knowingly* false.

### C. Relators Have Not Plausibly Alleged That Any Alleged False Statement Was Material To the FCC's Approval Decision.

"[A] misrepresentation about compliance with a statutory, regulatory, or contractual

requirement must be material to the Government's payment decision in order to be actionable

under the False Claims Act." *Escobar*, 136 S. Ct. at 2002. The FCA's "materiality standard is

demanding," because the statute is not "a vehicle for punishing garden-variety . . . regulatory

violations." *Id.* at 2003. And as with scienter, the Supreme Court has emphasized that materiality

should be "rigorous[ly]" enforced. *Id.* at 2002.

A false certification is not material if it would not affect the government's payment

decision—this means not only that the government *could* deny payment based on the false

certification, but in fact *would* deny payment if it knew the certification were false. *Id.* at 2004

(rejecting government's suggestion that materiality depends on whether "the government *could*

lawfully withhold payment") (emphasis added). In assessing materiality, the Supreme Court

30

directs courts to take into account the government's actual behavior. If the "Government pays a particular claim in full despite its actual knowledge that certain requirements were violated, that is very strong evidence that those requirements are not material." *Id.* at 2003–04. Likewise if the government regularly "pay[s] claims in the mine run of cases" despite that type of noncompliance, it is presumptively not material. *Id.*

Relators' pleadings regarding materiality fail for three reasons.

First, Relators fail to allege materiality in anything but the most generic and conclusory terms. *See* SAC ¶¶ 116, 171, 194 (alleging without support that if their relationship to U.S. Cellular had been disclosed, the DEs "would not have qualified for DE benefits"). Simply restating the elements of an FCA claim is facially insufficient under either Rule 8(a) or Rule 9(b). *Iqbal*, 556 U.S. at 687. Likewise, the SAC stops short of alleging that the FCC *actually would have denied or reclaimed the bidding credits or denied the licenses* based upon Defendants' purportedly false certifications. Bare recitals that the Designated Entities "would not have qualified for DE benefits" money under FCC's regulations, *see* SAC ¶¶ 116, 171, 194, are insufficient. "A misrepresentation cannot be deemed material merely because the Government designates compliance with a particular . . . requirement as a condition of payment. Nor is it sufficient for a finding of materiality that the Government would have the option to decline to pay if it knew of the defendant's noncompliance." *Escobar*, 136 S. Ct. at 2003.

Second, facts alleged in the Complaint—along with others of which this Court can take notice—demonstrate that *if* any of the statements or certifications in issue were false, that falsity was not material to FCC's decision to grant the Designated Entities' bid credits and, later, their spectrum licenses as a matter of law.

Here, the FCC knew of the facts underlying the alleged violations *at the time it granted licenses* to King Street, Carroll, and Barat. The SAC concedes that the agreements defining relationships were openly discussed and fully disclosed to the FCC, *see* SAC ¶¶ 84(c), 131–32, 159(d), 187, 189, which the FCC's own judicially-noticeable records confirm beyond any doubt. For example, the FCC reviewed all agreements relevant to the King Street/U.S. Cellular relationship (including the Management Services Agreement that Relators incorrectly assert was concealed, SAC ¶ 88) before it granted King Street's licenses. *See* King Street Response to Bureau Inquiry at 4 & n.7, FCC File No. 0003379814 (filed May 8, 2009), *attached at* https://wireless2.fcc.gov/UlsApp/ApplicationSearch/applAdmin.jsp?applID=4752724. Indeed, the FCC's docket shows that by the time it granted King Street's licenses in 2009, it knew of the Prior *Qui Tam* Action, which included all of Relators' central allegations with respect to the alleged fraud, and had requested and received a response from King Street itself. *See generally id.*

The FCC's award of bid credits and its licensing decisions for the other auctions confirms this point. The FCC, with full information, has approved bidding credits to similarly-structured DEs in partnership with U.S. Cellular *five times* over more than a decade, strongly suggesting that its practice "in the mine run of cases" is to not deny award of credits or granting licenses in the face of allegations such as Relators make in their SAC. Either the FCC did not view any statements or certifications as false, or it viewed any misstatements as immaterial. Regardless, the FCC's decisions to grant the bid credits and the licenses armed with the facts as alleged in the SAC, precludes finding an FCA violation. *See Escobar*, 136 S. Ct. at 2003.

