**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| **UNITED STATES OF AMERICA**<br><br>*ex rel.,*<br><br> **MARK J. O'CONNOR AND SARA F. LEIBMAN,**<br><br>      Plaintiffs-Relators,<br><br> v.<br><br>**UNITED STATES CELLULAR CORPORATION,** *et al.*<br><br>     Defendants. | **Civil Action No.: 20-2071 (TSC)** |

**PLAINTIFFS/RELATORS' CONSOLIDATED RESPONSE IN OPPOSITION
TO DEFENDANTS' MOTIONS TO DISMISS**

# TABLE OF CONTENTS

I.     INTRODUCTION ............................................................................................................. 1

II.    BACKGROUND .............................................................................................................. 2

   A.     Regulatory Framework .......................................................................................... 2

   B.     Factual Allegations As Pled in the Second Amended Complaint ......................... 5

III.   ARGUMENT ................................................................................................................. 11

   A.     The Public Disclosure Bar Does Not Preclude Relators' Claims ...................... 11

      1.     Legal Standard for "Public Disclosure" ...................................................... 11

      2.     The Second Amended Complaint Pleads Different, Later Allegations from Those in the 2008 Complaint ......................................................................... 16

      3.     Documents Submitted to the FCC Were Not "Public Disclosures" of the Allegations in the Second Amended Complaint ........................................... 17

      4.     The 2011 Network Sharing Agreement Was Not Disclosed to the FCC .................. 20

      5.     SEC Filings Are Not a "Public Disclosure" of the Allegations in the Second Amended Complaint ..................................................................................... 21

      6.     News Media Reports Did Not Disclose the Allegations in the Second Amended Complaint ..................................................................................... 22

      7.     The Relators are the Original Source of the Allegations in the Second Amended Complaint ..................................................................................... 23

   B.     Relators Have Fully and Sufficiently Pled All Claims in the Second Amended Complaint ........................................................................................................... 26

      1.     The Second Amended Complaint Satisfies All Applicable Pleading Standards ........ 26

      2.     The False Claims Allegations in the Second Amended Complaint Meet All Requirements for Materiality ....................................................................... 28

      3.     The Allegations in the Second Amended Complaint Meet the Pleading Requirements for Scienter ............................................................................ 33

      4.     The Allegations in the Second Amended Complaint Meet the Pleading Requirements for Falsity .............................................................................. 36

      5.     The Allegations in the Second Amended Complaint Meet the Pleading Requirements for Conspiracy ...................................................................... 38

      6.     The Allegations in the Second Amended Complaint Meet the Pleading Requirements for Reverse False Claims ...................................................... 39

   C.     The FCA's Statute of Limitations Does Not Bar Any Claims in the Second Amended Complaint .......................................................................................... 41

   D.     The Relators Should Be Permitted to Proceed with Their Case against Defendants ..... 44

IV.    CONCLUSION .............................................................................................................. 44

# TABLE OF AUTHORITIES

## Cases

*Ashcroft v. Iqbal*, 556 U.S. 662 (2009) ............................................................ 24, 26, 42

*Bell Atl. Corp. v. Twombly*, 550 U.S. 544 (2007) ....................................................... 26

*Cimino v. Int'l Bus. Machs. Corp.,* 2019 WL 4750259 (D.D.C. Sept. 30, 2019) ........................ 31

*Cochise Consultancy, Inc. v. United States ex rel. Hunt*, 139 S. Ct. 1507 (2019) ....................... 41

*Comcast Cable Communications, LLC v. FCC,* 717 F.3d 982 (D.C. Cir. 2013) ......................... 32

*Comcast Corp. v. FCC,* 526 F.3d 763 (D.C. Cir. 2008) ................................................. 32

*Halberstam v. Welch*, 705 F.2d 472 (D.C. Cir. 1983) .................................................. 38

*Harrison v. Westinghouse Savannah River Co.*, 176 F.3d 776 (4th Cir. 1999) ........................... 30

*Hobson v. Wilson*, 737 F.2d 1 (D.C. Cir. 1984) ......................................................... 43

*In re Natural Gas Royalties Qui Tam Litigation*, 562 F.3d 1032 (10th Cir. 2009) ..................... 24

*\*Pencheng Si v. Laogai Research Foundation*, 71 F. Supp. 3d 73 (D.D.C. 2014) .......... 12, 27, 40

*Riddell v. Riddell Washington Corp.*, 866 F.2d 1480 (D.C. Cir. 1989) ....................................... 43

*RKO General, Inc. v. FCC*, 670 F.2d 215 (D.C. Cir. 1981) ............................................... 5

*Singletary v. Howard Univ.*, 939 F.3d 287 (D.C. Cir. 2019) ........................................... 27

*United States ex rel. Alexander v. Dyncorp, Inc.*, 924 F. Supp. 292 (D.D.C. 1996) ................... 13

*United States ex rel. Barko v. Halliburton Co.*, 952 F. Supp. 2d 108 (D.D.C. 2013) ................. 27

*United States ex rel. Amin v. George Washington Univ.*, 26 F. Supp. 2d 162 (D.D.C. 1998) ..... 38

*United States ex rel. Bettis v. Odebrecht Contractors of Cal., Inc.*, 393 F.3d 1321 (D.C. Cir. 2015) ............................................................................................ 28, 29, 30

*United States ex rel. Burke v. Record Press, Inc.*, 816 F.3d 878 (D.C. Cir. 2016) ................ 34, 36

*United States ex rel. Ervin & Assocs., Inc. v. Hamilton Sec. Grp., Inc.*, 370 F. Supp. 2d 18 (D.D.C. 2005) ........................................................................................ 40

*United States ex rel. Findley v. FPC-Boron Employees' Club*, 105 F.3d 675 (D.C. Cir. 1997)... 13

*United States ex rel. Folliard v. CDW Tech. Servs., Inc.*, 722 F. Supp. 2d 20 (D.D.C. 2010)27, 37

*United States ex rel. Folliard v. Gov't Acquisitions, Inc.*, 764 F.3d 19 (D.C. Cir. 2014)............. 33

*United States ex rel. Green v. Service Contract Educ. and Training Trust Fund*, 843 F. Supp. 2d

    20 (D.D.C. 2012) ........................................................................................................... 24

*United States ex rel. Groat v. Bos. Heart Diagnostics Corp.*, 255 F. Supp. 3d 13 (D.D.C. 2017),

    *amended on reconsideration in part*, 296 F. Supp. 3d 155 (D.D.C. 2017) .............................. 36

*\*United States ex rel. Heath v. AT & T, Inc.*, 791 F.3d 112 (D.C. Cir. 2015).................. 27, 28, 34

*\*United States ex rel. Hockett v. Columbia/HCA Healthcare Corp.*, 498 F. Supp. 2d 25 (D.D.C.

    2007) .......................................................................................................................... 13, 24, 33

*United States ex rel. J. Cooper & Assoc., Inc. v. Bernard Hodes Group, Inc.*, 422 F. Supp. 2d

    225 (D.D.C. 2006) ............................................................................................................... 24

*United States ex rel. K & R Limited Partnership v. Massachusetts Housing Finance Agency*, 530

    F.3d 980 (D.C. Cir. 2008) .................................................................................................... 34

*United States ex rel. Keaveney v. SRA Int'l, Inc.*, 219 F. Supp. 3d 129 (D.D.C. 2016)............... 36

*United States ex rel. Landis v. Tailwind Sports Corp.*, 160 F. Supp. 3d 253 (D.D.C. 2016) ....... 39

*United States ex rel. Landis v. Tailwind Sports Corp.*, 51 F. Supp. 3d 9 (D.D.C. 2014) ............. 26

*United States ex rel. Marcus v. Hess*, 317 U.S. 537 (1943).................................................... 28, 30

*United States ex rel. May v. Purdue Pharma L.P.*, 737 F.3d 908 (4th Cir. 2013)....................... 11

*United States ex rel. McBride v. Halliburton Co.*, 848 F.3d 1027 (D.C. Cir. 2017) ........ 28, 30, 31

*United States ex rel. McBride v. Halliburton Co.*, No. 1:05-cv-828, 2014 WL 12691854 (D.D.C.

    Dec. 10, 2014)..................................................................................................................... 37

*United States ex rel. McCready v. Columbia/HCA Healthcare Corp.*, 251 F. Supp. 2d 114
(D.D.C. 2003) ...................................................................................................... 34

*United States ex rel. Miller v. Bill Harbert Int'l Constr., Inc.*, 608 F.3d 871 (D.C. Cir. 2010).... 38

*United States ex rel. Minnesota Ass'n of Nurse Anesthetists v. Allina Health Sys. Corp.*, 276 F.3d
1032 (8th Cir. 2002)............................................................................................... 24

*United States ex rel. Morsell v. Symantec Corp.*, No. CV 12-800 (RC), 2020 WL 5651277
(D.D.C. Mar. 30, 2020)......................................................................................... 34

*\*United States ex rel. Oliver v. Philip Morris USA Inc.*, 826 F.3d 466 (D.C. Cir. 2016)  14, 17, 24

*United States ex rel. PCA Integrity Assocs., LLP v. NCO Fin. Sys., Inc.*, No. CV 15-750 (RC),
2020 WL 686009 (D.D.C. Feb. 11, 2020) ............................................................ 24

*United States ex rel. Phalp v. Lincare Holdings, Inc.*, 857 F.3d 1148 (11th Cir. 2017) ............. 35

*United States ex rel. Purcell v. MWI Corp.*, 824 F. Supp. 2d 12 (D.D.C. 2011), *rev'd and
remanded*, 807 F.3d 281 (D.C. Cir. 2015)............................................................. 15

*United States ex rel. Purcell v. MWI Corp.*, 807 F.3d 281 (D.C. Cir. 2015).................... 34, 35, 36

*\*United States ex rel. Scollick v. Narula*, WL 6544734 slip op. (D.C.C. Nov. 6, 2020).. 28, 29, 30

*United States ex rel. Settlemire v. District of Columbia*, 198 F.3d 913 (D.C. Cir. 1999)  15, 17, 24

*United States ex rel. Shea v. Verizon Commc'ns, Inc.,* 160 F. Supp. 3d 16 (D.D.C. 2015) .. 12, 16,
18, 23

*United States ex rel. Shea v. Cellco P'ship*, 863 F.3d 923 (D.C. Cir. 2017)................................. 23

*United States ex rel. Shemesh v. CA, Inc.*, 89 F. Supp. 3d 36 (D.D.C. 2015)........................ 30, 37

*United States ex rel. Siewick v. Jamieson Sci. & Eng'g, Inc.*, 214 F.3d 1372 (D.C. Cir. 2000)... 37

*\*United States ex rel. Springfield Terminal Ry. Co. v. Quinn* ("Springfield Terminal"), 14 F.3d
645 (D.C. Cir. 1994) ...................................................................................... passim

*United States ex rel. Tessler v. City of New York*, 712 Fed.Appx. 27 (2d Cir. 2017)................... 34

*United States ex rel. Totten v. Bombardier Corp.*, 286 F.3d 542 (D.C. Cir. 2002)..................... 27

*United States ex rel. Westrick v. Second Chance Body Armor, Inc.*, 685 F. Supp. 2d 129 (D.D.C. 2010) .............................................................................................................. 38

*United States ex rel. Williams v. Martin–Baker Aircraft Co.*, 389 F.3d 1251 (D.C. Cir. 2004)... 27

*\*United States v. Comstor Corp.,* 308 F. Supp. 3d 56 (D.D.C. 2018).............................. 14, 15, 34

*United States v. DynCorp Int'l, LLC*, 253 F. Supp. 3d 89 (D.D.C. 2017) ............................ 33, 37

*United States v. Kellogg Brown & Root Servs., Inc.*, 800 F.Supp. 2d 143 (D.D.C. 2011).......... 36

*United States v. Krizek*, 111 F.3d 934 (D.C. Cir. 1997) ................................................. 33

*United States v. Sci. Applics. Int'l Corp.*, 626 F.3d 1257 (D.C. Cir. 2010)..................... 28, 34, 37

*\*Universal Health Servs., Inc. v. United States ex rel Escobar*, 136 S. Ct. 1989 (2016)....... 29, 31

**Statutes**

\*31 U.S.C. §§ 3729-3733 ................................................................................... passim

47 U.S.C. § 309 ........................................................................................................ 2, 3

**Other Authorities**

*Application of Baker Creek Communications*, *L.P.*, 13 FCC Rcd. 18709 (1998) ...................... 35

*Application of Ellis Thompson Corp.*, Memorandum Opinion and Order and Hearing Designation Order, 9 FCC Rcd. 7138 (1994)........................................................................... 35

*In the Matter of Implementation of Section 309(j) of the Communications Act - Competitive Bidding*, Fifth Memorandum Opinion and Order, 10 FCC Rcd. 403 (1994)........................... 35

*Intermountain Microwave*, 24 Rad. Reg. 7 (P & F) 983 (1963)................................................. 35

**Rules**

Fed. R. Civ. P. 9(b) ....................................................................................... 26, 27, 33

Fed. R. Civ. P. 12(b) ............................................................................................................ 24, 26

**Regulations**

47 C.F.R. § 27.14 ...................................................................................................................... 8

47 C.F.R. §§ 1.2110; 1.2111 .............................................................................................. 3, 4, 35

*Asterisks indicate those cases or authorities on which counsel chiefly relies. LCvR 7(b).

