## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

UNITED STATES OF AMERICA, EX REL.
MARK J. O'CONNOR and SARA F.
LEIBMAN,

                 Plaintiffs,

     v.

UNITED STATES CELLULAR
CORPORATION, USCC WIRELESS
INVESTMENT, INC., TELEPHONE AND
DATA SYSTEMS, INC., KING STREET
WIRELESS, L.P., KING STREET
WIRELESS, INC., and ALLISON CRYOR
DINARDO,

                 Defendants.

Case No. 20-CV-2071-TSC

**ORAL ARGUMENT REQUESTED**

### REPLY BRIEF IN SUPPORT OF
### MOTION TO DISMISS OF DEFENDANTS KING STREET WIRELESS, L.P.,
### <u>KING STREET WIRELESS, INC., AND ALLISON CRYOR DINARDO</u>

# TABLE OF CONTENTS

Page

INTRODUCTION ................................................................................................... 1

ARGUMENT ......................................................................................................... 3

    I.    The D.C. Circuit Has Rejected Relators' Public Disclosure Bar Arguments. ................ 3

    II.   Relators' Allegations of Materiality, Scienter, and Falsity Are Legally Insufficient. ................................................................................................ 17

    III.  Relators' Reverse False Claims And Conspiracy Arguments Are Meritless. ............... 24

CONCLUSION..................................................................................................... 25

# TABLE OF AUTHORITIES

Page(s)

**Cases**

*Cimino v. International Business Machines Corp.*,
    2019 WL 4750259 (D.D.C. Sept. 30, 2019) .......................................................................20

*Graham Cty. Soil & Water Conservation Dist. v. United States ex rel. Wilson*,
    559 U.S. 280 (2010) .........................................................................................................16

*Kingman Park Civic Ass'n v. Gray*,
    27 F. Supp. 3d 142, 160 n.7 (D.D.C. 2014) ...................................................................11

*SNR Wireless LicenseCo, LLC v. FCC*,
    868 F.3d 1021 (D.C. Cir. 2017) .....................................................................................20

*Tel. & Data Sys., Inc. v. Fed. Comm'cns Comm'n*,
    19 F.3d 42 (D.C. Cir. 1994) ............................................................................................23

*United States ex rel. Barko v. Halliburton Company*,
    241 F. Supp. 3d 37 (D.D.C. 2017) .................................................................................18

*United States ex rel. Burke v. Record Press, Inc.*,
    816 F.3d 878 (D.C. Cir. 2016) .......................................................................................21

*United States ex rel. Complin v. North Carolina Baptist Hospital*,
    818 Fed. Appx. 179 (4th Cir. 2020) ...............................................................................21

*United States ex rel. Doe v. Staples, Inc.*,
    773 F.3d 83 (D.C. Cir. 2014) .....................................................................................3, 13

*United States ex rel. Findley v. FPC-Boron Employees' Club*,
    105 F.3d 675 (D.C. Cir. 1997) ...................................................................................5, 16

*United States ex rel. Heath v. AT&T, Inc.*,
    791 F.3d at 125 (D.C. Cir. 2015) ...................................................................................21

*United States ex rel. Hockett v. Columbia/HCA Healthcare Corp.*,
    498 F. Supp. 2d 25 (D.D.C. 2007) ...................................................................................5

*United States ex rel. J. Cooper & Assocs., Inc. v. Bernard Hodes Grp., Inc.*,
    422 F. Supp. 2d 225 (D.D.C. 2006) .................................................................................5

*United States ex rel. Janssen v. Lawrence Mem'l Hosp.*,
    949 F.3d 533 (10th Cir. 2020) .......................................................................................25

**TABLE OF AUTHORITIES**
*(continued)*

Page(s)

*United States ex rel. K & R Limited Partnership v. Massachusetts Housing Finance Agency*,
530 F.3d 980 (D.C. Cir. 2008) ................................................................................22

*United States ex rel. Kasowitz Benson Torres LLP v. BASF Corp.*,
929 F.3d 731 (D.C. Cir. 2019) ...............................................................................25

*United States ex rel. Marcus v. Hess*,
317 U.S. 537 (1943) ................................................................................................18

*United States ex rel. McBride v. Halliburton Co.*,
2014 WL 12691854 (D.D.C. Dec. 10, 2014) .........................................................24

*United States ex rel. Morsell v. Symantec Corp.*,
2020 WL 5651277 (D.D.C. Mar. 30, 2020) ...........................................................18

*United States ex rel. Morton v. A Plus Benefits, Inc.*,
139 Fed. App'x 980 (10th Cir. 2005) .....................................................................24

*United States ex rel. Oliver v. Philip Morris USA Inc.*,
826 F.3d 466 (D.C. Cir. 2016) .................................................................5, 6, 8, 9, 13

*United States ex rel. Phalp v. Lincare Holdings, Inc.*,
857 F.3d 1148 (11th Cir. 2017) ..............................................................................22

*United States ex rel. Purcell v. MWI Corp.*,
807 F.3d 281 (D.C. Cir. 2015) ...............................................................................22

*Promoting Interoperability in the 700 MHz Com. Spectrum*,
27 FCC Rcd. 3521 (Mar. 21, 2012) ..................................................................11, 14

*United States ex rel. Scott v. Pac. Architects & Engineers, Inc.*,
2020 WL 224504 (D.D.C. Jan. 15, 2020) ..................................................4, 6, 8, 13

*United States ex rel. Settlemire v. Dist. of Columbia*,
198 F.3d 913 (D.C. Cir. 1999) ....................................................................3, 6, 8, 9

*United States ex rel. Shea v. Verizon Commc'ns, Inc.*,
160 F. Supp. 3d 16 (D.D.C. 2015), *aff'd sub nom. United States ex rel. Shea v. Cellco P'ship*, 863 F.3d 923 (D.C. Cir. 2017) ........................................................6

*United States ex rel. Springfield Terminal Ry. Co. v. Quinn*,
14 F.3d 645 (D.C. Cir. 1994) .................................................................................16

# TABLE OF AUTHORITIES
*(continued)*

Page(s)

*United States ex rel. Westrick v. Second Chance Body Armor, Inc.*,
    266 F. Supp. 3d 110 (D.D.C. 2017) ............................................................................... 18

*United States ex rel. Wilson v. Kellogg Brown & Root, Inc.*,
    525 F.3d 370 (4th Cir. 2008) ........................................................................................ 24

*United States v. Brookdale Senior Living Communities, Inc.*,
    892 F.3d 822 (6th Cir. 2018) ........................................................................................ 21

*United States v. Comstor Corp.*,
    308 F. Supp. 3d 56 (D.D.C. 2018) ............................................................................... 20

*United States v. Dyncorp International, Inc.*,
    253 F. Supp. 3d 89 (D.D.C. 2017) ............................................................................... 19

*United States v. Honeywell Int'l, Inc.*,
    2020 WL 6940028 (D.D.C. Nov. 25, 2020) ................................................................. 18

*United States v. Kernan Hospital*,
    880 F. Supp. 2d 676 (D. Md. 2012) ............................................................................. 21

*United States v. Strock*,
    --- F.3d ---, 2020 WL 7062274 (2d Cir. Dec. 3, 2020) ............................................... 19

*Universal Health Servs., Inc. v. United States ex rel. Escobar*,
    136 S. Ct. 1989 (2016) ............................................................................................ 18, 20

*Scollick ex rel. United States v. Narula*,
    2020 WL 6544734 (D.D.C. Nov. 6, 2020) ................................................................... 19

## Statutes

31 U.S.C. § 3729(a)(1)(B) ...................................................................................................... 17

31 U.S.C. § 3729(a)(1)(G) ...................................................................................................... 18

31 U.S.C. § 3729(b)(4) ........................................................................................................... 18

31 U.S.C. § 3730(e)(4)(B) ...................................................................................................... 15