Finally, the FCC's *continued inaction* with respect to King Street, Carroll, and Barat also negates materiality. As the D.C. Circuit has explained, courts that "have the benefit of hindsight,"

32

"should not ignore what actually occurred" after a claim was paid. *United States ex rel. McBride v. Halliburton Co.*, 848 F.3d 1027, 1034 (D.C. Cir. 2017). Here, the FCC has known all the material facts, as well as Relators' allegations, for more than ten years, but has taken no action to recover the benefits of the supposed fraud. Again, the FCC either sees no misstatement or, if any were made, deems them immaterial. *See McBride*, 848 F.3d at 1034 (no materiality where the government "investigated [the relator's] allegations and did not disallow any charged costs."); *United States ex rel. Janssen v. Lawrence Mem'l Hosp.*, 949 F.3d 533, 542 (10th Cir. 2020) (no materiality where the government "conducted an investigation . . . into the central allegations presently at issue," but "d[id] nothing in response"), *cert. denied*, 2020 WL 5883407 (Oct. 5, 2020); *Cimino v. Int'l Bus. Machs. Corp.*, 2019 WL 4750259, at *7 (D.D.C. Sept. 30, 2019) (finding it "implausible that the IRS sat on its hands upon learning that IBM had tricked it into signing a contract for $265 million for software that it did not need," and "[i]n fact . . . agreed to pay even more money").

## III.    The SAC's Claims Regarding Auctions 58 and 66 Are Time-Barred Under the False Claims Act Statute of Limitations.

FCA "Section 3731(b) sets forth two limitations periods that apply to 'civil action[s] under section 3730,'" and "a relator-initiated, non[-]intervened suit is a 'civil action under section 3730'—and thus subject to the limitations periods in subsections (b)(1) and (b)(2)." *Cochise Consultancy, Inc. v. United States ex rel. Hunt*, 139 S. Ct. 1507, 1511-12 (2019). Under Section 3731(b), a non-intervened *qui tam* action is time-barred if it is brought

> more than 6 years after the date on which the violation of section 3729 is committed, or (2) more than 3 years after the date when facts material to the right of action are known or reasonably should have been known by the official of the United States charged with responsibility to act in the circumstances, but in no event more than 10 years after the date on which the violation is committed, whichever occurs last.

33

31 U.S.C. § 3731(b)(1)–(2).

The last alleged injury with regard to Carroll was the FCC's decision to grant Carroll's spectrum licenses from Auction 58 on January 6, 2006. SAC ¶ 161. The last alleged injury with regard to Barat was the FCC's decision to grant Barat's spectrum licenses from Auction 66 on April 30, 2007. SAC ¶ 188. Because Relators filed their complaint in this action more than six years after all of the injuries they allege occurred with regard to Carroll and Barat, those claims are time-barred and must be dismissed. Relators also cannot take advantage of the FCA's three-year tolling provision because, with the filing of the Prior *Qui Tam* Amended Complaint, the "facts material to the right of action [were] known or reasonably should have been known by the official of the United States charged with responsibility to act in the circumstances." 31 U.S.C. § 3731(b)(2). Relators filed their complaint on April 8, 2015, more than three years after the Prior *Qui Tam* Action was initiated and more than three years after the relator there filed the amended Prior *Qui Tam* Amended Complaint to make all of the essential allegations Relators assert in the present case about the three FCC auctions at issue in both cases.

Further, alleged overt acts in a civil conspiracy do not extend the limitations period unless they cause additional injury: "[T]he statute of limitations in a civil damages action for conspiracy runs separately from each overt act *that is alleged to cause damage to the plaintiff.*" *Barr v. Clinton*, 370 F.3d 1196, 1201 (D.C. Cir. 2004) (emphasis added). Thus even if were true that Defendants took overt acts in furtherance of the alleged conspiracy within the last six years, those acts did not trigger a new limitations period in the case of Carroll and Barat because the relevant harms alleged by Relators—the granting of Carroll and Barat's licenses and bid credits—occurred no later than 2007.

## CONCLUSION

For the foregoing reasons, the Second Amended Complaint should be dismissed with prejudice.

Dated:  October 26, 2020                                    Respectfully submitted,

                                                            /s/ *Frank R. Volpe*

                                                            Frank R. Volpe
                                                            Robert Joseph Conlan, Jr.
                                                            SIDLEY AUSTIN LLP
                                                            1501 K Street, NW
                                                            Washington, DC 20005
                                                            Telephone: 202-736-8000
                                                            Fax: 202-736-8711
                                                            fvolpe@sidley.com
                                                            rconlan@sidley.com