Relators Mark J. O'Connor and Sara F. Leibman submit this consolidated[1] Opposition to (1) the Motion to Dismiss[2] of Defendants King Street Wireless, L.P., King Street Wireless, Inc., and Allison Cryor DiNardo (the "King Street Defendants"); and (2) the Motion to Dismiss[3] of Defendants United States Cellular Corporation, USCC Wireless Investment, Inc., and Telephone and Data Systems, Inc., (the "U.S. Cellular Defendants"), all collectively referred to herein as the "Defendants." For the reasons set forth below, the Defendants' Motions should be denied.

## I.     INTRODUCTION

Relators' Second Amended Complaint ("SAC") alleges that Defendants engaged in a significant, multi-year scheme and conspiracy to violate the False Claims Act ("FCA") by fraudulently obtaining and retaining over $150 million in Government-provided bid credits for which they were not eligible. The Defendants carried out the conspiracy through sham entities, which they formed and used to acquire wireless communications spectrum licenses in three different Federal Communications Commission ("FCC") auctions, using bid credits that Congress and the FCC have reserved exclusively for small and very small businesses. The sham entities acted as fronts for U.S. Cellular, a major telecommunications provider with billions of dollars in revenue, to acquire discounted licenses fraudulently, which it then used to fill out and expand its own network.

---

[1] Although the Motions to Dismiss of the King Street Defendants and the U.S. Cellular Defendants are not identical, each relies upon similar and related arguments and points of law. In the interest of efficiency, both for the Court as well as the parties, Relators submit this consolidated Opposition in response to both Motions.
[2] The Motion to Dismiss [Dkt. 148] and the Memorandum of Points and Authorities in Support [Dkt. 148-1] are collectively hereafter "KSW MTD."
[3] The Motion to Dismiss [Dkt. 149] and the Memorandum of Points and Authorities in Support [Dkt. 149-1] are collectively hereafter "USC MTD."

The scheme included fraudulently inducing the FCC to provide bid credits to the sham companies under false pretenses; secretly ceding control of the spectrum licenses to U.S. Cellular; filing numerous false and fraudulent statements and documents to conceal that U.S. Cellular, not the sham entities, controlled the licenses; concealing information from the FCC that would have alerted the FCC to the fraud; and fraudulently evading their obligation to repay the funds to the Government. Defendants made and submitted numerous false, misleading and incomplete statements and documents to the FCC to obtain the credits, conceal the fraud, and retain the funds.

Defendants now move to dismiss the SAC for failure to state a claim on various grounds, including the public disclosure bar, assorted alleged failures to satisfy pleading standards, and as barred by the statute of limitations. Defendants mischaracterize the allegations in the SAC, as well as the sources for their claims; ask the Court to apply the standard of review for summary judgment, rather than for a motion to dismiss; argue the wrong standard of materiality; and rely for their arguments on facts that are either in dispute or not in the record. Accordingly, both Motions to Dismiss should be denied.

## II.      BACKGROUND

### A.      Regulatory Framework

Under Section 309(j) of the Federal Communications Act, the FCC allocates spectrum licenses to commercial wireless companies through auctions. 47 U.S.C. § 309(j)(1). Congress directed the FCC to design its auction and licensing rules to "promote (i) an equitable distribution of licenses and services among geographic areas, (ii) economic opportunity for a wide variety of applicants, including small businesses …, and (iii) investment in and rapid deployment of new technologies and services." *Id.* at § 309(j)(4)(C)-(D). Congress recognized, however, that allocating commercial licenses by auction would favor large wireless providers, such as U.S.

Cellular, that have far greater resources than small businesses, and are motivated to prevent new independent providers from entering their service areas.

The statute, therefore, directs the FCC to "ensure that small businesses … are given the opportunity to participate in the provision of spectrum-based services, and, for such purposes, consider the use of tax certificates, bidding preferences, and other procedures." *Id*. To accomplish this, the FCC provides auction bidding credits to "very small businesses" and "small businesses," known as Designated Entities ("DEs"), which are expressed as percentage discounts in the prices they are required to pay the government for the licenses they win at auction.

Congress was also concerned that large companies seeking to use the DE program to lower their license acquisition costs would hide behind very small and small business entities to acquire and use these benefits fraudulently. The statute, accordingly, directs the FCC to "to protect the public interest in the use of the spectrum," *id*. at § 309(j)(3), including the "avoidance of unjust enrichment[,]" *id*. at § 309(j)(3)(C), and further, to "require such transfer disclosures and anti-trafficking restrictions and payment schedules as may be necessary to prevent unjust enrichment as a result of the methods employed to issue licenses and permits." *Id*. at § 309(j)(4)(E).

The FCC has implemented regulations to prevent fraud and comply with these directives.[4] DEs are required to: (1) meet the small or very small business size standard, which is measured by their attributable revenues, *and* (2) retain control over the spectrum associated with the licenses for which it received small business benefits, for the first five years of the license term. *See* 47 C.F.R. §§ 1.2110(b)(1)-(3), 1.2111(b)(1). Revenues attributable to an applicant must include the

---

[4] Regardless of whether, as Defendants state, the FCC generally "encourage[d] large companies to *invest* in designated entities" (KSW MTD at 3) (emphasis added), the rules are designed to ensure that the large company is a passive investor that does not *control* the small company DEs – or, as in this case, *use* them to acquire discounted licenses for themselves with government provided bid credits.

average gross revenues of the applicant, its affiliates, its controlling interests, and the affiliates of its controlling interests, as each of those terms are defined in the regulations, *and must be disclosed* in the Short-Form Application, Form 175, to compete in the auction and in the Long-Form Application, Form 601, for the licenses. *Id.* To establish their DE eligibility, and *retain* their DE bidding credits during this five-year period, DE licensees must abide by the attributable material relationship ("AMR") rule, the management agreement controlling interest ("MACI") rule, the joint venture rule, and the *de facto* control rule for the first five years of the license term. *See* SAC ¶¶ 57-63, 65. If a DE licensee enters into a disqualifying business transaction or relationship with a larger non-DE company, such as U.S. Cellular, it must report and seek approval for the change from the FCC, and make an unjust enrichment payment to repay the Government the remaining balance of the DE bidding credit used to purchase the license(s).[5]

The FCC has enacted three rules to safeguard compliance with the DE reporting and unjust enrichment payment requirements. First, the licensee must file a "DE Annual Report" each year "that shall include, at a minimum, a list and summaries of all agreements and arrangements (including proposed agreements and arrangements) that relate to eligibility for designated entity benefits." 47 C.F.R. § 1.2110(n)(2). Second, a DE licensee must seek prior FCC approval of any event or transaction during the unjust enrichment period that affects its eligibility for the benefits, *i.e.*, a "reportable eligibility event." *Id*. at § 1.2114(a). Finally, if a DE licensee "seeks to make any ownership change or to enter into a material relationship … that would result in the licensee losing eligibility for a bidding credit … the amount of the bidding credit … plus interest based on the rate

---

[5] In some circumstances, the licensee may obtain a waiver of the DE rules if the FCC determines it would be in the public interest. *See, e.g., In the Matter of Grain Management*, 29 FCC Rcd. 9080 (2014) (granting DE licensee a waiver of the AMR rule for spectrum leases with AT&T and Verizon).

for ten year U.S. treasury obligations applicable on the date the license is granted, must be paid to

the U.S. Government as a condition of Commission approval of the assignment or transfer or of a

reportable eligibility event." *Id.* at § 1.2111(d)(1)(2014).

These rules depend entirely upon accurate and truthful self-reporting by the licensee. The

FCC "must rely heavily on the completeness and accuracy of the submissions made to it, and its

applicants in turn have an affirmative duty to inform the Commission of the facts it needs in order

to fulfill its statutory mandate." *RKO General, Inc. v. FCC*, 670 F.2d 215, 232 (D.C. Cir. 1981)

("This duty of candor is basic, and well known."). No amount of diligence by the FCC and its staff

could alert them to a disqualifying relationship or transaction if the DE licensee conceals or fails

to report it fully and properly to the FCC.

**B.      Factual Allegations As Pled in the Second Amended Complaint**

The SAC alleges violations of the False Claims Act, 31 U.S.C. §§ 3729-3733, by United

States Cellular Corporation ("USCC"), USCC Wireless Investment, Inc. ("USCCWI"), Telephone

and Data Systems, Inc. ("TDS") (collectively, "U.S. Cellular"),[6] King Street Wireless, L.P., King

Street Wireless, Inc. (collectively, "King Street"),[7] and Allison Cryor DiNardo ("DiNardo").

---

[6] TDS is a publicly held Delaware corporation with its principal place of business in Chicago, Illinois. TDS owns approximately 80 percent of U.S. Cellular, which, through its wholly owned subsidiary, USCCWI, owns 90 percent of King Street, Aquinas Wireless L.P., and Advantage Spectrum L.P. SAC ¶ 24.

[7] King Street Wireless, L.P. is a limited partnership, registered in Delaware on or about November 27, 2007, with its business address listed as 105 N. Washington Street, Suite 301, Alexandria, Virginia 22314. King Street Wireless, L.P. has one general partner, King Street Wireless, Inc., and one limited partner, USCC.  SAC ¶ 26. King Street Wireless, Inc. is a Delaware corporation, formed on November 27, 2007, with the same business address, and is the sole general partner and 10 percent owner of King Street Wireless, L.P. Defendant Allison Cryor DiNardo is the sole shareholder and owner of King Street, Inc. SAC ¶ 27.

Between 2005 and 2008, U.S. Cellular used King Street, as well as Carroll Wireless, L.P., Carroll PCS, Inc., (collectively "Carroll"), Barat Wireless, L.P., and Barat Wireless, Inc. (collectively "Barat"),[8] all of which were formed as sham "very small businesses" in partnership with DiNardo, to fraudulently acquire discounted wireless spectrum licenses using over $150 million in Government-provided bid credits, as well as licenses that were reserved exclusively for legitimate small business entrepreneurs.

On November 27, 2007, DiNardo registered King Street Wireless, L.P. as a limited partnership, and King Street Wireless, Inc. as a corporation, in Delaware. SAC ¶¶ 26-27. On the following day, DiNardo submitted King Street Wireless, L.P.'s FCC Form 175 Short-Form Application to participate in FCC Auction 73 as a "very small business." SAC ¶¶ 76-77. DiNardo falsely certified that King Street Wireless, Inc. and DiNardo held the controlling interests in King Street Wireless, L.P.; that DiNardo had both *de jure* and *de facto* control of King Street Wireless, Inc.; that, as the 100 percent owner of King Street Wireless, Inc., DiNardo had a controlling interest in King Street Wireless, L.P.; and that King Street's attributable revenues were less than $15 million. DiNardo further certified falsely that, "[n]o other individual or entity has a controlling interest in the Applicant," and that King Street had no affiliates except for entities that were affiliates of DiNardo. SAC ¶ 78.

King Street successfully bid on and won 152 licenses, offsetting the $400.6 million cost with $100.2 million in bid credits provided by the Government. All of these licenses were in or adjacent to markets in which U.S. Cellular already held spectrum licenses. SAC ¶¶ 80, 89.

---

[8] USCC also owned 90 percent of Carroll Wireless, L.P. and Barat Wireless, L.P., until 2012, when it formally acquired both entities outright. SAC ¶ 25.

On March 28, 2008, DiNardo submitted King Street's Form 601 Long-Form Application for the licenses, falsely certifying that King Street had not entered into any agreements that would impact its status as a very small business DE. SAC ¶ 84. In fact, King Street, through DiNardo, entered into numerous agreements with U.S. Cellular, only some of which were disclosed in the application, some of which were publicly disclosed after the licenses were granted, and some of which were never disclosed. These agreements, together and separately, established that U.S. Cellular held a controlling interest in King Street, making King Street ineligible both to acquire and to retain the DE benefits that it ceded to U.S. Cellular. *Id.*

While King Street's applications were pending, Relator O'Connor, acting through his law firm, filed a complaint, which was amended in 2008 ("2008 Complaint"), alleging that U.S. Cellular was using King Street as a front to acquire licenses in Auction 73 with government-provided bid credits. The Department of Justice obtained an order unsealing portions of the 2008 Complaint to allow the FCC to conduct an inquiry into the circumstances before making a decision on the licenses.