31 U.S.C. § 3730(e)(4)(B) (1986) .......................................................................................... 16

31 U.S.C. § 3730(e)(4)(B) (2010) .......................................................................................... 16

# TABLE OF AUTHORITIES
*(continued)*

Page(s)

**Regulations**

47 C.F.R. § 1.2110(b)(3)(iv)(A) (2012)...............................................................12

47 C.F.R. § 1.2110(b)(3)(iv)(B) (2007)...............................................................22

80 Fed. Reg. 56764 (Sept. 28, 2015) ..................................................................22

80 Fed. Reg. 56769 (Sept. 28, 2015) ..................................................................22

31 U.S.C. § 3730(e)(4)(B) (2010).......................................................................17

**Other Authorities**

*Promoting Interoperability in the 700 MHz Com. Spectrum,*
    27 FCC Rcd. 3521 (Mar. 21, 2012) .........................................................11, 14

# INTRODUCTION

Relators' Second Amended Complaint ("SAC") is a fatally flawed attempt to hold the hammer of FCA liability over a woman and her small business by recycling public information and an old case that failed long ago.  Relators' Opposition does nothing to alter this reality.  Instead, it attempts to rewrite D.C. Circuit precedent and radically alter the case actually pleaded in the SAC.  Relators' case fails as a matter of law.

On the public disclosure bar, Relators fundamentally misconstrue the governing legal standard.  The bar does not require (as Relators suggest) disclosure of the alleged fraud itself, or every last specific of the true state of affairs.  The law requires the amount of information in the public domain to be sufficient to put the government "on the trail of [alleged] fraud."  That standard is amply met here:  the government *did in fact investigate* King Street, including the core allegations Relators raise here.

To evade the bar, Relators urge this Court to focus only on allegations that post-date the FCC's grant of licenses and bidding credits to King Street in 2009.  But the D.C. Circuit has repeatedly held that a gap in time between a public disclosure and a later *qui tam* complaint does not negate the force of the public disclosure bar.  Whatever detail the SAC adds to the 2008 Complaint and the voluminous public disclosures is purely ornamental and immaterial—it comes nowhere close to supplying a material missing piece or pieces of information that "put the government on the trail of [alleged] fraud," particularly when the Department of Justice ("DOJ") already investigated (and declined to intervene in) a previous fully-formed FCA case on these same issues.

Relators also pivot to claim that the 2011 Network Sharing Agreement ("NSA")—which is mentioned in only 13 of 231 paragraphs in the SAC—is the centerpiece of their entire case.  Throughout the SAC, Relators relied on a host of publicly disclosed documents to contend that the

1

King Street Defendants committed FCA violations based on their documented business relationship with U.S. Cellular.  But now, Relators say that these publicly disclosed documents do not prove the fraud, they obscure it, and that the 2011 NSA standing alone proves the fraud and earns them original source status.  But Relators cannot overcome two problems:  Relators concede that the 2012 NSA—which was relied on by the FCC in granting spectrum licenses to U.S. Cellular in Auction 901—*was* disclosed publicly, and allege that *both* agreements constitute regulatory violations.  Even if Relators are correct (and they are not) that an NSA is a *per se* regulatory violation, then by their own logic, the disclosure of *either* NSA was sufficient to trigger the public disclosure bar.  Moreover, Relators are *not* the original sources of the now supposedly mission-critical 2011 NSA—they acknowledge DOJ gave the document *to them* while investigating (and then declining to intervene in) the SAC.

Relators' arguments regarding materiality, scienter, and falsity are equally unpersuasive.  When arguing against the public disclosure bar, Relators insist that only post-2010 conduct matters.  But when it comes to the legal sufficiency of the SAC's elements pleading, Relators say that because they have pleaded a "fraudulent inducement" theory they don't need to comply with the stringent materiality requirement set forth in *Escobar*.  Of course, a fraudulent inducement claim requires consideration of the supposedly false representations made to the FCC *before* King Street received licenses and bidding credits in late 2009—which is precisely what DOJ and the FCC already investigated.  If fraudulent inducement is Relators' theory as they now maintain, the public disclosure bar dispatches it easily.  In any event, Relators' argument for a diluted materiality standard is based entirely on one outlier case in this District that cuts directly against the decisions of multiple other courts, including the D.C. Circuit and Supreme Court.

The FCC investigated the 2008 Complaint, granted King Street licenses and bidding credits following that investigation, and has never sought return of the licenses and credits despite full knowledge of Relators' allegations (then and now). Relators do not identify *a single case* in which a court has allowed an FCA complaint to proceed in the face of a prior on-file FCA complaint that raised substantially-similar fraud allegations and that the agency reviewed before making the payment in question, or of public disclosures remotely approaching the scope here. Relators' Opposition confirms this case is not legally viable and should end now.

## ARGUMENT

### I.     The D.C. Circuit Has Rejected Relators' Public Disclosure Bar Arguments.

Relators' public disclosure argument boils down to the mistaken suggestion that *all* of the details of the fraud alleged in the SAC must have been disclosed for the public disclosure bar to apply. Specifically, Relators contend that: (1) their case is not barred because the various public documents are "not prior public disclosures of the very explicit fraud allegations in the SAC," Opp'n at 15; (2) the 2008 Complaint's disclosure of the "'general practice' of defrauding the FCC" is not "'substantially the same' as the very specific allegations of fraud in the SAC," *id*. at 17; and (3) the SAC provides a more "detailed description of the Defendants' scheme" than what was in the public domain, *id*. at 26. The D.C. Circuit has already rejected Relators' legal positions.

Under settled D.C. Circuit precedent, the public disclosure bar analysis asks whether the "publicly disclosed information could have formed the basis for a governmental decision on prosecution, or could at least have alerted law-enforcement authorities to the likelihood of wrongdoing." *United States ex rel. Settlemire v. Dist. of Columbia*, 198 F.3d 913, 918 (D.C. Cir. 1999) (internal quotation marks omitted). This test simply requires that "the 'quantum of information already in the public sphere' [be] sufficient to 'set the government investigators on the trail of [alleged] fraud.'" *United States ex rel. Doe v. Staples, Inc.*, 773 F.3d 83, 87 (D.C. Cir.

2014) (pre-2010 version) (citation omitted); *United States ex rel. Scott v. Pac. Architects & Eng'rs, Inc.*, 2020 WL 224504, at *6 (D.D.C. Jan. 15, 2020) (post-2010 version).  Relators give this proposition but a passing glance.  *See* Opp'n at 15.[1]

The D.C. Circuit's "X + Y = Z" formulation—which Relators do accept, *see* Opp'n at 13–14—is fundamentally about the sufficiency of information already in the public domain.  And here, "the 'quantum of information already in the public sphere'" was plainly "sufficient to 'set the government investigators on the trail of [alleged] fraud.'  As is clear on the face of the SAC, both "the allegation of fraud itself"—the "Z"—and the "critical elements of the transaction themselves"—the "X" and "Y"—on which Relators base their claims were unquestionably disclosed publicly through multiple statutory channels long before Relators filed their case.  Indeed, what is effectively Relators' *entire* case (the "X," "Y," *and* "Z"), was publicly disclosed in a prior *qui tam* complaint filed by a different relator.  All of the misrepresentations Relators allege in their SAC appeared in materials filed publicly on the FCC docket.  *See* ECF 148-1 at 13–21.  And the alleged "true state of facts"—that U.S. Cellular constructed, built out, and was using King Street's spectrum to provide 4G LTE services to its own customers—was made public in FCC and SEC filings, by the media, and by the FCC itself.

Unable to avoid dismissal under governing law, Relators resort to a series of arguments that the D.C. Circuit and this District have already rejected.