On May 8, 2009, in response to a letter from the FCC's Wireless Bureau, King Street submitted a lengthy memorandum with exhibits, falsely denying that King Street was controlled by U.S. Cellular or TDS, and falsely insisting throughout that DiNardo had controlled all auction activities, had at all times controlled King Street, and handled all daily and long-term partnership decisions.[9] Thus falsely assured of King Street's independence from U.S. Cellular, the FCC's

---

[9] U.S. Cellular and King Street entered into a Management Services Agreement ("MSA") in January 2009, which delegated certain responsibilities in the management of the "CMRS systems licensed to, constructed, and operated by or on behalf of King Street, LP utilizing licenses acquired in Auction No. 73," to U.S. Cellular, while falsely and repeatedly stating throughout in varying terms that King Street Wireless, Inc. held the controlling interest in King Street Wireless, L.P. SAC, ¶ 87. King Street did not amend its long form application to disclose the MSA and did not appear to include the MSA in its response to the FCC. SAC ¶¶ 87, 88.

Wireless Bureau awarded the licenses to King Street on December 27, 2009.[10] SAC ¶ 89.

Having fraudulently induced the FCC to provide $100 million in bid credits and to award it DE licenses, King Street was required to: construct and operate wireless networks that provided a wireless signal sufficient to offer service covering specific percentages of the geographic license areas within specified time periods; file detailed "Construction Notices" reporting the installation and operation of wireless transceiver equipment for each market; and offer wireless service to the public in each market using the licensed spectrum and wireless networks. 47 C.F.R. § 27.14(g); SAC ¶ 12. In fact, King Street neither constructed nor operated any wireless networks, and never offered wireless service to the public using its licensed spectrum. SAC ¶ 13. Instead, U.S. Cellular integrated King Street's licensed spectrum into its own networks for its own customers.

On or about October 25, 2011, U.S. Cellular and King Street executed and formalized a so-called "network sharing agreement" ("NSA") that leased *all* of King Street's spectrum in 90 of the 152 King Street markets to U.S. Cellular, and allowed it to build 4G LTE networks to serve U.S. Cellular's *own* customers. SAC ¶ 92. This 2011 NSA, which clearly and plainly established U.S. Cellular's unlawful control of King Street and violated the FCC's AMR rule, was never disclosed to the FCC. SAC ¶¶ 92-95.

Relators' independent investigation included commissioning spectrum analysis studies showing U.S. Cellular's use and control of the King Street spectrum, contacting King Street's alleged sales team to determine whether King Street offered wireless services to customers (it did not), obtaining customer service contracts that identified U.S. Cellular as the sole provider in King Street markets, and locating permits and other documents naming U.S. Cellular (or its affiliates) in connection with the build out of the purported King Street networks. SAC ¶¶ 98, 101, 108, 111.

---

[10] The Relators voluntarily dismissed the 2008 Complaint on January 12, 2010.

These and other investigative activities by the Relators independently established that, under the DE regulations, King Street was controlled by U.S. Cellular and ineligible for DE benefits. *Id.*

The Relators further found that King Street failed to meet even the most basic regulatory obligations of a commercial wireless operating company. SAC ¶¶ 112-113. As alleged in the SAC, King Street never applied for telephone numbers to be able to offer services to customers, never filed a Form 499A identifying the jurisdictions where it offered services, and never even filed for a Form 499 number, which is required for the FCC to enforce certain statutory obligations. *Id.*

Beginning in December 2010 and continuing through December 2013, to retain the fraudulently obtained licenses and avoid having to repay the bid credits, King Street submitted false and fraudulent DE Annual Reports that misrepresented its relationship to U.S. Cellular, and concealed that it had ceded its licenses to U.S. Cellular. SAC ¶¶ 118, 128-135. In these reports, King Street purportedly summarized and, in fact, mischaracterized and misrepresented its arrangements with U.S. Cellular, falsely stating, in particular, that under the Management Services Agreement ("MSA"), U.S. Cellular would serve as the manager of systems licensed to, constructed, and operated by or on behalf of King Street, King Street would control all service offerings and pay all financial obligations, King Street would make all regulatory filings and pay all fees, and U.S. Cellular would provide certain technical and plan development services to King Street. Underscoring these opaque assertions, the MSA repeatedly and falsely stated that King Street retained *de facto* control of its licenses and operations. SAC ¶132.

King Street further filed false and fraudulent Construction Notices stating that it was constructing and building out the networks utilizing its spectrum licenses, when, in fact, U.S. Cellular built, owned, and operated the networks, and was using the spectrum for its own customers. SAC ¶¶ 119-127. If U.S. Cellular's actual role and use of King Street's spectrum had

been disclosed, the FCC would have been required to cancel King Street's licenses, and King Street would have been required to repay the bid credits. SAC ¶¶ 12, 118-120.

In 2012, the FCC conducted a "reverse auction,"[11] FCC Auction 901, that awarded $300 million in one-time Mobility Fund Phase I support subsidies to telecommunications providers that committed to provide 3G or better mobile voice and broadband services in small census tract areas where such services were unavailable. SAC ¶¶ 138-139. Applicants were required to demonstrate that they had "access" to the necessary spectrum in these areas – which included areas where King Street held 700 MHz licenses. *Id.,* SAC ¶ 141.

Although the undisclosed 2011 NSA already gave U.S. Cellular full access to King Street's spectrum in 19 census tract areas where U.S. Cellular "won" subsidies in Auction 901, the 2011 NSA also left no doubt that Defendants had violated the DE eligibility rules. SAC ¶142. Accordingly, U.S. Cellular and King Street crafted a second purported NSA (the "2012 NSA"), which U.S. Cellular then summarized in its Mobility Fund application to establish that it "currently holds a license for or leases the spectrum" necessary to construct 4G LTE networks in the census tract areas. *Id.*

The 2012 NSA purported to give U.S. Cellular the necessary spectrum access *only* in the tiny census tract areas where U.S. Cellular won subsidies, avoiding the disclosure that it was actually using much more than 25 percent of King Street's spectrum in multiple markets with much larger license areas (which would have revealed the Defendants' violations of the AMR and *de facto* control rules, and disqualified King Street as a DE). SAC ¶ 143. Even though King Street was the purported lessor of the spectrum, King Street never reported the 2012 NSA to the FCC, as

---

[11] A reverse auction is one in which bidders compete to determine which is willing to accept the smallest subsidy from the government.

the regulations required. Instead, *U.S. Cellular* submitted a purported summary of the 2012 NSA as part of its application to compete for the subsidies in Auction 901, an auction in which King Street had no role beyond providing the required access to the spectrum. SAC ¶ 145.

It was only through Relators' investigation and research after the First Amended Complaint ("FAC") was filed in 2016 that the two NSAs came to light, and the Department of Justice required that they be disclosed as part of its investigation of Relators' allegations.

Because King Street leased and ceded control of its licensed spectrum to U.S. Cellular far beyond the limits of the DE rules, and U.S. Cellular performed the actions necessary to maintain the licenses, King Street, was ineligible for, and required to repay approximately $100.2 million in DE bid credits to the FCC. SAC ¶¶ 1, 4, 6-10, 13-15, 70-73, 100-105, and Counts 1-5.

On February 9, 2018, *after* the unjust enrichment period had expired, U.S. Cellular filed an application for FCC consent to formally transfer control of the King Street licenses from King Street/DiNardo to U.S. Cellular. That application remains pending at the FCC. SAC ¶ 16.

## III.   ARGUMENT

### A.   The Public Disclosure Bar Does Not Preclude Relators' Claims

#### 1.   Legal Standard for "Public Disclosure"

Defendants argue that Relators' claims are "precluded" by the FCA's public disclosure bar, which disqualifies private suits based on fraud already disclosed in particular settings, unless the relator meets the definition of an "original source" under the FCA. The public disclosure bar, which was first enacted in 1986, originally "operated as a jurisdictional limitation." *United States ex rel. May v. Purdue Pharma L.P.*, 737 F.3d 908, 916 (4th Cir. 2013). In 2009, Congress

substantially amended the public disclosure bar as part of the Affordable Care Act (ACA).[12] The

current public disclosure bar, which became effective on March 23, 2010, provides that:

> The court shall dismiss an action or claim under this section, unless opposed by the
> Government, if substantially the same allegations or transactions as alleged in the action
> or claim were publicly disclosed—
>> (i) in a Federal criminal, civil, or administrative hearing in which the Government
>> or its agent is a party;
>> (ii) in a congressional, Government Accountability Office, or other Federal report,
>> hearing, audit, or investigation; or
>> (iii) from the news media,
> unless the action is brought by the Attorney General or the person bringing the action is an
> original source of the information.

31 U.S.C. § 3730(e)(4)(A)(i)-(iii).[13]

The 2010 amendments shifted the public disclosure bar from a jurisdictional bar to an

affirmative defense, *i.e.,* for failure to state a claim – with consequences for the standard of review

in this case. *See United States ex rel. Shea v. Verizon Commc'ns, Inc.,* 160 F. Supp. 3d 16, 24

(D.D.C. 2015). Rather than the relator bearing the burden of proving that the public disclosure bar

did not preclude the action, "[t]he court [now] must view the complaint in [the] light most favorable

to the plaintiff and must accept as true all reasonable factual inferences drawn from well-pleaded

factual allegations" under Rule 12 (b)(6). *Pencheng Si v. Laogai Research Foundation*, 71 F. Supp.

3d 73 (D.D.C. 2014).

The 2010 amendments redefined the question from whether an action was "based upon"

the public disclosure of allegations or transactions to whether the relator's allegations are

---

[12] Although no direct legislative history seems to exist, the textual changes alone evidence
Congress' intent to lower the bar for relators, at least as to some of its components.

[13] Because Relators' allegations concern Defendants' actions *after* the FCC awarded the DE
licenses to King Street on December 30, 2009, and the false representations began with King
Street's December 2010 DE Annual Report, the 2010 amendments apply in this case.

"substantially the same" as publicly available information.[14] Because the "substantially the same" standard actually drew on and paraphrases the "substantially similar" standard previously developed by the D.C. Circuit, *United States ex rel. Findley v. FPC-Boron Employees' Club*, 105 F.3d 675, 682 (D.C. Cir. 1997), the pre-amendment cases still offer guidance into whether the "allegations" or "transactions" are "substantially the same" as the cited public disclosure.

The Court must first determine that: (1) there has been a public disclosure of allegations or transactions; and (2) that the lawsuit's allegations are [substantially the same as] allegations or transactions already publicly disclosed. *United States ex rel. Hockett v. Columbia/HCA Healthcare Corp.*, 498 F. Supp. 2d 25, 41 (D.D.C. 2007). Notably, the FCA only "bars suits based on publicly disclosed 'allegations or transactions,' not [on publicly disclosed] information." *United States ex rel. Springfield Terminal Ry. Co. v. Quinn* ("Springfield Terminal"), 14 F.3d 645, 653 (D.C. Cir. 1994). "[I]n common parlance, allegation connotes a conclusory statement implying the existence of provable supporting facts," while "transaction" suggests "an exchange between two parties or things that reciprocally affect or influence one another." *Id.* at 653-654.

The threshold question under the public disclosure bar then is "whether there has been a public disclosure at all of the sort contemplated by the statute." *Hockett,* 498 F. Supp. 2d at 46. An allegation of "[f]raud requires recognition of two elements: a misrepresented state of facts and a true state of facts." *United States ex rel. Alexander v. Dyncorp, Inc.*, 924 F. Supp. 292, 301 (D.D.C. 1996). The D.C. Circuit has framed this question by expressing the allegation as an equation:

[I]f X + Y = Z, Z represents the allegation of fraud and X and Y represent its essential elements. In order to disclose the fraudulent transaction publicly, the combination of X

---

[14] Other substantial changes in the 2010 amendments included the Government's right to veto dismissal of the action and the requirement that a public disclosure in a criminal, civil, or administrative hearing be in a federal proceeding in which the Government or its agent is a party.

and Y must be revealed, from which readers or listeners may infer Z, i.e., the conclusion that fraud has been committed. The language employed in § 3730(e)(4)(A) suggests that Congress sought to prohibit qui tam actions only when either the allegation of fraud or the critical elements of the fraudulent transaction themselves were in the public domain.