---

[1]  Relators suggest that the 2010 amendments to the public disclosure bar were "substantial[]," but they admit (as the King Street Defendants had explained, *see* ECF No. 148-1 at 10 n.5) that the key question—whether Relators' allegations are "substantially the same" as the publicly disclosed information—is based on the pre-2010 "standard previously developed by the D.C. Circuit."  Opp'n at 12–13 (citing *United States ex rel. Findley v. FPC-Boron Employees' Club*, 105 F.3d 675, 682 (D.C. Cir. 1997)).  Far from being a "substantial[]" shift in the law, the 2010 amendments aligned the statutory standard with the test the D.C. Circuit had been applying for more than a decade.

*First*, contrary to Relator's position (Opp'n at 17, 26), "[m]erely providing more specific details about what happened does not negate substantial similarity" for purposes of the public disclosure bar. *United States ex rel. Oliver v. Philip Morris USA Inc.* ("*Oliver II*"), 826 F.3d 466, 472 (D.C. Cir. 2016). The bar does *not* require "that a public disclosure contain every detail of the alleged fraud"—including the "who, when, and where" of the supposed scheme—"so long as it contains *the basic allegation of fraud*." *United States ex rel. Hockett v. Columbia/HCA Healthcare Corp.*, 498 F. Supp. 2d 25, 49 (D.D.C. 2007) (emphasis added); *see also United States ex rel. J. Cooper & Assocs., Inc. v. Bernard Hodes Grp., Inc.*, 422 F. Supp. 2d 225, 235 n.10 (D.D.C. 2006) (bar can be triggered even when "a *qui tam* suit [is] 'even partly based upon publicly disclosed allegations or transactions'" (citation omitted)).

*Second*, Relators are wrong to suggest that the public disclosure bar is triggered only where the *specific* theory of fraud has been previously spelled out publicly. The D.C. Circuit has never held that a public disclosure must relate to a specific fraud theory. To the contrary, the D.C. Circuit has expressly declined to make the public disclosure bar turn on whether the public information in question "irrefutably prove[s] a case of fraud," much less a specific theory of fraud. *Oliver II*, 826 F.3d at 473 (citation omitted). Rather, "[i]t is sufficient" under the governing legal standard "that the 'publicly disclosed transaction is sufficient to *raise the inference* of fraud.'" *Id.* (emphasis added). It is impossible to say the 2008 Complaint failed to do that.

*Third*, Relators maintain that the disclosure of the "general practice" is "not 'substantially the same' as the very specific allegations of fraud in the SAC." Opp'n at 17. But the law is *directly to the contrary*: "[A] relator's ability to reveal specific instances of fraud where the *general practice* has already been publicly disclosed is insufficient" to prevent dismissal under the bar.

*Settlemire*, 198 F.3d at 919 (emphasis added); *see also, e.g.*, *Oliver II*, 826 F.3d at 472. Relators have no way around these holdings.

Relators' characterization of the post-2010 public disclosure bar as an "affirmative defense" is also misguided. *See* Opp'n at 12. Where the allegations in the complaint, even if taken as true, support a conclusion that the public disclosure bar standard set by Congress has been satisfied as a matter of law, courts can and do dismiss FCA cases on public disclosure grounds under Rule 12(b)(6). *See, e.g.*, *Scott*, 2020 WL 224504, at *6; *see also United States ex rel. Shea v. Verizon Commc'ns, Inc.*, 160 F. Supp. 3d 16, 24 (D.D.C. 2015), *aff'd sub nom. United States ex rel. Shea v. Cellco P'ship*, 863 F.3d 923 (D.C. Cir. 2017). That is the result required here.

## A.    The 2008 Complaint Alone Bars Relators' Case.

Relators say this Court should focus solely on events that post-date the dismissal of the 2008 Complaint, so that the overlap between the 2008 Complaint and the SAC is not fatal to them under the public disclosure bar. *See* Opp'n at 12 n.13; 16–17. This argument is baseless.

There is extraordinary and undeniable overlap between the 2008 Complaint and the conduct Relators now challenge. The SAC has three sections:  King Street allegations during Auction 73 in **2008**, SAC ¶¶ 74-149; Carroll allegations in Auction 58 in **2005**, SAC ¶¶ 150-80; and Barat allegations in Auction 66 in **2006**, SAC ¶¶ 181-202. The 2008 Complaint directly challenged each of those entities in each of those auctions on the same theory Relators advance here. *See, e.g.*, 2008 Complaint p. 1-2, ¶¶ 3, 6-10, 15-28, 53-62.[2] The 2008 allegations expressly track—in both theory and substance—the allegations in Relators' SAC. The following chart illustrates this overlap:

---

[2] An unredacted copy of the 2008 Complaint is attached hereto as Exhibit A.

| 2008 Complaint | SAC |
|---|---|
| "Defendants US Cellular [] and [its] controlling parent . . . formed sham 'very small business,' bidding entities (Carroll, Barat, and King Street) for purposes of obtaining 25 percent credits against their gross winning bids" in Auctions 58, 66, and 73. ¶ 3. | U.S. Cellular used Defendants King Street, Carroll, and Barat, "all of which were formed as sham 'very small businesses' . . . to acquire wireless communications spectrum licenses using over $150 million in Government-provided bid credits[.]" ¶ 1. |
| "In furtherance of their fraudulent scheme, the Defendants made material misstatements and omissions in their submissions to the FCC for each of the spectrum auctions[,]" including failing to identify  U.S. Cellular as a "'real part[y] in interest' for the license acquisition in each spectrum auction"  or "as [an] affiliate[] of the sham bidders." ¶ 4. | Defendants "caus[ed] to be made and used false records and statements material to, and in furtherance of, these false and fraudulent claims," obscuring that "U.S. Cellular was an affiliate of" and "attributable interest holder in" the various DEs.  ¶¶ 178; 217(ii). |
| U.S. Cellular has "maintained *de facto* control of the FCC Applicants from their inception[.]" ¶ 49. | "U.S. Cellular. . . has *de facto* control" of King Street, Carroll, and Barat.  ¶¶ 104, 163, 200. |
| "Defendants Carroll [], Barat [], and King Street [] did not seek to acquire licenses for the purpose of developing or providing telecommunications services for end-users. Rather, they acted as fronts for the [U.S. Cellular Defendants] to acquire licenses to complement US Cellular's existing wireless operating footprint." ¶ 8. | Defendants "agree[d] to bid on licenses that were adjacent to or overlapped with U.S. Cellular's pre-existing licenses, and that could be incorporated into U.S. Cellular's existing network."  ¶ 212(d); "King Street has never offered its own wireless services" and "has no customers." ¶ 108. |
| "Defendants Carroll [], Barat [], and King Street [], and their respective general partners, did not and do not operate or function as actual businesses." ¶ 61. | "Neither Carroll nor Barat took even the most preliminary steps to become functioning wireless providers during their respective five-year unjust enrichment periods." ¶ 18; "King Street has never been a functioning telecommunications service provider." ¶ 114. |
| The U.S. Cellular Defendants "provided all of the hundreds of millions of dollars necessary for the FCC Applicants' upfront payments and net winning bid payments" and "controlled virtually all of the FCC Applicants' financial obligations[.]" ¶ 74. | "U.S. Cellular, through King Street, paid $300.4 million" "for the [Auction 73] licenses."  ¶ 11; "U.S. Cellular controls virtually every aspect of King Street's finances. King Street effectively has no access to funds except through U.S. Cellular." ¶ 102. |

Not only were the allegations in the 2008 Complaint sufficient, when compared to the SAC, to put the government "on the trail" of the fraud that the SAC alleges, but they also *did* prompt the FCC and the Department of Justice to *actually investigate* those allegations. *See* ECF 148-1 at 12. That Relators disagree with the *outcome* of the government's investigation has no bearing on the legal question of whether the government was sufficiently set "on the trail" of the alleged fraud for the purposes of the public disclosure bar. The law does not require that the government actually follow the trail to a relator's preferred conclusion in order for the public disclosure bar to be triggered. *See, e.g.*, *Scott*, 2020 WL 224504, at *6. The 2008 Complaint alone ends this case.[3]