*Id.* at 654. *See, e.g.*, *United States v. Comstor Corp.*, 308 F. Supp. 3d 56, 72 (D.D.C. 2018) (the fact that the defendants were selling TAA non-compliant products to the government (X), plus the fact that the defendants falsely certified that they were complying with the TAA (Y), permits the inference that the defendants committed fraud (Z)); *United States ex rel. Oliver v. Philip Morris USA Inc.*, 826 F.3d 466, 471 (D.C. Cir. 2016) ( "the fact that Philip Morris was not providing the Exchanges with the best price for cigarettes (X) plus the fact that Philip Morris falsely certified that it complied with the Most Favored Customer provisions (Y)" gives rise to "the conclusion Philip Morris committed fraud (Z)").

Both components of the allegation/equation (X *and* Y), or the allegation itself (Z) must have been publicly disclosed. *See Springfield Terminal*, 14 F.3d at 653. Where only one element of the fraudulent transaction is in the public domain (*e.g.,* X), the relator may mount a case by coming forward with either the additional elements necessary to state a case of fraud (*e.g.,* Y) or allegations of fraud itself (*e.g.*, Z). *Id.* at 655.

Here, Relators allege that, by any of the measures established by the FCC, U.S. Cellular *controlled* King Street in violation of the DE eligibility rules, that King Street was ineligible for DE bid credits and licenses, and that Defendants fraudulently retained over $100 million in benefits that the Government had set aside for DEs. These are explicit allegations of fraud (Z), consisting of numerous misrepresentations of facts made and submitted by the Defendants (X) and the true state of the facts (Y) discovered through Relators' independent efforts.

Defendants argue, however, that, in this case, X, Y, and Z all were publicly disclosed.  In fact, neither "the allegation of fraud or the critical elements of the fraudulent transaction themselves

were in the public domain." *Springfield Terminal,* 14 F.3d at 654. First, the documents Defendants rely on for this assertion are not prior public disclosures of the very explicit fraud allegations in the SAC.  Second, none of the documents cited by the Defendants disclosed the true state of the facts (Y), from which the fraud could have been inferred. Third, as the SAC alleges, these documents and statements were false, misleading, and incomplete, and were made to further conceal the true state of the facts, and in furtherance of the scheme and conspiracy to violate the FCA. Fourth, the publicly disclosed information could not "have formed the basis for a governmental decision on prosecution, or . . . have alerted law-enforcement authorities to the likelihood of wrongdoing." *Comstor,* 308 F. Supp. At 75 (D.D.C. 2018); *United States ex rel. Settlemire v. District of Columbia*, 198 F.3d 913, 918 (D.C. Cir. 1999); *United States ex rel. Doe v. Staples, Inc.,* 773 F.3d 83, 86 (D.C. Cir. 2014).  Fifth, the true state of the facts (Y) was concealed from the public and the FCC, as evidenced by *e.g.* the 2015 Comsearch engineering study of King Street licensed spectrum use; the 2015 customer agreements for U.S. Cellular 4G LTE service; customer declarations obtained by the Relators in 2015; interviews by the Relators of former King Street employees; the 2011 Network Sharing Agreement ("NSA"); and King Street's failure to make any telecommunications regulatory filings or payments, all of which were independently commissioned and discovered by Relators.

With the exception of the 2011 NSA, *which was deliberately and intentionally concealed from the FCC,* none of the documents Defendants rely on, individually or collectively, exposed the allegation that the Defendants were engaged in a fraudulent scheme to obtain and retain DE benefits in violation of the DE rules and the FCA. *See United States ex rel. Purcell v. MWI Corp.*, 824 F. Supp. 2d 12, 24 (D.D.C. 2011), *rev'd and remanded*, 807 F.3d 281 (D.C. Cir. 2015) (the public disclosure bar operates "only when enough information exists in the public domain to expose the fraudulent transaction.").

15

### 2. The Second Amended Complaint Pleads Different, Later Allegations from Those in the 2008 Complaint

Setting aside for the moment that Relator O'Connor was the original source of the 2008 Complaint,[15] the SAC alleges additional fraudulent conduct, as well as additional violations of the FCA, that differ significantly from the fraudulent conduct alleged in the 2008 Complaint. In fact, beyond the allegations of fraud in the obtaining of the discounted licenses from the FCC, the SAC alleges substantial fraudulent activity between 2011 and 2015. *See Springfield Terminal*, 14 F.3d at 653 ("Cases may arise where disclosures of a practice are insufficient to be considered public disclosures of later instances of fraud, as 'Congress did not prescribe by mathematical formulae the quantum or centrality of nonpublic information that must be in the hands of the qui tam relator in order for suits to proceed.'")

Defendants' post-2010 fraudulent conduct involving King Street included: (1) the creation and concealment of the 2011 network sharing agreement (SAC ¶¶ 92-97); (2) the incorporation of King Street's spectrum into U.S. Cellular's own 4G LTE network (*id.* at ¶¶ 98-99); (3) U.S. Cellular's payment for, construction of, and ownership of the facilities and equipment necessary to operate the 4G LTE networks that use the King Street licenses (*id.* at ¶¶ 100-105); (4) King Street's failure to function as a telecommunications provider (*id.* at ¶¶ 107-114); (5) King Street's submission of false statements and material omissions in its DE Annual Reports and Construction Notices (*id.* at ¶¶ 118-130); and (6) the submission of false statements by U.S. Cellular regarding its control of King Street's spectrum in FCC Auction 901 (*id.* at ¶¶ 138-146).

---

[15] *See United States ex rel. Shea v. Verizon Commc'ns, Inc.*, 160 F. Supp. 3d at 28 (Noting that "[t]he public disclosure bar is designed to 'discourage[ ][ ] opportunistic plaintiffs who have no significant information to contribute of their own[,]'" but where a prior complaint was filed by the Relators themselves, they "could not possibly have 'opportunistically' relied on the unsealing of [that complaint.]") (internal citations omitted).

Defendants' post-2010 fraudulent conduct involving Carroll and Barat included: (1) U.S. Cellular's *de facto* control during the unjust enrichment period (*id.* at ¶¶ 162, 190-193); (2) failure to operate as a telecommunications provider (*id.* at ¶¶ 166-170, 176); (3) submission of DE Annual Reports containing false certifications (*id.* at ¶¶ 173-174, 196-197); (4) submission of Construction Notices containing false certifications (*id.* at ¶ 175); (5) the acquisition of Carroll and Barat by U.S. Cellular (*id.* at ¶¶ 177, 199); and (6) the failure to disclose changes in DE eligibility (*id.* at ¶¶ 178-179, 200-201).

Far from "[m]erely providing more specific details about what happened," as Defendants would have it, the SAC alleges substantial additional fraudulent conduct that occurred *after* the 2008 Complaint was voluntarily dismissed, as well as different violations of the FCA, in the form of reverse false claims, that arose in December 2010 and continued through December 2014. *Oliver*, 826 F.3d at 472. Further, to the extent Defendants claim that the 2008 Complaint disclosed an alleged "general practice" of defrauding the FCC, allegations of "general practices" are not "substantially the same" as the very specific allegations of fraud in the SAC.

Finally, the argument that Relator's own prior complaint was a prior public disclosure precluding him from bringing a later, very different complaint is contrary to logic, fact and law. *See id.*; *Settlemire*, 198 F.3d at 913.[16]

### 3.   Documents Submitted to the FCC Were Not "Public Disclosures" of the Allegations in the Second Amended Complaint

King Street's FCC filings also did not alert or notify the FCC of the true state of the facts, but were drafted to conceal that U.S. Cellular controlled King Street in violation of FCC's *de facto* control, MACI, joint venture, and AMR rules. *See Springfield Terminal*, 14 F.3d at 655; *see also*

---

[16] Defendants reliance on the "investigation" prompted by Realtor O'Connor's 2008 Complaint as bearing on materiality is similarly misplaced, as discussed in Section III(B)(2)(b) below.

*Shea*, 160 F. Supp. At 27  ("[T]he test our Court of Appeals has established does not ask whether supporting evidence might exist in the public domain. Instead, the Court must decide whether the essential elements of the fraud have been disclosed.").

### a. Corporate Documents

Documents describing the legal *ownership* of King Street did not answer the question of *de facto control* of King Street for DE purposes. The allegations in the SAC are not based on misrepresentations regarding Defendants' respective equity interests in King Street, but on the numerous false statements that King Street made claiming to control its operations and wireless spectrum licenses.

### b. The Financial Agreements

Similarly, the financial agreements between King Street and U.S. Cellular, some, but not all, of which were summarized in King Street's Short-Form and Long-Form Applications, do not disclose the true nature and extent of U.S. Cellular's control over King Street and its wireless spectrum licenses. These purported "disclosures" mischaracterize the true state of the relationship between the entities, and, in particular, do not notify the government that U.S. Cellular controlled, built out, and incorporated the King Street spectrum into its own network.

### c. The MSA

The Defendants assert that the FCC "explicitly evaluated" the January 2009 MSA, and that the summaries of the MSA in the DE Annual Reports "clearly disclosed" U.S. Cellular's "participation in King Street's spectrum build-out." KSW MTD at 17. These are assertions of alternative facts. First, there is no independent basis for concluding, as Defendants claim, that the FCC "explicitly evaluated" the MSA. The MSA was not included in King Street's Long-Form Application (or in any amendments) for the licenses or in its May 2009 response to the FCC's

inquiry. Instead, the ambiguous footnote 7 in the May 2009 response cited by the Defendants merely states without support that the FCC reviewed a range of documents, and does not identify which MSAs of the three Limited Partnerships were reviewed. Second, while Defendants claim that "U.S. Cellular's *"participation"* in King Street's spectrum build-out" was "clearly disclosed" in the summaries of the MSA in King Street's DE Annual Reports," (KSW MTD at 17) (emphasis added), in fact, the summaries falsely stated that the MSA arrangement would be subject to "King Street LP's continuing oversight, review, supervision and control [], that control of the CMRS systems will remain in King Street LP, and that nothing in the Management Agreement will give USCC *de facto* or *de jure* control over King Street LP or its operations[.]" *Id.* Far from disclosing U.S. Cellular's control of King Street, the statements in the DE Annual Reports regarding the MSA further misrepresented the true state of facts to the FCC.

### d. Construction Notices

Defendants make the remarkable and similarly disputable claim that the *omission* of U.S. Cellular's role in the construction and operation of the networks in the Construction Notices is "irrelevant" in light of the references to U.S. Cellular in the DE Annual Reports. *See, e.g.*, KSW MTD at 18. Apart from the fact that the purported "disclosures" in the DE Annual Reports did *not* notify the FCC that U.S. Cellular had *de facto* control of both King Street *and* its spectrum licenses, the Construction Notices and the DE Annual Reports required different information for different purposes. Defendants' intentional omission in the Construction Notices of U.S. Cellular's role in the network buildout was necessary to the claim that *King Street* had timely met the construction and service benchmarks, and to conceal that *U.S. Cellular* had built out and owned the networks, incorporated and connected them with its own larger cellular networks, and was providing services under the U.S. Cellular name. These omissions, which were only identified through Relators' own

independent investigation, were highly relevant as they concealed King Street's ineligibility to retain the DE credits and licenses during the unjust enrichment period.

Similarly, statements that U.S. Cellular would "use the 700 MHz licenses of its partner, King Street Wireless" and that "King Street…is partnering with U.S. Cellular to deliver high speed 4G LTE service to U.S. Cellular's customers" in a "joint effort" falsely framed the relationship between King Street and U.S. Cellular. KSW MTD at 18-19. While the DE rules do not prevent passive investors from engaging in certain arrangements with DEs, they do prevent DEs from ceding control and their licenses to non-DEs, as King Street did with U.S. Cellular.[17]

### 4.    The 2011 Network Sharing Agreement Was Not Disclosed to the FCC

The 2011 NSA, which defined the terms by which U.S. Cellular took over the King Street spectrum, was never publicly disclosed or even submitted to the FCC until after Relators' discovered its existence. The 2012 NSA was carefully crafted to enable U.S. Cellular to qualify for the government subsidies in FCC Auction 901, without revealing – as the 2011 NSA would have – that U.S. Cellular had full "access" to the entire King Street spectrum, in violation of the AMR and *de facto* control rules.