Faced with the reality that the 2008 Complaint is materially identical to dozens of pages of the SAC, Relators radically shift course in their Opposition. They now say the Court should focus solely on "fraudulent conduct that occurred after the 2008 Complaint" and "activity between 2011 and 2015." Opp'n at 17. Relators cite *no* support for this argument because that is not how the public disclosure bar works. The D.C. Circuit has consistently held that a public disclosure that "predates" a specific transaction alleged in a complaint is sufficient to trigger the bar because "the time difference does not undermine the disclosure of [defendant's] general practice." *Oliver II*, 826 F.3d at 473; *see also Settlemire*, 198 F.3d at 919 ("[A] relator's ability to reveal specific instances of fraud where the general practice has already been publicly disclosed is insufficient to prevent operation of the jurisdictional bar."). Indeed, the court has explained that "disclosures going back as far as forty years prior to the relator's lawsuit [are] sufficient to disclose the practices

---

[3] Relators attempt to downplay the import of the government's investigation of the 2008 Complaint by claiming that King Street's May 8, 2009 submission responding to the FCC's inquiry was itself misleading. Opp'n at 18–19. Relators offer no support for this contention. But even if Relators *were* correct (and they are not), their claim merely highlights why the bar is triggered in this case. On their logic, the May 8, 2009 submission was a misrepresentation, and the 2008 Complaint constituted the true state of affairs—meaning that the two documents together form the "X + Y" in the D.C. Circuit's formulation.

which formed the basis of the relator's suit." *Settlemire*, 198 F.3d at 919.  Relators have not identified a *single case* in which the passage of time between the initial public disclosure and the filing of a *qui tam* complaint defeated the public disclosure bar.

Relators also argue that the "post-2010" fraudulent conduct they have tacked on to the SAC salvages their case because it supplies critical details allegedly missing from the 2008 Complaint that for the first time can put law enforcement on the trail of King Street's alleged fraud.  *See* Opp'n at 16-17.  Relators are wrong.  The law is clear that "[m]erely providing more specific details about what happened does not negate substantial similarity."  *Oliver II*, 826 F.3d at 472. And in reciting their list of post-2010 allegations, Relators ignore that (1) those allegations *are themselves* derived from public disclosures, and (2) none of these allegations materially adds to what remains a theory of fraud indistinguishable from what was pleaded in the 2008 Complaint. *See generally*, ECF 148-1 at 13–21; 25–29.  Critically, Relators *acknowledge* that the 2008 Complaint disclosed the Defendants' "'general practice' of defrauding the FCC."  *See* Opp'n at 17.  That concession alone is dispositive for the public disclosure bar.  *Settlemire*, 198 F.3d at 919 ("[A] relator's ability to reveal specific instances of fraud where the *general practice* has already been publicly disclosed is insufficient" to prevent dismissal under the bar. (emphasis added)).

**B.    The 2011 NSA Does Not Save Relators' Case from Dismissal.**

Relators also contend that the 2011 NSA is now the linchpin of their case and that it is the only document that "exposed the allegation that the Defendants were engaged in a fraudulent scheme to obtain and retain DE benefits in violation of the DE rules and the FCA."  Opp'n at 15. According to Relators, because the 2011 NSA allegedly "was never publicly disclosed or even submitted to the FCC until after Relators' [sic] discovered its existence," Opp'n at 20, the allegations about the 2011 NSA take their SAC outside the ambit of the public disclosure bar.  But

Relators' claim about "discover[ing]" the NSA is simply untrue—as they concede.  *See* Opp'n at

11.  Relators also say the 2011 NSA was not "merely 'a specific example' of how King Street and

U.S. Cellular partnered to provide service . . . but an agreement that violated the DE rules on its

face and in practice" and that "[n]one of the public filings cited by Defendants . . . even suggested

that King Street had ceded and leased the vast majority of its spectrum to U.S. Cellular[.]"  Opp'n

at 21.  That argument suffers from three fatal and obvious flaws for public disclosure bar purposes.

*First*, in basing the 2011 NSA's supposed significance on the ground that it "violated the

DE rules on its face and in practice," Opp'n at 21, Relators effectively suggest (contrary to D.C.

Circuit precedent) that the public disclosure bar applies only when Relators' specific theory of

fraud has previously been spelled out publicly.  The 2008 Complaint explicitly alleged that King

Street was a "front" and a "sham" for U.S. Cellular to appropriate King Street's spectrum.  *See,*

*e.g.*, 2008 Complaint ¶¶ 3-4, 6-7, 51, 54-59, 61-62, 67.  Relators' argument about the 2011 NSA

is just a variation of that theory.

*Second*, to the extent Relators suggest that the 2011 NSA disclosed materially more of the

"Y" in the D.C. Circuit's formula (the true state of affairs) than other public disclosures did, they

are wrong.[4]  A litany of public disclosures—some of which Relators acknowledge, and most of

which they blatantly ignore—disclosed the precise "Y" that Relators now say the 2011 NSA

uncovered:  (1) that U.S. Cellular, not King Street, was responsible for the construction and build

out of the King Street spectrum; (2) that U.S. Cellular was using King Street's spectrum to provide

4G LTE services to its own customers; and (3) that King Street had no direct customers of its own.

*See, e.g.*, SAC ¶¶ 101, 108, 110, 112, 118-21, 124-30, 164.

---

[4]  Relators concede, as they must, that the "X"—the allegedly misrepresented state of facts—was
     publicly disclosed.  Opp'n at 6–10, 14–15, 17–20.

All of this information was already squarely and undeniably in the public domain—and not

hard to find.  For example:

- All material information about U.S. Cellular's role in the construction and build-out of the King Street Spectrum—*including* the parties' Management Services Agreement ("MSA")—was disclosed in every one of the DE Annual Reports King Street filed throughout the DE period, additional *ex parte* FCC filings, and U.S. Cellular's SEC filings.  *See, e.g.*, SAC Ex. 4, pp. 9-10, 20-21, 31-32, 42-43; King Street DE Annual Reports, FCC ULS File Nos.: 0004547584, Ex. II (Dec. 27, 2010) ("USCC will also provide the following services for the King Street LP Systems:  [ . . . ] Developing and implementing plans for *the construction* of the King Street LP Systems in accordance with the Technical Services Plan to be developed with King Street LP") ; 0005008335, Ex. II (Dec. 29, 2011) (same); 0005570518, Ex. II (Dec. 26, 2012) (same); 0006070145, Ex. II (Dec. 26, 2013) (same); King Street Notice of *Ex Parte* Communication, FCC WT Docket 11-18, (Nov. 30, 2011), https://ecfsapi.fcc.gov/file/7021749099.pdf; U.S. Cellular Corp., Annual Report (Form 10-K) (Feb. 27, 2012); *see also* ECF 148-1 at 17, 19, 22, 27.

- U.S. Cellular's use of the King Street spectrum to provide services to its own customers was disclosed in multiple SEC filings, by the news media, and by the FCC itself.  *See, e.g.*, U.S. Cellular Form 10-K (Feb. 27, 2012); U.S. Cellular Corp., Annual Report (Form 10-K) (Feb. 26, 2013); Darren Murph, *U.S. Cellular Launches First 4G LTE Smartphone: Samsung Galaxy S Aviator*, ENGADGET (April 5, 2012), https://www.engadget.com/2012-04-05-us-cellular-galaxy-s-aviator-lte-now-shipping-price-details.html; *Promoting Interoperability in the 700 MHz Com. Spectrum*, 27 FCC Rcd. 3521, 3534 (Mar. 21, 2012); U.S. Cellular *Ex Parte* Filing, WT Docket No. 12-69 (Jan. 24, 2013), https://ecfsapi.fcc.gov/file/7022111812.pdf (stating that "by the end of 2013, U.S. Cellular in conjunction with King Street Wireless, L.P. would have 4G LTE service deployed to 87% of its customers").[5]

- King Street disclosed that it had "minimal" or no customers of its own in *all* of the DE Annual Reports attached to Relators' SAC.  *See, e.g.*, SAC Ex. 4, pp. 12, 23, 34, 45 (noting that King Street's subscribers were "[c]urrently none" or "minimal").