Defendants mischaracterize Realtors' allegations that the 2011 NSA "formalized the arrangements" between U.S. Cellular and King Street to argue that the 2011 NSA was merely a summary of facts that were previously disclosed to the FCC, and, thus, that its concealment was irrelevant. The assertion that "the FCC was aware of the precise business relationship that the 2011 NSA embodied," KSW MTD at 19, artfully mischaracterizes the facts. The 2011 NSA is not

---

[17] King Street argues that an FCC Notice issued in 2012 shows that the FCC was generally aware of U.S. Cellular's use of King Street's licenses. KSW MTD at 18. The Notice, however, merely cited a U.S. Cellular press release referring to its partnership with King Street, and said nothing about U.S. Cellular's appropriation and control of the King Street licenses. *Promoting Interoperability in the 700 MHz Com. Spectrum*, 27 FCC Rcd. 3521, 3534 at n. 77 (2012).

merely "a specific example" of how King Street and U.S. Cellular partnered to provide service, (KSW MTD at 20), but an agreement that violated the DE rules on its face and in practice.  None of the public filings cited by Defendants - or, indeed, any filings anywhere - even suggested that King Street had ceded and leased the vast majority of its spectrum to U.S. Cellular, even though King Street had an unambiguous duty to include that information in its DE Annual Reports, as well as to report it as a "reportable eligibility event."

Defendants' assertion that the 2012 NSA is "substantively indistinguishable" from the undisclosed 2011 NSA is false on its face. KSW MTD at 21; *see also* USC MTD at 18.  While the 2012 NSA (falsely) stated that U.S. Cellular had access to King Street's spectrum in several small census tracts, the 2011 NSA gave U.S. Cellular the right to use *all* of King Street's spectrum in 90 BTAs and CMAs. SAC ¶¶ 142-144. The critical issue is not whether U.S. Cellular used a small portion of King Street's spectrum licenses pursuant to the 2012 NSA, but that King Street and U.S. Cellular concealed that U.S. Cellular already controlled virtually the entire King Street spectrum pursuant to the undisclosed 2011 NSA, in violation of the AMR and *de facto* control rules. Moreover, the Defendants – knowing that the 2012 NSA was a sham – never even implemented its payment provisions.

## 5.     SEC Filings Are Not a "Public Disclosure" of the Allegations in the Second Amended Complaint

As Defendants acknowledge, U.S. Cellular's statement of its "controlling financial interest" in King Street in its SEC filings was made "for a purpose specific to SEC accounting rules, not the FCC DE regulations." *See*, *e.g.*, KSW MTD at 22 n.10.  Defendants note that they publicly disclosed U.S. Cellular's "controlling interests" in King Street to the SEC because U.S. Cellular was the primary beneficiary, as it "has the greatest exposure to the entity's gains and losses[,]" which results in the consolidation of financial statements under the SEC's Variable

Interest Entity ("VIE") rules, not because it "had the actual power to control as required under the FCC [DE] rules." USC MTD at 25 n. 22.

If, as Defendants claim, U.S. Cellular intended its disclosure to the SEC of its "controlling interest" in King Street and King Street, Inc. to reflect a "controlling" relationship of a VIE based on U.S. GAAP criteria (ASC 810), which are separate and distinct from criteria based on FCC rules for *de facto* control of DEs, then U.S. Cellular's statement cannot be a public disclosure of the fraud allegations made in the SAC. This is because former FIN 46R, now ASC 810, "Consolidation," applies when a company has only economic control—not voting control—over the entity to be consolidated. According to the VIE criteria, U.S. Cellular had only contractual rights, not rights as an owner, to the profits (and losses) of its VIEs. U.S. Cellular's narrative disclosures to the SEC imply that U.S. Cellular's objective was to invest in the results of King Street's business operations and *do not reveal* it was using King Street as a sham front to enable U.S. Cellular to use and control assets—the spectrum licenses—at a significant discount.[18]

### 6. News Media Reports Did Not Disclose the Allegations in the Second Amended Complaint

Finally, Defendants point to several press releases and articles regarding their relationship as triggering the public disclosure bar. However, nothing in those documents reflects, suggests, or otherwise demonstrates the true state of facts alleged by Relators in the SAC. To the contrary, by Defendants' own admission, the information disclosed in these sources was limited to such statements as that "King Street and U.S. Cellular were 'partnering' with each other 'to deliver high

---

[18] Moreover, even if the disclosure of a DE as a VIE meant that U.S. Cellular exercised *de facto* control over the DE (which is not what that disclosure meant), the notion that the FCC staff examining King Street's filings should have examined filings made by one of King Street's affiliates for a completely different purpose and to a separate, independent federal agency—and ignore the representations made by King Street directly to the FCC staff—is quite a reach.

speed 4G LTE service to U.S. Cellular's customers in several of the carrier's markets.'" *See* KSW MTD at 24.

It was only Relators' independent investigations, intensive analysis of materials gleaned from those investigations and intimate knowledge of the communications industry that revealed the Defendants' fraudulent scheme and conspiracy to violate the FCA. *See United States ex rel. Shea v. Cellco P'ship, 863 F.3d 923, 935* (D.C. Cir. 2017) (Where a Relator "supplie[s] the missing link between the public information and the alleged fraud… 'bridg[ing] the gap by [his] own efforts and experience,' the public disclosure bar does not apply. *Springfield Terminal*, 14 F.3d at 657.").

### 7.    The Relators are the Original Source of the Allegations in the Second Amended Complaint

If, *and only if*, the court determines that the essential elements of the allegations in the SAC were publicly disclosed, then it proceeds to the second step of the test – whether the relator qualifies as an original source of the allegations. *See Shea v. Verizon Commc'ns, Inc*., 160 F. Supp. 3d at 2. Even if a relator's complaint is based on publicly disclosed information, the Court may not dismiss it if "the person bringing the action is an original source of the information." *Id.* § 3730(e)(4)(A)(iii). The "original source" requirement was also substantially amended in 2010:

> For purposes of this paragraph, 'original source' means an individual who either (i) prior to a public disclosure under subsection (e)(4)(a), has voluntarily disclosed to the Government the information on which allegations or transactions in a claim are based, or (2) who has knowledge that is independent of and materially adds to the publicly disclosed allegations or transactions, and who has voluntarily provided the information to the Government before filing an action under this section.

*Id.* § 3730(e)(4)(B). [19]

---

[19] The 2010 amendments focus on the *effect* of the information provided by the original source, while the 1986 statute required that the original source have "direct and independent" knowledge of the information.

Defendants argue that Relators' assertions of original source status are too "conclusory" and that the fruits of the Relators' pre-filing investigations fall short of materially adding to the publicly disclosed information. Neither argument has any merit.[20]

### a. Relators are an Original Source Based on their Independent Investigation

The Defendants' objection to Relators' assertions of their original source status in the SAC disregards the detailed factual allegations in the SAC that substantiate the claims. *See* USC MTD at 19; KSW MTD at 26.  The SAC alleges "sufficient factual matter" to establish that Relators are, indeed, original sources under the requisite pleading standard. *See Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009); *see also United States ex rel. PCA Integrity Assocs., LLP v. NCO Fin. Sys., Inc.*, No. CV 15-750 (RC), 2020 WL 686009, at *31 (D.D.C. Feb. 11, 2020) ("But taking the facts in the complaint to be true, as the Court must in deciding a 12(b)(6) motion to dismiss, Defendants' argument falls flat.").

Relators commissioned field tests that revealed that U.S. Cellular had fully appropriated the King Street spectrum into its own network, and constructed network facilities in the name of its own subsidiaries. Relators also contacted King Street's alleged sales team to determine whether King Street offered wireless services to customers, obtained customer service contracts that identified U.S. Cellular as the sole provider in King Street markets, obtained local building permits, which, along with related documents, revealed Defendants' intentional omission of U.S.

---

[20] Both arguments rely heavily on cases in which the Court applied the pre-ACA original source exception, not the standard applicable in this case. *See Oliver,* 826 F.3d at 479; *In re Natural Gas Royalties Qui Tam Litigation*, 562 F.3d 1032, 1039 n. 3 (10th Cir. 2009); *United States ex rel. Minnesota Ass'n of Nurse Anesthetists v. Allina Health Sys. Corp.*, 276 F.3d 1032, 1048 & n.11 (8th Cir. 2002); *Settlemire*, 198 F.3d at 918 ; *Springfield Terminal*, 14 F.3d at 645 ; *United Staples*, 932 F. Supp. 2d at 41-42 ; *United States ex rel. Green v. Service Contract Educ. and Training Trust Fund*, 843 F. Supp. 2d 20, 32-33 (D.D.C. 2012); *Hockett*, 498 F. Supp. 2d at 25; *United States ex rel. J. Cooper & Assoc., Inc. v. Bernard Hodes Group, Inc.*, 422 F. Supp. 2d 225, 237 (D.D.C. 2006).

Cellular's role in the buildout of King Street Networks, and further found that King Street never applied for or submitted the necessary materials to operate as a true telecommunications provider *See* SAC ¶¶ 98-99, 101, 111-113. While Defendants argue that the building permits are "public documents, and therefore public disclosures in their own right[,]"KSW MTD at 28, these documents were not submitted or disclosed in any federal proceeding, and do not fall within the statutory requirements for a public disclosure.

### b. Relators' Knowledge is Independent and Materially Adds to the Allegations

Defendants further argue that Relators are not original sources because the additional information they discovered is not "material" under § 3730(e)(4)(B). Relators' evidence regarding U.S. Cellular's appropriation of King Street's licensed spectrum was both independently developed and material to the allegations. As noted *supra*, while the King Street Defendants selectively disclosed certain agreements, and only hinted at mutual cooperation in press releases, the fact that U.S. Cellular had integrated King Street's DE spectrum into U.S. Cellular's own network was undisclosed to both the public and the FCC. Moreover, the Defendants concealed the 2011 NSA and created the 2012 NSA specifically to conceal that U.S. Cellular controlled the spectrum from the Government.

While Relators' frequency investigation took place in January 2015, it was sufficiently close in time to the expiration of the unjust enrichment period on December 31, 2014 to reveal that U.S. Cellular had begun integrating King Street's licenses into its own network and using the spectrum to serve its own customers during the unjust enrichment period.[21] This information was unknown to the FCC.

---

[21] The process of installing antennas and base station equipment and connecting backhaul facilities at hundreds of sites (within a single market) can take months or even years. Relators' January 2015

The key question in the original source analysis is whether the Relators' information materially added to the allegations. Relators' independent investigation of an unrelated FCC Auction resulted in the discovery and eventual disclosure of the 2011 NSA. The frequency analysis commissioned by Relators, which was also supplemented by Relators' independent contacts with King Street, revealed U.S. Cellular's wholesale appropriation of King Street's spectrum. Relators' other original source information, including King Street's failure to offer service, King Street's name appearing nowhere on U.S. Cellular's service contracts with customers, and U.S. Cellular's local building permits, add further material evidence of the DE rule violations and fraud alleged in the SAC. *See* SAC ¶¶ 96, 142-145.

**B.     Relators Have Fully and Sufficiently Pled All Claims in the Second Amended Complaint**

Defendants also ask the Court to dismiss the SAC for failure to state a claim, pursuant to Rules 12(b)(6) and 9(b), arguing that Relators failed to plead materiality, scienter, and falsity sufficiently. Relators' allegations, which provide a detailed description of the Defendants' scheme and conspiracy, are more than sufficient to satisfy both the Rule 12(b)(6) and Rule 9(b) pleading standards.

**1.     The Second Amended Complaint Satisfies All Applicable Pleading Standards**

"To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Iqbal*, 556 U.S. at 678 (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570, 127 S.Ct. 1955, 167 L.Ed.2d 929 (2007)); *United States ex rel. Landis v. Tailwind Sports Corp.*, 51 F. Supp. 3d 9, 49 (D.D.C. 2014), *on reconsideration in part*, 160 F. Supp. 3d 253 (D.D.C. 2016), and *clarified on denial of*

---

drive tests showed that U.S. Cellular's Cedar Rapids and Iowa City 700 MHz networks were fully functional and had been up and running long before the unjust enrichment period expired.

*reconsideration*, No. 1:10-CV-00976 (CRC), 2016 WL 3197550 (D.D.C. June 8, 2016).  The Court must "assume all the allegations in the complaint are true (even if doubtful in fact) and must give [Relator] the benefit of all reasonable inferences derived from the facts alleged." *United States ex rel. Barko v. Halliburton Co.*, 952 F. Supp. 2d 108, 111 (D.D.C. 2013); *see also Singletary v. Howard Univ.*, 939 F.3d 287, 302 (D.C. Cir. 2019) ("the question at the pleading stage is not whether the facts could be read differently than the plaintiff does. Instead, we must take all reasonable inferences in favor of [Relator].").