---

[5] Remarkably, the SAC explicitly alleges that U.S. Cellular's SEC filings "openly acknowledged" the true state of affairs regarding the parties' business relationship and constitute an "admission" of U.S. Cellular's "controlling interest in King Street."  *See* SAC p. 44, ¶ 147.  The SAC thus expressly concedes that the "true state of facts" was publicly disclosed.  Relators suggest that the SEC filings are irrelevant because they were not made to the FCC.  Opp'n at 21-22.  This misses the point.  According to their own allegations, the truth of U.S. Cellular's control over King Street was *public*.  Relators cannot run away from their pleading in an Opposition.  *See, e.g.*, *Kingman Park Civic Ass'n v. Gray*, 27 F. Supp. 3d 142, 160 n.7 (D.D.C. 2014).

Relators' suggestion that these disclosures merely "hinted" at the true state of affairs (Opp'n at 26) is demonstrably, woefully, and willfully incorrect. Relators cannot show that the 2011 NSA disclosed any new—let alone material—parts of the "Y" in this case.

*Third*, Relators' attempt to use the 2011 NSA to escape the public disclosure bar fails given Relators' allegations about the 2012 NSA—which all parties agree was publicly disclosed. *See* SAC ¶ 142. Relators contend that *both* NSAs amounted to *per se* regulatory violations. *See* SAC ¶ 97 ("The transfer of more than 25 percent of the spectrum rights *on even one license* established an attributable material relationship between King Street and U.S. Cellular.") (emphasis added); *see also* 47 C.F.R. § 1.2110(b)(3)(iv)(A) (2012) (AMR exists when a licensee has "one or more arrangements . . . for the lease or resale . . . of, on a cumulative basis, more than 25 percent of the spectrum capacity of *any one* of the . . . licensee's licenses" (emphasis added)). Even assuming that Relators are correct (and they are not) that an NSA was a *per se* regulatory violation, on the logic of their own position, the disclosure of *either* NSA was sufficient to trigger the public disclosure bar, because such a disclosure was sufficient to alert the government that the King Street Defendants were in violation of the DE rules through this type of agreement. If that is true, then non-disclosure of the 2011 NSA is of no consequence to the analysis, no matter how much broader the geographic scope of that agreement was compared to that of the 2012 NSA. Relators are therefore also wrong to assert that King Street had any reason to "conceal" the 2011 NSA, much less use the 2012 NSA to do so. *See* Opp'n at 21. Relators have no way to transform the 2011 NSA into such a new and material fact that singularly defeats the public disclosure bar.

## C.    Relators Are Not Original Sources.

That leaves Relators with a final argument—that the public disclosure bar should not apply because they are "original sources" under the FCA. According to Relators, their "independent

investigation" "materially add[ed]" to the publicly disclosed information because the various public disclosures "only hinted at mutual cooperation" between King Street and U.S. Cellular, while leaving the "appropriation" of King Street's spectrum unspoken.  *See* Opp'n at 25–26.  This argument distorts the public disclosures and applies massive grade inflation to Relators' efforts.[6]

Relators cannot turn themselves into original sources by conducting "collateral research" or reconnaissance that merely substantiates information that the public and the FCC already knew. *See, e.g.*, *Oliver II*, 826 F.3d at 479; *Staples Inc.*, 773 F.3d at 88.  The SAC itself makes clear that all of Relators' allegations about King Street and U.S. Cellular's partnership and U.S. Cellular's use of King Street's spectrum are derived from public sources.  For example, in Relators' own words, their "engineering study" just "*verified*" U.S. Cellular's incorporation of King Street's spectrum blocks in some cities in Iowa.  SAC ¶ 98 (emphasis added).  In other words, these "[f]ield tests" revealed nothing that was not apparent from public records regarding King Street's and U.S. Cellular's licenses and their partnership to provide 4G LTE services.  *See, e.g.*, *Oliver II*, 826 F.3d at 479  ("[R]elators [are] not an original source [when] they at best verif[y] [] information contained in" the public record.).  Indeed, long before Relators' "field tests," various media outlets reported that King Street and U.S. Cellular were "partnering" with each other "to deliver high speed 4G LTE service to U.S. Cellular's customers in several of the carrier's markets."  *See, e.g.*, Darren Murph, *U.S. Cellular Launches First 4G LTE Smartphone: Samsung Galaxy S Aviator*, ENGADGET (April 5, 2012),  https://www.engadget.com/2012-04-05-us-cellular-galaxy-s-aviator-lte-now-shipping-price-details.html; *see also* ECF 148-1 at 23–25.  Multiple SEC filings

---

[6]  Relators assert in a footnote that Defendants' arguments "rely heavily" on cases applying the pre-2010 version of the original source exception to the public disclosure bar, but do not suggest any material difference between the pre- and post-2010 versions.  Opp'n at 24 n.20. In any event, courts applying the post-2010 statute continue to rely on pre-2010 cases.  *See, e.g.*, *Scott*, 2020 WL 224504, at *7.

by U.S. Cellular likewise made clear that the company was not just cooperating with King Street, but was in fact *using its spectrum* to serve U.S. Cellular customers—*including* in "certain cities in Iowa." *See, e.g.*, U.S. Cellular Corp., Annual Report (Form 10-K) (Feb. 25, 2011); *see also* U.S. Cellular Form 10-K (Feb. 27, 2012).  And the *FCC itself* acknowledged in a public rulemaking proceeding that U.S. Cellular's 4G LTE network would "*use the 700 MHz licenses of its partner*, King Street Wireless."  *Promoting Interoperability in the 700 MHz Com. Spectrum*, 27 FCC Rcd. 3521, 3534 (Mar. 21, 2012) (emphasis added).  Against this backdrop, the so-called "[f]ield tests" cannot possibly qualify as a "material" and "independent" contribution that qualifies Relators as statutory original sources.

The same is true regarding the information that Relators supposedly "discovered" by talking to former King Street employees, reviewing U.S. Cellular customer agreements, and searching local business permits on the internet.  *See* Opp'n at 15; 24–25.  Relators' story has consistently been that the "Y" here—the alleged "true state of facts"—is that U.S. Cellular, not King Street, was responsible for building out the King Street spectrum, and that U.S. Cellular was using King Street's spectrum to provide 4G LTE services to U.S. Cellular customers (not King Street to its own customers).  *See, e.g.*, SAC ¶¶ 101, 108, 110, 112, 118-21, 124-30, 164.  This arrangement was publicly disclosed in multiple sources at multiple times—in the 2008 Complaint, FCC filings and Rulemakings, SEC filings, and media reports.  *See* Section I(A)-(B), *supra*; ECF 148-1 at 10-25.  Details from Relators' phone calls to King Street employees and internet searches duplicate information already in the public domain.[7]

---

[7]  Relators also claim that U.S. Cellular is "the sole provider in King Street markets," and that Relators "found that King Street never applied for or submitted the necessary materials to operate as a true telecommunications provider."  Opp'n at 24-25.  Relators similarly contend that King Street failed to comply with the "most basic regulatory obligations of a commercial wireless operating company," such as "appl[ying] for telephone numbers to be able to offer

Not even Relators mount a full-throated defense of their claim to original source status based on these bits of information. Their supposed claim to fame is the 2011 NSA. But notably, Relators *do not assert they are the original source of that document*. Nor could they. If they had been, they undoubtedly would have included it in their original Complaint or their First Amended Complaint ("FAC"). They did not. Relators *admit* that it was only *after* the FAC was filed that the NSAs "came to light." Opp'n at 11 (passive voice in original). Relators conspicuously do *not* claim that their "independent investigation" itself revealed the 2011 NSA, stating only that the investigation "resulted in the discovery and eventual disclosure" of that agreement. *See id.* at 24–26. Nor do Relators contend that *they* voluntarily provided the 2011 NSA to the government before filing the SAC, which even the post-2010 version of the statute *requires*. *See* 31 U.S.C. § 3730(e)(4)(B). As Relators ultimately acknowledge, DOJ provided the NSAs to Relators. *See* Opp'n at 11. That concession puts a stake through Relators' claim to be "original sources."