Complaints brought under the FCA must comply with Rule 9(b). *United States ex rel. Totten v. Bombardier Corp.*, 286 F.3d 542, 551 (D.C. Cir. 2002). Nonetheless, "intent, knowledge, and other conditions of a person's mind may be alleged generally." Fed. R. Civ. P. 9(b). An FCA plaintiff need only "provide the 'who,' 'what,' 'when,' and 'where' with respect to the circumstances of the fraud." *United States ex rel. Heath v. AT & T, Inc*., 791 F.3d 112, 124 (D.C. Cir. 2015). Relators need only provide "sufficient information to allow for preparation of a response," and are not required "to allege every fact pertaining to every instance of fraud when a scheme spans several years." *United States ex rel. Williams v. Martin–Baker Aircraft Co*., 389 F.3d 1251, 1256, 1259 (D.C. Cir. 2004).

The FCA recognizes different causes of action for liability.  A "presentment" claim brought under § 3729(a)(1)(A) has three elements: "(1) the defendant submitted a claim [for payment] to the government, (2) the claim was false, and (3) the defendant knew the claim was false." *United States ex rel. Folliard v. CDW Tech. Servs., Inc.*, 722 F. Supp. 2d 20, 26 (D.D.C. 2010). A "false statement" claim under § 3729 (a)(1)(B) requires that the defendant "made a false statement to the government, as opposed to the submission of a false claim for payment." *Si.*, 71 F. Supp. at 87.

Although the False Claims Act does not define the words "false" or "fraudulent," the courts have recognized three ways that a claim can be false. *United States ex rel. McBride v. Halliburton Co.*, 848 F.3d 1027, 1031 (D.C. Cir. 2017). A claim is "false" if it includes "an incorrect description of goods or services provided" or a "request for reimbursement for goods or services never provided." *Id.* (quoting *United States v. Sci. Applications Int'l Corp.*, 626 F.3d 1257, 1266 (D.C. Cir. 2010)). These claims typically involve express certifications of compliance with the requirements for payment. Alternatively, under the so-called "implied certification" theory of liability, a claim is "false" if it "rests on a false representation of compliance with an applicable federal statute, federal regulation, or contractual term." *Id.* Finally, a claim can also be "false or fraudulent" if it is submitted pursuant to a contract that was "procured by fraud," *United States ex rel. Bettis v. Odebrecht Contractors of Cal., Inc.*, 393 F.3d 1321, 1326 (D.C. Cir. 2015), or through "fraud in the inducement." *Scollick ex rel. United States v. Narula*, WL 6544734 slip op. at *7 (D.C.C. Nov. 6, 2020) (citing *United States ex rel. Marcus v. Hess*, 317 U.S. 537, 542–44 (1943)).

The SAC specifically and particularly identifies the "who, what, when, and where" of the alleged fraud, and these factual allegations, properly assumed to be true, meet all the requirements for materiality, scienter, and falsity. *Heath*, 791 F.3d at 124.

## 2.     The False Claims Allegations in the Second Amended Complaint Meet All Requirements for Materiality

The SAC alleges that Defendants secured more than $150 million in bid credits and more than 180 discounted licenses for King Street, Carroll, and Barat by fraudulently claiming that each was a DE, and eligible for the benefits associated with that status. The FCC awarded the credits, as well as the licenses, in reliance on the Defendants' false and fraudulent claims that King Street, Carroll and Barat were DEs. These false and fraudulent claims caused the FCC to divert government funds and benefits that were intended to be provided, and, by law, could only be

provided to DEs to Defendants. As a result of Defendants' fraudulent scheme and conspiracy, the government paid $150 million and awarded property in the form of the licenses that it would not otherwise have paid or provided to Defendants." (SAC ¶¶ 80, 158, 185). The Defendants' false and fraudulent claims were indisputably "material," both as fraudulent inducements to the FCC to award the credits and licenses, *and* as express false certifications of eligibility. Because Defendants' false and fraudulent certifications of eligibility *were express certifications*, the rigorous materiality standard for *implied certifications* established in *Universal Health Servs., Inc. v. United States ex rel Escobar*, 136 S. Ct. 1989 (2016) does not apply in this case. *See Scollick*, WL 6544734 at *9 ("*Escobar* set forth a demanding materiality standard for plaintiffs who plead falsity under the implied false certification theory. Its materiality standard does not apply, however, when a plaintiff pleads falsity under the fraud in the inducement theory of falsity."). Even under the demanding *Escobar* standard, however, Defendants' false and fraudulent claims were material.

### a. Defendants' False and Fraudulent Claims of DE Eligibility Caused the FCC to Award $150 Million and to Grant 180 DE Licenses to Defendants

For a fraud in the inducement claim, the government's award must have been "procured by fraud;" *i.e.,* a misrepresentation in the defendant's application must have caused the award to be made. *Bettis*, 393 F.3d at 1326. By definition, therefore, the fraud in the inducement theory incorporates the "materiality" requirement. *See Scollick*, WL 6544734 at *10 ("a fraudulent statement that secures a government contract *will always be material* to the government's decision to pay the contractor under that agreement"), *citing Escobar*, 136 S. Ct. at 2002 ("any understanding" of the concept of materiality "look[s] to the effect on the likely or actual behavior of the recipient of the alleged misrepresentation.") The "initial fraud in procuring the contract 'taint[s]' all subsequent actions, including the defendant's submission of claims to the government

for payment under that contract." *Scollick*, WL 6544734 at *10; *cf. Marcus*, 317 U.S. at 543–44.

Thus, Relators need only allege that the FCC was induced by, or relied on, Defendants' false statements when it awarded the bid credits and licenses to the DE fronts. *United States ex rel. Shemesh v. CA, Inc.*, 89 F. Supp. 3d 36, 47 (D.D.C. 2015) (citing *Harrison v. Westinghouse Savannah River Co.*, 176 F.3d 776, 791 (4th Cir. 1999)); *accord Bettis*, 393 F.3d at 1326. Relators have alleged the DE eligibility requirements and regulations, the importance of these requirements to the FCC's decisions to award bid credits and licenses to DEs, the facts misrepresented in the Defendants' false and fraudulent certifications, the dates of the awards, the amounts paid and licenses awarded to Defendants, and the importance of continuing compliance with the regulations to the FCC's allowing DEs to retain the credits and licenses. Relators have properly pled fraudulent inducement with specificity and particularity.

### b. Defendants' False Claims are Material, Even Under Escobar

*Escobar* recognized that, under certain circumstances, the implied false certification theory can also be a basis for liability under the FCA. An implied false certification is an implicit representation that the claimant has complied with the applicable statutes, regulations, or requirements – of which there literally may be hundreds.  Noting that the FCA 'is not a vehicle for punishing garden-variety breaches of contract or regulatory violations," *Escobar* imposed a "demanding" materiality standard for implied false certification claims. *Escobar*, 136 S.Ct. at 2003. Thus, the Court held, "materiality" *of an implied false certification* requires a showing that the defendant's noncompliance with a statutory, regulatory, or contractual requirement is material to the government's decision to pay the defendant. *Id.* at 2003; *McBride*, 848 F.3d at 1031.

The FCC *requires* DE applicants to expressly certify that they meet the requirements for eligibility, unequivocal and incontrovertible evidence that the certification is material to its

decisions to award bid credits and grant licenses to applicants. Defendants' false and fraudulent claims of DE eligibility were *express*, not implied, certifications that Defendants satisfied the specific requirements for DE eligibility, and, as such, material.[22]

The Defendants' argument focuses, not on the actual nature of their certifications, but on *Escobar's* conclusion that an implied certification of compliance with a requirement may not be material if the Government had "actual knowledge" that the requirements were violated and still paid the claims. *Escobar* stated that:

> . . .if the Government pays a claim in full despite its *actual knowledge* that certain requirements were violated, that is very strong evidence that those requirements are not material. Or, if the Government regularly pays a particular type of claim in full despite *actual knowledge* that certain requirements were violated, and has signaled no change in position, that is strong evidence that the requirements are not material.

136 S. Ct. at 2002. (Emphasis added.) *Accord, McBride,* 848 F.3d t 1031 ; *Cimino v. Int'l Bus. Machs. Corp.,* 2019 WL 4750259 (D.D.C. Sept. 30, 2019). *Escobar's* more demanding materiality standard for implied false certifications recognizes that not all requirements are material to the Government's decision to pay a claim, and, where the alleged false certification is implied, rather than express, focuses on the likely *effect* of the false certification on the Government's decision to determine its materiality. Even if Defendants' false certifications of compliance with the DE requirements were implied, rather than express, certifications, and even if the *Escobar* standard applied in this case, the Defendants' arguments for lack of materiality still fail.

Defendants argue, in effect, that the FCC had actual knowledge of their arrangements and relationships when it awarded the credits and licenses to the sham entities.[23] Assertions of the

---

[22] The SAC alleges the required certifications and Defendants' numerous false and fraudulent certifications in ¶¶ 10, 47, 49, 50, 51, 55 fn. 19, 64, 78, 84-85, 119-121, 125-130, 136, 155-156, 159, 173, 184, and 196.

[23] Defendants do not specify exactly what the FCC knew of the relationship. It is not clear whether Defendants are conceding that U.S. Cellular controlled King Street in violation of the DE rules,

Government's actual knowledge are questions of fact that cannot be resolved on a motion to dismiss. Relying on cases decided on summary judgment, Defendants assert that, based on the 2008 Complaint, the FCC filings, discussed in Section III(a)(3), *supra*, and the 2012 NSA, the FCC had actual knowledge of the purported DEs' relationships with U.S. Cellular, when it paid for, and did not require repayment of, the bid credits and licenses awarded to King Street as a DE.[24] Apart from the fact that the FCC *expressly requires* the certifications of compliance with the DE eligibility requirements, the evidence cited by Defendants did not provide the agency with actual knowledge of U.S. Cellular's *de facto* control of King Street. To the contrary, as discussed in detail, *supra*, the Defendants falsely and fraudulently denied the allegations, as well as the existence of any information that would have given the FCC actual knowledge of the circumstances, in order to *induce* the FCC to grant the licenses.[25] The fact that the FCC granted the licenses is evidence, not of a lack of materiality as Defendants would have it, but that the FCC accepted and believed King Street's false and misleading claims about its relationship with U.S.

---

[24] but that the FCC acquiesced in that relationship when it awarded the licenses, or whether they are arguing that King Street's misrepresentations of its relationship with U.S. Cellular represented the true state of the facts, thereby justifying the award of the licenses to King Street. In either case, their argument rests on facts that are in dispute.

[24] Moreover, if the FCC staff acted in a manner that was inconsistent with the Commission's interpretation of the Commission's rules, that interpretation was not binding on the Commission. *See Comcast Corp. v. FCC,* 526 F.3d 763,769 (D.C. Cir. 2008); *accord Comcast Cable Communications, LLC v. FCC,* 717 F.3d 982, 1002 (D.C. Cir. 2013).

[25] The fact that the MSA, which was entered into in January 2009, was only ever publicly disclosed in selective summaries and in repeated assertions in the DE Annual Reports that King Street maintained control of its activities and spectrum further supports the allegations in the SAC that Defendants intentionally – and repeatedly – lied to the FCC about their actual relationship. Interestingly, while King Street represented in 2009 that the FCC's review had included MSAs "for each or most of the Limited Partnerships," here it asserts that the FCC "explicitly evaluated" the King Street MSA. KSW MTD at 17.

Cellular, and awarded the licenses on that basis.[26]

Defendant U.S. Cellular further argues that Relators' allegations that Defendants violated the FCC's AMR and *de facto* control rules cannot be material because, they assert, they did not violate these rules. There is no basis for this assertion, which, in any event, is – as the SAC demonstrates – highly disputable.  In fact, the SAC alleges, in extensive and substantial detail, facts that are more than sufficient to support the allegations that the 2011 NSA violated the AMR Rule, and that U.S. Cellular had *de facto* control of King Street, Barat, and Carroll under the DE Rules, as evidenced by its appropriation of their spectrum licenses to expand its own network. The issue of Defendants' compliance or noncompliance with the DE requirements is not capable of resolution on a motion to dismiss.

### 3. The Allegations in the Second Amended Complaint Meet the Pleading Requirements for Scienter

The FCA requires that the alleged false claims be made knowingly, *United States ex rel. Folliard v. Gov't Acquisitions, Inc.*, 764 F.3d 19, 29 (D.C. Cir. 2014), either by "(1) having actual knowledge, (2) acting in deliberate ignorance, or (3) acting in reckless disregard." *Id*; 31 U.S.C. § 3729(b).  *Hockett*, 498 F. Supp. 2d at 57; *see also United States v. Krizek*, 111 F.3d 934, 942–43 (D.C. Cir. 1997).