As a final stand, Relators insist that their "knowledge of the communications industry" allowed them to piece the various public disclosures together and "reveal[]" Defendant's allegedly fraudulent scheme. Opp'n at 23. But "[e]xpertise" in a particular field "[does] not in itself give a *qui tam* plaintiff the basis for suit when all the material elements of fraud are publicly available, though not readily comprehensible to nonexperts." *United States ex rel. Springfield Terminal Ry. Co. v. Quinn*, 14 F.3d 645, 655 (D.C. Cir. 1994); *see also United States ex rel. Findley v. FPC-*

---

services to customers." Opp'n at 9. Relators are again wrong. Rather than requiring license holders to have customers or subscribers, FCC rules at the relevant time required licensees like King Street to meet construction and service requirements—which King Street fully and timely satisfied. *See* 47 C.F.R. §27.14(g) (licensee "shall provide signal coverage and offer service" over specified geographic area); U.S. Gov. Accountability Office, GAO-14-236, "Spectrum Management: FCC's Use and Enforcement of Buildout Requirements" (2014). Those rules unequivocally contained no customer mandate. It was not until 2017 that the FCC promulgated a rule—which did not go into effect until 2020—requiring "service to at least one subscriber" as a condition to retain a license. 47 C.F.R. §1.953; 82 Fed. Reg. 41530 (Sept. 1, 2017).

*Boron Emps.' Club*, 105 F.3d 675, 688 (D.C. Cir. 1997) (same).  Similarly, "[a] relator's ability to recognize the *legal* consequences of a publicly disclosed fraudulent transaction does not alter the fact that the material elements of the violation already have been publicly disclosed."  *Findley*, 105 F.3d at 688 (emphasis added).  Here, no amount of synthesis by Relators of publicly-disclosed information can change the fact that the material elements of the allegedly fraudulent transactions all were in the public domain.  Nothing more is needed for the public disclosure bar to operate.

Lastly, Relators cannot skate by on their brand-new, wholly-unsubstantiated claim that "Relator O'Connor was the original source of the 2008 Complaint."  Opp'n at 16.  Not only is this allegation conspicuously absent from the SAC, but it also does not appear in the 2008 Complaint. *See* Am. Compl., No. 1:07-cv-00800-JDB (D.D.C. Apr. 25, 2008), ECF No. 11.  It is indisputable that a *law firm*, Lampert & O'Connor, P.C., was the named relator, not O'Connor individually. 2008 Complaint ¶ 14.  To the extent Relators are suggesting that Relator O'Connor's status as a partner at that law firm when the 2008 Complaint was filed automatically qualifies him as the "original source" for those allegations, that suggestion finds no support in law.[8]  Indeed, if such a relationship were sufficient for "original source" purposes, any opportunistic partner at any law firm named as a *qui tam* relator could later claim ownership of publicly disclosed allegations—a scenario that could result in a single relator begetting thousands of original sources.  That result is wholly inconsistent with Congress's intent in erecting the public disclosure bar.  *See e.g.*, *Graham Cty. Soil & Water Conservation Dist. v. United States ex rel. Wilson*, 559 U.S. 280, 281 (2010)

---

[8]  Moreover, the 2008 Complaint itself does not even support this view.  The most it states regarding specific Lampert & O'Connor personnel is that "its members have knowledge of the false claims contained in this Amended Complaint."  2008 Complaint ¶ 14.  Of course, mere "knowledge" of FCA allegations has never been sufficient for original source status.  *See* 31 U.S.C. § 3730(e)(4)(B) (1986); 31 U.S.C. § 3730(e)(4)(B) (2010).

(the public disclosure bar "was enacted to strike a balance between encouraging private persons to root out fraud and stifling parasitic lawsuits"); *Springfield Terminal*, 14 F.3d at 649 (same).

In any event, the 2008 Complaint suffered from the same fatal defect as the SAC:  it was based *entirely* on public documents.  Like the SAC, the 2008 Complaint cited King Street, Carroll, and Barat's FCC filings (including all of the foundational agreements and the parties' short and long form Applications) as *direct evidence* of the parties' ineligibility for DE status, *see, e.g.*, 2008 Complaint ¶¶ 69, 73-77, 80-85, and the U.S. Cellular defendants' SEC filings as evidence of the "true nature of the[] [parties'] relationships," *id*. at  ¶¶ 8-9, 54, 62.  Not even the 2008 law firm relator brought non-public information to the table.

## II.   Relators' Allegations of Materiality, Scienter, and Falsity Are Legally Insufficient.

### A.  Relators Do Not Make Legally Sufficient Allegations of Materiality.

Relators contend that *Escobar*'s materiality standard should not apply to this case because they are proceeding on a fraudulent inducement theory.  Opp'n at 29.  Relators did not explicitly plead the fraudulent inducement theory in the SAC, and those words do not appear in any of its 231 paragraphs.  Moreover, a fraudulent inducement theory is fundamentally incompatible with Relators' assertion that, for public disclosure bar purposes, this Court should focus solely on events after 2010 and after licenses and bidding credits here were fraudulently induced.  Yet setting that contradiction in Relators' position aside, and even if the SAC were read generously to include a fraudulent inducement theory, Relators still would have to plead the stringent materiality standard set forth in *Escobar*.  Their suggestion that the Supreme Court exempted fraudulent inducement cases from this stringent materiality requirement fails.

First, Congress made materiality a bedrock element of FCA liability.  One of the core provisions of the statute imposing direct FCA liability requires that a defendant "knowingly make[], use[], or cause[] to be made or used, a false record or statement *material to a false or*

*fraudulent claim.*" 31 U.S.C. § 3729(a)(1)(B) (emphasis added).  And as the Supreme Court noted, the statute defines the word "material" (which is also used explicitly in the reverse false claims provision, 31 U.S.C. § 3729(a)(1)(G)) to mean "having a natural tendency to influence, or be capable of influencing, the payment or receipt of money or property."  31 U.S.C. § 3729(b)(4); *see also Universal Health Servs., Inc. v. United States ex rel. Escobar*, 136 S. Ct. 1989, 2002 (2016).

Second, the *Escobar* Court used broad language to refer to "§ 3729(a)(1)(A)'s materiality requirement" and the need to "evaluat[e] materiality under the False Claims Act"—without limiting its analysis by reference to the specific theory (implied false certification theory) at issue in that case.  In fact, the Court cited *United States ex rel. Marcus v. Hess*, 317 U.S. 537 (1943)— the seminal case on the fraudulent inducement theory of the FCA—for the proposition that "[m]ateriality . . . cannot be found where noncompliance is minor or insubstantial."  136 S. Ct. at 2003.  Perhaps most significantly, the Court emphasized the "demanding" materiality standard to ensure that the FCA is not used as "an all-purpose antifraud statute" or a "vehicle for punishing garden-variety breaches of contract or regulatory violations."  *Id*. at 2003.  Those principles are not limited to a subset of FCA theories.