The complaint must allege both knowledge of a regulatory or contractual violation, and knowledge that the violation or noncompliance would be material to the government's decision to pay. *See United States v. DynCorp Int'l, LLC*, 253 F. Supp. 3d 89, 103 (D.D.C. 2017). As with any motion to dismiss, the Court must take "all inferences in favor of the plaintiff" when determining

---

[26]  The mere disclosure of by King Street of its relationship or "partnership" with U.S. Cellular for the provision of wireless services did not disclose U.S. Cellular's plan to use King Street as a front to obtain and retain bid credits to which U.S. Cellular was not entitled. Rather, Defendants' incomplete disclosures served as a means to conceal the scheme.

whether the complaint complies with the requirements for scienter. [27] *Id.* Scienter may be "averred generally" as long as the plaintiff pleads "the factual basis which gives rise to a strong inference of fraudulent intent." *United States v. Comstor Corp.*, 308 F. Supp. 3d at 88 (citing *United States ex rel. Tessler v. City of New York*, 712 Fed. Appx. 27, 29 (2d Cir. 2017). A relator has adequately plead scienter when it provides factual specificity concerning the type of fraud, how it was implemented, and a concrete example corroborating the pattern of fraud as alleged. *See Heath*, 791 F.3d at 125.

The SAC alleges in detail and with specificity that the Defendants made and filed numerous false statements in their applications, DE Annual Reports, and Construction Notices in order to obtain and retain benefits for which they were ineligible, and took steps, including the creation of two false and fraudulent NSAs, to conceal their scheme and conspiracy to defraud the Government. The SAC has more than adequately alleged scienter.

Because scienter is a fact-intensive inquiry, it generally cannot be resolved on a motion to dismiss or a motion for summary judgment. *See United States ex rel. Morsell v. Symantec Corp.*, No. CV 12-800 (RC), 2020 WL 5651277, at *29 (D.D.C. Mar. 30, 2020) (citing *United States ex rel. McCready v. Columbia/HCA Healthcare Corp.*, 251 F. Supp. 2d 114, 120 (D.D.C. 2003) ("Scienter is 'a fact-intensive inquiry' in an FCA suit, so it is hardly surprising that it cannot be resolved at summary judgment.").

---

[27] In arguing for dismissal for lack of scienter, however, the Defendants again rely largely on cases involving motions for summary judgment, rather than the standard for scienter on a motion to dismiss. *See, e.g.*, *United States ex rel. Purcell v. MWI Corp.*, 807 F.3d 281, 287-89 (D.C. Cir. 2015) (overturning a jury verdict); *United States v. Sci. Applics. Int'l Corp.*, 626 F.3d 1257, 1274 (D.C. Cir. 2010) (reviewing summary judgment); *United States ex rel. K & R Limited Partnership v. Massachusetts Housing Finance Agency*, 530 F.3d 980, 983-84 (D.C. Cir. 2008) (reviewing summary judgment); *United States ex rel. Burke v. Record Press, Inc.*, 816 F.3d 878, 881 (D.C. Cir. 2016) (reviewing motion for partial judgment).

Defendants further argue "FCA scienter cannot be satisfied if the defendant reached an objectively reasonable interpretation of an ambiguous regulation that was consistent with how the agency applied it in practice and the defendant was not 'warned away' from that interpretation by the government. KSW MTD at 34 (citing *Purcell*, 807 F.3d at 287-89). First, the underlying and unsupported assertion that Defendants, despite years of experience in the telecommunications industry, did not understand the longstanding DE requirements is a question of fact that cannot be decided on a motion to dismiss.[28]   Second, "scienter is not determined by the ambiguity of a regulation, and can exist even if a defendant's interpretation is reasonable." *United States ex rel. Phalp v. Lincare Holdings, Inc.*, 857 F.3d 1148, 1155 (11th Cir. 2017). Third, the FCC's longstanding rules and procedures unambiguously notified Defendants that their actions were in violation of the DE rules.  FCC Rule 1.2110 specifically sets forth the "bright line" standards of the AMR, MACI, and joint venture rules. 47 C.F.R. §1.2110; SAC ¶¶ 57-63.  The *de facto* control standard has been explained in decades of FCC precedent,[29] and the FCC has applied the same *de facto* control standard for DEs since the program began.[30] Where, as here, a relator can point to "interpretive guidance that might have warned [defendant] away from the view it took," dismissal also is not warranted on this basis.  *See Purcell*, 807 F.3d at 288-89.

---

[28]In fact, to the contrary, the Defendants' aggressive and misleading response to the FCC's inquiry in 2009, carefully crafted statements in the DE Annual Reports and Construction Notices, and creation of the two NSAs, all demonstrate Defendants' considerable knowledge of the DE requirements.

[29] *See Application of Ellis Thompson Corp.*, Memorandum Opinion and Order and Hearing Designation Order, 9 FCC Rcd. 7138, ¶¶ 9-10 (1994); *Intermountain Microwave*, 24 Rad. Reg. 7 (P & F) 983 (1963).

[30] *In the Matter of Implementation of Section 309(j) of the Communications Act - Competitive Bidding*, Fifth Memorandum Opinion and Order, 10 FCC Rcd. 403, ¶¶ 77-86 (1994) (explaining the obligation of DEs to retain *de facto* control vis-à-vis non-DE investors); *Application of Baker Creek Communications, L.P.*, 13 FCC Rcd. 18709 (1998) (finding that non-DE investor had *de facto* control of DE).

Defendants, however, have flipped this on its face, arguing that because the FCC never "warned" them off the specific scheme to acquire and use DE licenses through King Street, Relators have not properly alleged that Defendants knew their conduct was fraudulent. *See* USC MTD at 29; KSW MTD at 34. *Cf. United States ex rel. Burke*, 816 F.3d at 881. Even if the FCC had a duty to warn Defendants not to use sham DEs to obtain and retain bid credits, which it did not, a purported failure to warn does not, as Defendants would have it, demonstrate agency approval of a defendant's conduct.

The factual question of the reasonable interpretation of a regulation, like scienter itself, "is in part an evidentiary question." *Purcell,* 807 F.3d at 291.  The underlying claim that Defendants were innocently confused by the FCC's rules also "requires the development of a factual record." *United States v. Newman*, No. CV 16-1169 (CKK), 2017 WL 3575848, at *8 (D.D.C. Aug. 17, 2017) ("The Court will not dismiss this case at the outset merely because the allegations in the complaint are rebutted by assertions about Defendant's state of mind in her briefing on her motion to dismiss.").

### 4.    The Allegations in the Second Amended Complaint Meet the Pleading Requirements for Falsity

Under the FCA, a claim may be either factually false, "in which a ... claimant submits information that is untrue on its face," *United States v. Kellogg Brown & Root Servs., Inc.*, 800 F. Supp. 2d 143, 154 (D.D.C. 2011), or legally false, in which the claim "rest[s] on a false representation of compliance with an applicable federal statute, federal regulation, or contractual term," *United States ex rel. Groat v. Bos. Heart Diagnostics Corp.*, 255 F. Supp. 3d 13, 23 (D.D.C. 2017), *amended on reconsideration in part*, 296 F. Supp. 3d 155 (D.D.C. 2017). A complaint "must allege that [Defendant] was aware of the claims' falsity or acted in "deliberate ignorance or reckless disregard of the truth." *United States ex rel. Keaveney v. SRA Int'l, Inc.*, 219 F. Supp. 3d

129, 148 (D.D.C. 2016) (citing *Folliard*, 722 F. Supp. 2d at 33). Although the statute does not so

state, the D.C. Circuit has read a materiality requirement into the statute, which is often treated as

part of the falsity element. *DynCorp Int'l*, 253 F. Supp. 3d at 98–99 (D.D.C. 2017) (citing *Science*

*Applications Int'l Corp.*, 626 F.3d at 1271; *Shemesh*, 89 F. Supp. 3d at 45).[31]

Defendants offer different bases for their respective falsity arguments. The U.S. Cellular

Defendants argue that Relators have presented "alternative theories" that fail to allege falsity

adequately, because, they assert: (1) U.S. Cellular lacked a *de jure* controlling interest over the

DEs; (2) U.S. Cellular and King Street were not engaged in a venture for joint profit; and (3) the

MSA did not give U.S. Cellular a *per se* controlling interest.  Like the same Defendant's assertion

that Defendants did not violate the AMR and *de facto* control rules, these are assertions of

alternative facts, or denials of the allegations, not grounds for dismissal of the SAC because

Relators failed to allege falsity sufficiently.

Alternatively, the King Street Defendants argue that Relators failed to allege falsity

sufficiently because "FCA liability cannot be predicated on a legal judgment, even one that is

disputed" citing *United States ex rel. McBride v. Halliburton Co.*, No. 1:05-cv-828, 2014 WL

12691854, at *4 (D.D.C. Dec. 10, 2014) (for FCA liability to exist, "the statement or conduct

alleged must represent an objective falsehood"). KSW MTD at 37.  *See, also*, *United States ex rel.*

*Siewick v. Jamieson Sci. & Eng'g, Inc.*, 214 F.3d 1372, 1378 (D.C. Cir. 2000).

Contrary to their claim, however, Relators do not allege that "King Street… [was] not

entitled to DE status under FCC regulations" as a false statement. KSW MTD at 38. That

allegation, regardless of its characterization, rests upon the true facts of the case; namely that King

---

[31] Defendants' arguments regarding materiality and falsity are ultimately interrelated; however, Relators address the arguments separately as they appear in respective supporting memoranda to the motions to dismiss.

Street was a front for U.S. Cellular. The false statements that made the scheme possible, including the concealment of the true facts and numerous omissions from the statements, constitute the false statements and false documents that underlie Defendants' violations of the FCA – and establish that King Street was not entitled to DE status. *See, e.g.*, SAC ¶¶ 4, 15, 78-9, 84-8, 118-26, 132-34.

### 5.    The Allegations in the Second Amended Complaint Meet the Pleading Requirements for Conspiracy

The FCA provides for civil liability for any person who "conspires to commit a violation of" any of the above-described provisions. 31 U.S.C. § 3729(a)(1)(C). A violation of this provision must allege "(1) that 'an agreement existed to have false or fraudulent claims allowed or paid' to the government, (2) that each alleged member of the conspiracy 'joined that agreement,' and (3) that 'one or more conspirators knowingly committed one or more overt acts in furtherance of the object of the conspiracy.'" *United States ex rel. Miller v. Bill Harbert Int'l Constr., Inc.*, 608 F.3d 871, 899 (D.C. Cir. 2010)). "General civil conspiracy principles apply to FCA conspiracy claims." *United States ex rel. Westrick v. Second Chance Body Armor, Inc. (Westrick)*, 685 F. Supp. 2d 129, 140 (D.D.C. 2010). Thus, for instance, there must be "some underlying tortious act" for there to be a conspiracy. *Halberstam v. Welch*, 705 F.2d 472, 479 (D.C. Cir. 1983). In the FCA context, liability for conspiracy exists where there is an underlying violation of the FCA. *See United States ex rel. Amin v. George Washington Univ.*, 26 F. Supp. 2d 162, 165 (D.D.C. 1998)).

First, Relators have fully alleged that the Defendants entered into numerous agreements to violate the FCA including: *e.g.,* the arrangements establishing the corporate and financial relationship between and amongst the U.S. Cellular Defendants, Defendant DiNardo, and the King Street, Carroll and Barat Defendants; the MSA; and the 2011 and 2012 NSAs. Second, each of the Defendants was a party to these various agreements.

Defendants all performed numerous overt acts in furtherance of the conspiracy, including, but not limited to: (a) filing false and fraudulent short-form applications, as described in ¶¶ 76-79, 152-157, and 187; (b) entering into Bidding Protocol Agreements, and agreeing to bid on licenses that were adjacent to or overlapped with U.S. Cellular's pre-existing licenses, as described in ¶¶ 84, 159, and 187; (c) filing false and fraudulent long-form applications, as described in ¶¶ 84-86, 159, 186, and 187; (d) entering into, and concealing, Management Services Agreements, as described in ¶¶ 87, 90, 189 and 194; (e) entering into and concealing the 2011 NSA, as described in ¶¶ 92-96; (f) entering into the 2012 NSA to facilitate U.S. Cellular's receipt of Federal subsidies, as described in ¶¶ 142-45; (g) incorporating virtually all of the King Street's spectrum into the U.S. Cellular network, and concealing U.S. Cellular's control and ownership of the networks using that spectrum, as described in ¶¶ 98-104;  (h) filing false Construction Notices and statements, as described in ¶¶ 119-127; (i) filing false DE Annual Reports and statements, as described in ¶¶ 128-136, 173-174, and 196-197; (j) making false and misleading statements regarding the nature of their association, as described in ¶¶ 119-120; (k) retaining at least 10 licenses, which were required to be returned under the Unjust Enrichment Rule, as described in ¶ 151; (l) formally transferring the Carroll and Barat licenses to U.S. Cellular, once the unjust enrichments had expired, as described in ¶¶ 177 and 199; and (m) applying to transfer formally the King Street licenses to U.S. Cellular, once the unjust enrichment period had expired, as described in ¶ 16.