 Relators' argument that *Escobar*'s materiality standard should not apply to a fraudulent inducement theory is contrary to the prevailing view of *Escobar* in this District.  Recently, Judge Friedman applied *Escobar*'s materiality standard in a fraudulent inducement case.  *See United States v. Honeywell Int'l, Inc.*, 2020 WL 6940028, at *1 (D.D.C. Nov. 25, 2020)*.*  This decision is in line with the conclusions of numerous other decisions from this District.  *See United States ex rel. Westrick v. Second Chance Body Armor, Inc.,* 266 F. Supp. 3d 110, 129 (D.D.C. 2017) ("[T]he elements of [ ] fraudulent inducement claims include not just materiality but also causation; the defendant's conduct must cause the government to make a payment or to forfeit money owed.")

(internal citations and quotations omitted); *United States ex rel. Morsell v. Symantec Corp.*, 2020 WL 5651277, at *1 (D.D.C. Mar. 30, 2020) (same); *United States ex rel. Barko v. Halliburton Co.*, 241 F. Supp. 3d 37 (D.D.C. 2017) (same); *United States v. Dyncorp Int'l, Inc.*, 253 F. Supp. 3d 89 (D.D.C. 2017) (same).

Relators point to the conclusion in *Scollick ex rel. United States v. Narula*, 2020 WL 6544734 (D.D.C. Nov. 6, 2020), *see* Opp'n at 28-30, that the materiality standard from *Escobar* is inapplicable in fraudulent inducement cases. Even the *Scollick* court acknowledged that its reading of *Escobar* was inferred. *Scollick* at *7 ("Though the Court in Escobar does not explicitly say so . . . ."). And that reading is not correct. While *Escobar* was decided in the context of a *qui tam* case that invoked the implied false certification theory, the Court's discussion of the "rigorous" materiality standard was not confined to that theory. The King Street Defendants respectfully submit that, in light of what the Supreme Court actually said and the multiple other decisions from this District applying *Escobar* to the fraudulent inducement theory, *Scollick* is an outlier that should not control here.

Relators aver in the alternative that the fraudulent inducement theory only requires a material misrepresentation at the time the government initially enters into a contract or agreement with a defendant, rather than a material misrepresentation every time payment is sought. *See* Opp'n at 30. That is incorrect. *See United States v. Strock*, --- F.3d ---, 2020 WL 7062274, at *5-6 (2d Cir. Dec. 3, 2020) ("[I]n fraudulent inducement cases, the government's 'payment decision' under *Escobar* encompasses both its decision to award a contract and its ultimate decision to pay under that contract."). In any event, Relators fail to show that the supposed misrepresentations they allege "induced" the awarding of King Street's licenses and bidding credits were material. When the FCC approved King Street's licenses and bidding credits, it had all the information

necessary to identify the alleged fraud on which Relators base their claims (including the 2008 Complaint). Yet it approved the bidding credits nonetheless and has never sought to have them returned, even as the FCC *has* determined that other DEs were not entitled to the DE bidding credits they received in other auctions, *see SNR Wireless LicenseCo, LLC v. FCC,* 868 F.3d 1021, 1028 (D.C. Cir. 2017). The FCC's knowledge and approval of King Street's licenses defeats materiality as a matter of law.

Moreover, contrary to Relators' assertion, if the case is not dismissed on public disclosure grounds, this Court can and should address the materiality issue now. *Escobar* expressly recognized that courts can decide the materiality question at the pleadings stage. 136 S. Ct. at 2004 n.6. Multiple courts in this District have granted motions to dismiss on materiality grounds. *See, e.g.*, *Cimino v. Int'l Bus. Machs. Corp.,* 2019 WL 4750259, at *7 (D.D.C. Sept. 30, 2019) (dismissing for lack of materiality where government paid a "substantial portion" of a licensing agreement after the filing of a *qui tam* case); *United States v. Comstor Corp.,* 308 F. Supp. 3d 56, 86 (D.D.C. 2018) (dismissing for lack of materiality where "the government was fully informed for years about the relator's allegations regarding the defendant['s] purported role in the fraudulent scheme" and continued payment). Relators fundamentally fail to engage with the fatal import of these cases, and they offer no authority for their own contrary arguments.

**B. Relators Do Not Make Legally Sufficient Allegations of Scienter.**

1. *The FCC's repeated approvals negate scienter.*

Relators insist that they have "more than adequately alleged scienter." Opp'n at 34. That is incorrect. Relators fail entirely to address or respond to the King Street Defendants' argument that the FCC's *repeated* approvals of arrangements like the one between King Street and U.S. Cellular negates FCA scienter as a matter of law. *See* ECF No. 148-1 at 36-37. The SAC alleges

20

that King Street's relationship with U.S. Cellular was merely a repeat of similar arrangements involving Carroll, Barat, and Aquinas—and that each iteration of the arrangement can be traced back to Ms. DiNardo's connections to U.S. Cellular.  SAC ¶ 151-161.  But every one of these licenses was approved (a fact that Relators do not address, except to suggest if the FCC staff is wrong the Commission in theory could still reverse those decisions, *see* Opp'n at 32 n.24.) Accepting Relators' factual allegations as true, the King Street Defendants cannot have acted with scienter because the FCC approved licenses again and again.  *See United States ex rel. Burke v. Record Press, Inc.*, 816 F.3d 878, 881 (D.C. Cir. 2016).

Relators cannot ignore this defect by citing cases saying that scienter is a fact-intensive inquiry.  *See* Opp'n at 34.  A motion to dismiss can be granted on scienter grounds where a relator's well-pleaded allegations, taken as true, establish that the statutory standard cannot be met as a matter of law.  *United States v. Brookdale Senior Living Cmtys., Inc.,* 892 F.3d 822, 838 (6th Cir. 2018) (affirming grant of motion to dismiss *qui tam* complaint where factual allegations in complaint demonstrated that defendant had not acted with requisite scienter); *United States ex rel. Complin v. North Carolina Baptist Hosp.*, 818 F. App'x 179 (4th Cir. 2020) (same); *United States v. Kernan Hosp.*, 880 F. Supp. 2d 676 (D. Md. 2012) (same).  Here, the factual allegations contained in the SAC leave no room for dispute regarding the FCC's long history of approving arrangements just like King Street's.  Relators point to no allegations in the SAC that salvage an inference of scienter—let alone a "strong inference of fraudulent intent," Opp'n at 34.[9]

---

[9]  Relators cite the *Heath* case for the proposition that "[a] relator has adequately pled scienter when it provides factual specificity concerning the type of fraud, how it was implemented, and a concrete example corroborating the pattern of fraud as alleged."  Opp'n at 34 (citing *United States ex rel. Heath v. AT & T, Inc.*, 791 F.3d 112, 125 (D.C. Cir. 2015)).  That is not an accurate reading of *Heath*, where the key issues before the court were (1) the extent of "specific, affirmative representations" that must be pled in order for Rule 9(b)'s particularity requirement to be met, (2) whether the complaint in the case "fail[ed] to identify the specific

2. *Relators' claims are based on disputed legal judgments which cannot give rise to scienter.*

Relators' claims also should be dismissed because they are based on disputed legal interpretations of the FCC's complex DE regulations. Relators fail to rebut D.C. Circuit authority establishing that a reasonable misinterpretation of an ambiguous regulation cannot support FCA scienter. *See, e.g.*, *United States ex rel. Purcell v. MWI Corp.*, 807 F.3d 281, 287–89 (D.C. Cir. 2015); *United States ex rel. K & R Ltd. P'ship v. Massachusetts Housing Fin. Agency*, 530 F. 3d 980, 983–84 (D.C. Cir. 2008). Relators rely on *United States ex rel. Phalp v. Lincare Holdings, Inc.*, 857 F.3d 1148 (11th Cir. 2017), for the proposition that "scienter is not determined by the ambiguity of a regulation, and can exist even if a defendant's interpretation is reasonable." *Id.* at 1155. But *Phalp* was focused on situations in which a defendant's interpretation is objectively reasonable but the defendant has "actual knowledge of a different authoritative interpretation." *Id.* Here, Relators have pled nothing of this sort.