### 6. The Allegations in the Second Amended Complaint Meet the Pleading Requirements for Reverse False Claims

While direct false claims cause the United States to remit money directly to claimants, reverse false claims facilitate the improper withholding of money or property to which the United States is legally entitled. *See United States ex rel. Landis v. Tailwind Sports Corp.*, 160 F. Supp. 3d 253, 255–56 (D.D.C. 2016).  Direct and reverse false claims are mirror images of one another—

both result in a loss to the Government. *Id.* (citing *United States ex rel. Ervin & Assocs., Inc. v. Hamilton Sec. Grp., Inc.*, 370 F. Supp. 2d 18, 37 (D.D.C. 2005) (noting that Congress intended § 3729(a)(7) "to treat 'an individual who makes a material misrepresentation to avoid paying money owed to the Government ... as if he submitted a false claim to receive money'")). This clause applies to any person who "knowingly conceals or knowingly and improperly avoids or decreases an obligation to pay or transmit money or property to the Government." 31 U.S.C. § 3729(a)(1)(G). The 2009 FERA amendments to the FCA "expanded the type of conduct underlying a reverse false claim action to include presentment (i.e., making a claim-related submission) as well as a material false statement, thereby mirroring sections 3729(a)(1)(A) and 3729(a)(1)(B)." *Si*, 71 F. Supp. 3d 73 at 88–89. They also broadened the relevant payment obligation by defining obligation as "an established duty, whether or not fixed, arising from an express or implied contractual, grantor-grantee, or licensor-licensee relationship, from a fee-based or similar relationship, from statute or regulation, or from the retention of any overpayment." 31 U.S.C. § 3729(b)(3).

Under the relevant pleading standards, Relators have properly alleged reverse false claims by the Defendants. As thoroughly discussed *supra*, Relators' allegations more than suffice to show materiality, scienter, and falsity. Moreover, with respect to Count Five, Relators have sufficiently pled that Defendants knowingly made, used, and caused to be made and used false records and statements, including false and fraudulent DE Annual Reports and Construction Notices, that were material to their obligation to pay and transmit money and property to the Government. Further, these knowing concealments and false statements were made in order to avoid and decrease their statutory obligation to pay and transmit money, avoid unjust enrichment payments, and avoid returning property (*i.e.* "closed" licenses) to the Government. *See United States ex rel. Riedel v. Bos. Heart Diagnostics Corp.*, 332 F. Supp. 3d 48, 82 (D.D.C. 2018) ("a typical reverse false claim

action involves a defendant knowingly making a false statement in order to avoid having to pay the government when payment is otherwise due.") (internal citations omitted).

**C.      The FCA's Statute of Limitations Does Not Bar Any Claims in the Second Amended Complaint**

The FCA contains two statute of limitations periods:

> The first period requires that the action be brought within 6 years after the statutory violation occurred. The second period requires that the action be brought within 3 years after the United States officials charged with the responsibility to act knew or should have known the relevant facts, but not more than 10 years after the violation. Whichever period provides the later date serve as the limitations period.

*Cochise Consultancy, Inc. v. United States ex rel. Hunt*, 139 S. Ct. 1507, 1510, 203 L. Ed. 2d 791 (2019). Defendants argue that Relators' claims regarding Auctions 58 (Carroll) and 66 (Barat) are time-barred under 31 U.S. C. § 3731(b), because the SAC was filed "more than six years after all of the injuries … allege[d]" accrued. USC MTD at 34.  They further assert that the claims cannot be saved by the FCA's three-year tolling provision because the "facts material to the right of action [were] known or reasonably should have been known by the official of the United States charged with responsibility to act under the circumstances" *Id*. These arguments mischaracterize Relators' allegations and misapply the statute.

Relators filed the SAC on April 8, 2015, well within the 6-year statutory period for their claims regarding Carroll and Barat, which ran from 2012 when the unjust enrichment periods ended for both Carroll (*December 5, 2012*; SAC ¶ 177) and Barat (*September 2012*; SAC ¶ 199)**.** The SAC also provides a detailed description of the scheme and conspiracy by which U.S. Cellular, through Carroll and Barat (as well as King Street), fraudulently acquired and retained DE licenses, defrauding the Government of over $150 million, and defeating the very purposes for which Congress and the FCC established the DE program. Carroll and Barat's fraudulent securing of the

41

DE licenses were overt acts in furtherance of a conspiracy that, at least as far as they were concerned, did not end until 2012. (*see, e.g.,* SAC ¶ 204-211). This misconduct is well within the 6-year limitations period in § 3731(b)(1).[32]

Defendants further argue, however, that the overt acts alleged in Count One "did not trigger a new limitations period in the case of Carroll and Barat because the relevant harms alleged by Relators – the granting of Carroll's and Barat's licenses and bid credits – occurred no later than 2007." USC MTD at 34.  The object of the conspiracy, as accomplished through Carroll and Barat (as well as King Street) was for U.S. Cellular to expand its network with discounted DE licenses and closed "entrepreneur" licenses acquired through sham companies, which it controlled, and to retain those benefits. Because the licenses required that they be held and controlled for five years or the funds would have to be repaid and the closed "entrepreneur" licenses returned to the FCC, Defendants committed additional further overt acts to conceal the scheme and retain the credits and the licenses in violation of the FCC's unjust enrichment rules. U.S. Cellular's "acquisitions" of Carroll and Barat, once the five years period had ended, simply formalized the parties' covert affiliation and relationship once it was "safe" to do so.

Defendants argue that the claims are also time-barred under the three-year period because the "facts material to the right or action [were] known or reasonably should have been known" to the FCC in 2009, when the Court partially unsealed the 2008 Complaint. As extensively discussed above, Defendants aggressively and fraudulently denied the allegations, successfully negating, as far as the FCC was concerned, whatever "knowledge" was conveyed by the 2008 Complaint, and, in any event, the allegations in the SAC differ substantially and significantly from the allegations

---

[32] As is the case for all of the allegations in the SAC, the conduct relating to Carroll and Barat is assumed to be true at the stage of the litigation. *Iqbal*, 556 U.S. at 678.

in the 2008 Complaint. The SAC also alleges numerous additional specific examples of the Defendants' concealment of their fraud regarding Carroll[33] and Barat[34] that occurred after 2009 – and after the 2008 Complaint was dismissed in 2010.

In this case, the concealment of the conspiracy was not incidental to obtaining the DE licenses – it was critical to the successful completion of the scheme. While the general rule is that the statute of limitations in a civil conspiracy runs separately from each overt act, in this Circuit, the rule applies only "absent special circumstances, such as *fraudulent concealment of the conspiracy*," *Lawrence v. Acree*, 665 F.2d 1319, 1324 (D.C. Cir. 1981), which tolls the running of a statute of limitations. *Hobson v. Wilson*, 737 F.2d 1, 33 (D.C. Cir. 1984); *see also Riddell Washington Corp.*, 866 F.2d 1480, 1491 (D.C. Cir. 1989). Where, as here, fraudulent concealment is alleged with regard to a conspiracy, one conspirator's acts not only toll the statute of limitations for the other conspirators, but also toll the substantive claims underlying the conspiracy.[35]

---

[33] The Defendants made and caused to be made numerous false statement and omission of material facts to conceal that, as a front for U.S. Cellular, Carroll was ineligible or DE and Entrepreneur benefits, and to avoid having to return $22 million and its closed licenses to the Government. SAC ¶¶ 171-180.

[34] The Defendants made and caused to be made numerous false statement and omission of material facts to conceal that, as a front for U.S. Cellular, Barat was ineligible or DE and Entrepreneur benefits, and to avoid having to return $42 million and its closed licenses to the Government. SAC ¶¶ 194-202.

[35] [I]n a case where an act of concealment was either contemplated by or carried out in furtherance of a civil conspiracy, the statute of limitations as to the underlying wrong must be tolled. For without the support of the underlying wrongs, the conspiracy counts would collapse; as a matter of substantive law, one cannot be liable for a conspiracy that does not have as its object an actionable wrong. We do not believe that either federal or local law contemplates such a perverse result. Since we have already held that one conspirator's act of fraudulent concealment, if within the scope of the conspiracy, tolls the statute as to the other alleged conspirators, it follows that the tolling effect should apply also to the substantive wrongs underlying the conspiracy; and we so hold. *Riddell Washington Corp.*, 866 F.2d at 1493.

The allegations in the SAC, which are assumed to be true at this stage of the proceeding, establish that Defendants' fraud was well within the limitations periods provided by § 3731(b). Accordingly, Defendants' motion to dismiss the claims against Carroll and Barat under the statute of limitations should be denied.

**D.      The Relators Should Be Permitted to Proceed with Their Case against Defendants**

In the event this Court finds a compelling reason to dismiss the SAC, any dismissal should be without prejudice. While the SAC has been amended previously, its amendment was not in response to a Motion to Dismiss, and Relator's should not be deprived of the opportunity to correct any defects this Court may find. Such an opportunity would hardly represent a "futile" exercise, as Defendants' contend, but would serve the interest of justice. *See* Fed. R. Civ. P. 15(a)(2) ("The court should freely give leave [to amend] when justice so requires.").

## IV.      CONCLUSION

For the foregoing reasons, the Defendants' Motions to Dismiss should be denied, and Relators afforded the opportunity to proceed to conduct discovery and develop a factual record in support of their claims. Relators respectfully request a hearing on this Consolidated Response in Opposition to Defendants' Motions.

Dated: November 25, 2020                    Respectfully submitted,

                                            /s/ *Adriaen M. Morse, Jr.*

                                            Adriaen M. Morse, Jr., DC Bar No. 483347
                                            Sara M. Lord,* DC Bar No. 1620099
                                            John P. Rowley III,* DC Bar No. 392629
                                            Micah L. Kanters, DC Bar No. 198563
                                            Georgina C. Shepard*
                                            ARNALL GOLDEN GREGORY LLP
                                            1775 Pennsylvania Avenue NW, Suite 1000
                                            Washington, DC 20006
                                            Telephone:  202.677.4058
                                            Fax:  202.677.4059
                                            adriaen.morse@agg.com
                                            sara.lord@agg.com
                                            john.rowley@agg.com
                                            micah.kanters@agg.com
                                            georgina.shepard@agg.com

                                            Benjamin James Vernia, DC Bar No. 441287
                                            THE VERNIA LAW FIRM
                                            1455 Pennsylvania Avenue NW, Suite 400
                                            Washington, DC 20004
                                            Telephone:  202.349.4053
                                            Fax:  866.572.6728
                                            Email: bvernia@vernialaw.com

                                            *Attorneys for Relators Mark J. O'Connor*
                                            *and Sara F. Leibman*

                                            * Admitted pro hac vice

## **CERTIFICATE OF SERVICE**

The undersigned counsel certifies that on this 25th day of November, 2020, he caused an electronic copy of the foregoing document, Plaintiffs/Relators' Consolidated Response in Opposition to Defendants' Motions to Dismiss, to be served on counsel listed below by filing it in the court's electronic-filing (CM/ECF) system, as Local Civil Rule 5.4(d) authorizes:

*Attorneys for Defendants United States
Cellular Corporation, USCC Wireless
Investment, Inc., and Telephone and Data
Systems, Inc.*

Frank R. Volpe, Esq.
Robert Joseph Conlan, Jr., Esq.
SIDLEY AUSTIN LLP
1501 K Street, NW
Washington, DC 20005
Telephone: 202-736-8000
Fax: 202-736-8711
fvolpe@sidley.com
rconlan@sidley.com

*Attorneys for Defendants King Street
Wireless, L.P., King Street Wireless, Inc., and
Allison Cryor DiNardo*

Andrew S. Tulumello, Esq.
Stuart F. Delery, Esq.
GIBSON, DUNN & CRUTCHER LLP
1050 Connecticut Avenue, N.W.
Washington, DC 20036
Telephone: 202.955.8500
Fax: 202.530.9678
atulumello@gibsondunn.com
sdelery@gibsondunn.com

*/s/ Adriaen M. Morse Jr.*
Adriaen M. Morse Jr.