Relators try to portray the DE regulations as "unambiguous[]," and the *de facto* control test as adequately "explained in decades of FCC precedent." Opp'n at 35. Relators are just wrong to suggest that "decades of FCC precedent" have crystallized and clarified the *de facto* control standard. *See* Opp'n at 35 n.29-30. This would be news to the D.C. Circuit, which has eviscerated that test as a "meaningless recitation" of factors that embodies "the very sort of arbitrariness and capriciousness we are empowered to correct":

> [T]he Commission may find compliance or noncompliance by arbitrarily saying in one case that theoretical access to the facility is sufficient while in another that the purported licensee must have actual control of the facility; that in one case a theoretical, hazy, and intermittent right to participate in daily operations is

---

actors who made the false statements or misrepresentations," and (3) whether the complaint had to plead "representative samples" of claims in order to survive Rule 9(b). *See* 791 F.3d at 124–27. At no point did the court hold, as Relators aver, that scienter is adequately pled simply whenever details of the falsehood are adequately pled.

> sufficient, in another actual control is required; that in one case awareness of policy decisions is sufficient and in another determining and carrying out policy decisions including preparing and filing applications is required; and that in one case being in actual charge of employment supervision and dismissal of personnel is a determinative factor and in another a factor hardly relevant to the *Intermountain* analysis at all.   This is not reasoned decisionmaking[.]

*Tel. & Data Sys., Inc. v. Fed. Comm'cns Comm'n*, 19 F.3d 42, 50 (D.C. Cir. 1994).   The Commission itself has recognized the uncertainty generated by its "totality of the circumstances" approach to *de facto* control.   *See In re Northstar Wireless*, LLC, 30 FCC Rcd. 8887, 8890, 8929 (Aug. 18, 2015).   Indeed, while claiming the rules are perfectly clear, Relators themselves appear to be totally confused by the regulations, given that they claim King Street violated a regulation *not even in force until 2015* (*see* SAC ¶ 97), well after Auction 73 and the close of King Street's restricted DE period.   *See* 47 C.F.R. § 1.2110 (c)(2)(ii)(J).   It is precisely these sorts of thorny technical disputes about murky regulations that courts do not allow *qui tam* relators to exploit through the FCA.

The FCC has *never* stated that the arrangements the King Street Defendants entered into were noncompliant with the regulations.   Relators are free to disagree with the FCC's determinations (though Relators are wrong).   But the FCA is not a vehicle for private litigants to vent their policy disagreements with an agency.   The rule barring imposition of FCA liability based on ambiguous regulations exists precisely for cases like this one, where regulators and courts have recognized the confusion created by the absence of clear rules.   The objective ambiguity of the DE regulations bars Relators' claim on scienter grounds as a matter of law.

### C.   Relators Make Legally Insufficient Allegations of Falsity.

Finally, Relators' defense of their falsity allegations falls flat.   Relators do not dispute the rule that falsity *cannot* be premised on disputed legal judgments.   *Compare* ECF 148-1 at 34-37 *and* Opp'n at 35-36.   Instead, Relators say that their allegation that King Street was not an eligible

DE "rests upon the true facts of the case," and that the King Street Defendants' assertions to the contrary were *factual* misrepresentations. But Relators' entire theory of materiality is that King Street made express certifications of compliance with DE regulations. *See* Opp'n at 30-31. The SAC pleads as the false certification King Street's certifications that "the grant of the application would not cause the applicant to be in violation of any pertinent . . . rules," and that the applicant "is eligible to hold the requested licenses." SAC ¶ 49; *see also* ¶¶ 84, 131. These are not objective *factual* statements—they are subjective certifications of compliance with complex legal rules, and amount to disputed legal judgments that cannot form the basis for FCA falsity. *See, e.g., United states ex rel. McBride v. Halliburton Co.*, 2014 WL 12691854, at *4 (D.D.C. Dec. 10, 2014) (for FCA liability to exist, "the statement or conduct alleged must represent an objective falsehood").

Contrary to Relators' argument, the sufficiency of FCA allegations based on disputed legal judgments is an issue that courts in multiple circuits have addressed at the pleading stage. *See, e.g., United States ex rel. Morton v. A Plus Benefits, Inc*., 139 F. App'x 980 (10th Cir. 2005) (affirming dismissal of FCA case for failure to establish falsity element based on disputed legal judgment); *United States ex rel. Wilson v. Kellogg Brown & Root, Inc*., 525 F.3d 370 (4th Cir. 2008) (affirming district court decision not to grant leave to file third amended complaint where relator failed to establish FCA falsity in a case involving disputed interpretation of contract provisions). Following the same analysis compels dismissal here.

### III. Relators' Reverse False Claims And Conspiracy Arguments Are Meritless.

Relators have no meaningful response for their failure to plead the required elements of a reverse false claims. *See* Opp'n at 40. Relators point to no cites in the SAC where they have pleaded any of the elements of materiality, scienter and falsity. Like other FCA claims, violations of the "reverse false claims" provision require these critical elements. *See United States ex rel.*

*Janssen v. Lawrence Mem'l Hosp.*, 949 F.3d 533, 539 (10th Cir. 2020).  Relators' avoidance of this issue compels dismissal.

Similarly, Relators' rebuttal to Defendants' conspiracy arguments is specious.  Relators state that an FCA conspiracy "exists where there is an underlying violation of the FCA," Opp'n at 38, but this begs the question.  If there is no underlying FCA violation, and there is none here, there can be no claim for conspiracy under the Act.  *See United States ex rel. Kasowitz Benson Torres LLP v. BASF Corp.*, 929 F.3d 721, 728 (D.C. Cir. 2019).  Relators' conspiracy claims fail for the same reason their underlying FCA claims fail.

## CONCLUSION

Relators cannot draw FCA blood from the stone of the failed 2008 Complaint and the other public disclosures in this case.  Nor should this Court permit Relators another attempt to do so because further amendment would be futile.  "[A]ny defects this Court may find" in the SAC, Opp'n at 44, are incurable—because the substance of prior public disclosures, and of the FCC's knowledge of the X, Y, and Z the SAC alleges, are immutable—a fact that Relators' two previous amendments demonstrate.  The government itself long ago decided that no fraud or regulatory violations were committed here.  It is long past time for this legally defective and opportunistic case to be dismissed from the lives of the King Street Defendants with prejudice.

Dated: December 16, 2020

Respectfully submitted,

/s/  *Andrew S. Tulumello*

Andrew S. Tulumello, DC Bar No. 468351
Stuart F. Delery, DC Bar No. 449890
GIBSON, DUNN & CRUTCHER LLP
1050 Connecticut Avenue, N.W.
Washington, DC  20036
Telephone:  202.955.8500
Fax:  202.530.9678
atulumello@gibsondunn.com
sdelery@gibsondunn.com

*Attorneys for Defendants King Street Wireless, L.P., King Street Wireless, Inc., and Allison Cryor DiNardo*

## CERTIFICATE OF SERVICE

I, Andrew S. Tulumello, an attorney for Defendants King Street Wireless, L.P., King Street Wireless, Inc., and Allison Cryor DiNardo, hereby certify that on this 16th day of December, 2020, I filed and therefore caused the foregoing document and its attachments to be served via the CM/ECF system in the United States District Court for the District of Columbia on all parties registered for CM/ECF in the above-captioned matter.  I also served the following by the following means:

Via Email

Elspeth A. England, Trial Attorney
United States Department of Justice
Civil Division
Commercial Litigation Branch, Fraud Section
Elspeth.A.England@usdoj.gov

*Counsel for the United States*

/s/ *Andrew S. Tulumello*
Andrew S. Tulumello

27